```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
 2                     COLUMBIA DIVISION

 3    UNITED STATES OF AMERICA,    )   CR. NO. 3:25-CR-778
                                   )   COLUMBIA, SC
 4                                 )   JUNE 12, 2025
                                   )
 5         VERSUS                  )
                                   )
 6    ROBERT JOHN MAY, III,        )
      A/K/A JOEBIDENNNN69          )
 7    A/K/A ERIC RENTLING,         )
                                   )
 8              DEFENDANT.         )
      _____)

 9
               BEFORE THE HONORABLE SHIVA V. HODGES
10              UNITED STATES MAGISTRATE JUDGE
                  ARRAIGNMENT/DETENTION HEARING
11
      APPEARANCES:
12
      FOR THE GOVERNMENT:     JONATHAN SCOTT MATTHEWS, AUSA
13                            LAMAR FYALL, AUSA
                              UNITED STATES ATTORNEY'S OFFICE
14                            1441 MAIN STREET
                              SUITE 500
15                            COLUMBIA, SC 29201

16    FOR THE DEFENDANT:      DAYNE CHRISTIAN PHILLIPS, ESQ.
                              PRICE BENOWITZ LLP
17                            1614 TAYLOR STREET
                              SUITE D
18                            COLUMBIA, SC 29201

19    COURT REPORTER:         DEBRA R. BULL, RPR, CRR
                              UNITED STATES COURT REPORTER
20                            315 SOUTH MCDUFFIE STREET
                              ANDERSON, SC  29624
21

22
               STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
23                  *** *** *** *** ***

24

25
```

1                              INDEX

2    BRITTON BAKER LORENZO

3        Direct exam by Mr. Matthews              11

4        Cross exam by Mr. Phillips               43

5        Redirect exam by Mr. Matthews            56

6        Recross exam by Mr. Phillips             62

7    Argument by Mr. Matthews                     65

8    Argument by Mr. Phillips                     71

9    Argument in reply by Mr. Matthews            82

10   Court's ruling                               83

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Whereupon, the hearing commenced at 10:44 a.m.)

2      THE COURT:   Please be seated.   Good morning to

3  everyone.   Got a couple of matters on the agenda for

4  this morning.   The first is the case of United States

5  of America  -- oh, we don't have our defendants here.

6  Are our defendants present?  Right here.   Do we have

7  Ms. Skuritch (phonetic)?  She hasn't been brought up

8  yet?

9      UNKNOWN SPEAKER:  Judge,  that is mine, it is at

10 eleven.  They say she is still on her way from Barnwell.

11     THE COURT:   All right.   The first case on the

12 agenda is the case of United States of America versus

13 Robert John May, III, criminal case number 3:25-778.  We

14 are scheduled for an arraignment in Mr. May's case.

15     Mr. May,  would you mind standing up for me,

16 sir?  You are here for an arraignment.   The purpose of

17 this hearing is to advise you of the charges against

18 you,  to advise you of your rights, and to set the

19 conditions of your release,  if any.   This is not a

20 trial.   You have got the right to remain silent, and

21 anything that you say can be used against you.   Do you

22 understand those rights I just reviewed?

23     THE DEFENDANT:   Yes, ma'am.

24     THE COURT:   You have also got the right to have

25 counsel represent you at every critical stage of the

proceeding, and if you can't afford an attorney, I can
appoint an attorney for you.

Counsel, if you would please state your name
for the record.

MR. PHILLIPS: Thank you, Your Honor, Dayne
Phillips, D-a-y-n-e, Phillips with two Ls, and I am
appearing for a special appearance today.

THE COURT: How long will you need to determine
whether you will be retained in this case?

MR. PHILLIPS: If I could have at least a week,
Your Honor, just to make sure.

THE COURT: All right. What I am going to do is
schedule a status of counsel hearing for two weeks out
to give you that time to figure out whether you are
going to be entering a notice of general appearance in
this case. So, we will do that -- let's see -- we
have got Court on the 24th, right? Well, let's
schedule it for almost two weeks out, Tuesday, June
24th, at ten a.m. What we will do is schedule s
status of counsel hearing. Mr. Phillips, if in the
interim you determine that you will be retained and will
enter a notice of general appearance converting your
special to a general appearance, then we will cancel
that hearing.

Mr. May, what that means is that if you don't

1    hire Mr. Phillips to represent you in this case and you

2    don't hire somebody else to represent you in this case,

3    then you are going to have to talk to me about what your

4    efforts are in finding counsel to represent you.    And

5    if you can't afford an attorney, then I will have you

6    complete a financial affidavit to see whether you would

7    be entitled to the appointment of counsel.

8            THE DEFENDANT:    Yes, ma'am.

9            THE COURT:    So,  hopefully,  everything will work

10   out, we won't have to have those hearings, and

11   Mr. Phillips, if you choose,  will continue to represent

12   you in this case.

13           All right.    Very well.    You have also got the

14   right to have me read formally out loud the Indictment

15   in this case.    If you have already reviewed the

16   Indictment -- have you had an opportunity to review the

17   Indictment?

18           THE DEFENDANT:    Yes,  Your Honor.

19           THE COURT:    You can waive me reading it formally

20   out loud if you understand --

21           THE DEFENDANT:    Yes, ma'am.

22           THE COURT:    -- the ten Counts against you.

23           THE DEFENDANT:    Yes, ma'am.

24           THE COURT:    Would you like me to waive reading it

25   formally?

1       THE DEFENDANT:   I would,  Your Honor,  yes,

2  ma'am.

3       THE COURT:   All right.   Very well.   So, you

4  understand the ten Counts against you and the maximum

5  penalties you face if convicted?

6       THE DEFENDANT:   Yes, ma'am.

7       THE COURT:   If you understand those charges

8  against you, I am happy to accept your plea of not

9  guilty, that is the only plea I can take from you today.

10  Mr. Phillips,  if you would,  please,  retrieve this

11  plea sheet for Mr. May to sign indicating his

12  acknowledgment of a receipt of the copy of the

13  Indictment and his desire to enter a plea of not guilty.

14  Madame Clerk,  if you would,  please,  publish the plea.

15       THE CLERK:   May it please the Court.   In the case

16  of the United States of America versus Robert John May,

17  III, criminal case 3:25-778,  the Defendant,  Robert

18  John May,  III, acknowledges receipt of a copy of the

19  Indictment and after arraignment pleads not guilty in

20  open court.   Signed by the Defendant,  June 12th, 2024.

21       THE COURT:   Very well.   Your plea of not guilty

22  has been entered of record.

23       What is the Government's position on the matter

24  of detention or bond?

25       MR. MATTHEWS:   Thank you,  Your Honor,  may it

1       please the Court.  The Government moves for detention.

2       As Your Honor  -- I don't know if Mr. Phillips intends

3       to ask for that hearing today,  I will note that

4       pretrial services had a very limited opportunity to meet

5       with Mr. May and they have not made a recommendation.

6       Having said that,  the Government is prepared to

7       proceed.  We have provided a pretrial brief or a brief

8       in support of detention to Your Honor, we e-mailed

9       approximately an hour ago, and the Government is ready

10       to proceed today if Mr. May so chooses or we can

11       reschedule based on Your Honor's preference.

12            THE COURT:  Very well.

13         Mr. May,  the Government has moved for your

14       detention pending the resolution of the charges against

15       you.  Before that can happen,  you are entitled to a

16       detention hearing, at which time the Court decides

17       whether you are a risk of flight, or a danger to the

18       community, or whether there are bond conditions that can

19       guard against those risks.  You have the right to have

20       your detention hearing once,  so you want to make sure

21       you are in the best position to move forward with it as

22       possible.  The Government has the right to ask for up

23       to three days to prepare for the hearing,  you have a

24       right to ask for up to five days to prepare for the

25       hearing.

1          Alternatively, you can waive your right to have

2     your detention hearing scheduled with leave to come back

3     and ask for it to be scheduled at a later time.  You

4     get one bite at the detention apple, so you want to make

5     sure you are in the best position to move forward with

6     it as possible.  If you were to elect to have your

7     detention hearing now, and if I were to rule against

8     you, you could not come back down the road and say,

9     well, there are these other witnesses or this other

10    information that I wish to have presented and I would

11    like to come back to the Court.  I will rule once and

12    then you are sort of stuck with the ruling.  So, you

13    can elect to have your detention hearing now or later

14    and meaning scheduled for later or waived to come back

15    and ask for it to be scheduled later.

16          Mr. Phillips, have y'all had an opportunity to

17    review the detention hearing rights and would you like

18    another opportunity to speak with Mr. May?

19          MR. PHILLIPS:  Could I have one more opportunity,

20    Your Honor?

21          THE COURT:  Sure.

22          MR. PHILLIPS:  Your Honor, he is ready.

23          THE COURT:  Ready to proceed with a detention

24    hearing today?

25          MR. PHILLIPS:  Yes, Your Honor.

THE COURT:  Let me make sure we are all on the same page.  All right.  Y'all understand, I believe this is a  -- there is a presumption that arises under Title 18, United States Code, Section 3142(e)(3) because it is an offense involving a minor victim under the relevant statute for distribution of child pornography; is that correct,  Mr.  -- is that correct with the Government?

MR. MATTHEWS:  Yes,  Your Honor,  it is a presumption case.

THE COURT:  Okay.  Do you agree with that, Mr. Phillips?

MR. PHILLIPS:  As far as the statute with presumption,  yes,  Your Honor,  we do believe that we can meet the burden and that there are conditions that can reasonably assure his appearance in court.

THE COURT:  Okay.  Very well.  The applicable factors are contained in Title 18 of the United States Code,  Section 3142(g), and those are the ones that I will be applying here today.  If you would please call your first witness.

MR. MATTHEWS:  Thank you,  Your Honor,  may it please the Court.  The Government calls Special Agent Britton Lorenzen with the Department of Homeland Security --  Homeland Security's Investigation office.

1       Your Honor,  pursuant to the Government's obligations

2       under Rule 26.2 and our obligations under the Jencks

3       Acts, we have a number of statements made by

4       Ms. Lorenzen, and they are voluminous,  I am going to

5       hand those to Mr. Phillips for his aid regarding the

6       topics to which she will be testifying to.  And,  Your

7       Honor,  if Your Honor requires or if Pretrial Services

8       requires,  we have submitted a brief in support of the

9       Government's motion.

10              THE COURT:   I read it.

11              MR. MATTHEWS:  Thank you,  Your Honor.

12              THE COURT:   That is why I was delayed,  I

13      apologize for the delay,  but I was busy reading your

14      22-page brief that you submitted.

15              MR. MATTHEWS:  Thank you,  Your Honor.

16              THE COURT:   And for y'all's information,  Mr. May

17      was interviewed by the Pretrial Services office this

18      morning by Pretrial Services and I received an oral

19      report from the Pretrial Services Officer and a written

20      report has not been prepared,  but I have received that

21      information,  as well.  Agent Lorenzen, if you will

22      please come forward to be sworn.

23              THE CLERK:  Please raise your right hand, state

24      your name for the record, spelling your last name.

25              THE WITNESS:  Special Agent Britton Baker

1    Lorenzen, L-o-r-e-n-z-e-n.

2         BRITTON BAKER LORENZEN, having been first duly

3    sworn, testified as follows:

4         THE COURT:    Mr. Matthews.

5         MR. MATTHEWS:    Thank you,  Your Honor.

6                        DIRECT EXAM

7    BY MR. MATTHEWS:

8    Q.      Special Agent Lorenzen,  could you please

9    introduce yourself to the Court and explain where you

10   are employed,  how long you have been doing that,  and

11   what some of your job duties entail?

12   A.      I am a Special Agent with the Department of

13   Homeland Security.   I previously was employed by the

14   Spartanburg County Sheriff's office from 2000 to 2004.

15   In 2004 I became employed with the U.S. Secret Service.

16   In 2009 I transferred over to Homeland Security

17   Investigations.

18   Q.      Thank you.

19           Tell us,  what are your primary areas of

20   responsibility as a Special Agent at Homeland Security?

21   A.      I am a member of the Internet Crimes Against

22   Children's Task Force and I investigate crimes against

23   children,  specifically child exploitation.

24   Q.      Okay.   And child exploitation also kind of more

25   generally falls under a term child pornography or CSAM,

1    can you please tell the Court what that is?

2    A.        Yes.     CSAM is child sexual assault material and

3    child pornography is an individual depiction of a minor

4    under the age of 18 in a sexual exploitation manner.

5    Q.        Okay.    And tell us,  what is the National Center

6    for Missing and Exploited Children?

7    A.        The National Center for Missing and Exploited

8    Children is also known as NCMEC,  it is a private

9    nonprofit corporation whose mission is to help find

10   missing children,  reduce the sexual exploitation of

11   children,  and prevent child victimization.

12   Q.        And as part of their roles and their functions as

13   an organization,  do they produce something called

14   CyberTip?

15   A.        Yes.

16   Q.        Tell us what a CyberTip is.

17   A.        CyberTip is a tip that NCMEC sends to the local

18   ICAC here in the region.

19   Q.        When you say "ICAC," can you please,  I think you

20   laid out what it was,  but please tell us what you are

21   referring to.

22   A.        Internet Crimes Against Children is what we refer

23   to as ICAC.   A CyberTip is issued by NCMEC from the

24   information they received from an internet service

25   provider,  in this case this would be from Kik, which is

1      a peer-to-peer application that was used to exchange

2      child pornography.

3  Q.      Okay.   So,  I will ask you about what Kik is in a

4      minute,  but the ICAC as you described it,  is the  --

5      based out of the South Carolina Attorney General's

6      office here in South Carolina?

7  A.      Yes.

8  Q.      Okay.   And then once they receive a CyberTip,

9      what do they do with it?

10 A.      They send a CyberTip to the ICAC affiliate in the

11     area that the CyberTip has been geolocated to by NCMEC.

12 Q.      And they do that based on an internet protocol or

13     IP address?

14 A.      Yes.

15 Q.      What is an  IP address?

16 A.      An IP address is a digital address that is

17     assigned by an ISP, internet service provider, to

18     distinguish a specific location where you are able to

19     access the internet for your Wi-Fi.

20 Q.      Okay.   Would that apply to like a home address or

21     Wi-Fi network and also apply to a phone or other mobile

22     device?

23 A.      Yes.

24 Q.      Okay.   Tell us what this application is you

25     mentioned,  "Kik,"  what is that?

1    A.       It is a mobile application used to communicate and

2        exchange different types of files with people using the

3        internet.

4    Q.       Okay.   So is that something you use on your

5        mobile device?

6    A.       Yes.

7    Q.       So,  it is a file, a peer-to-peer file sharing

8        system?

9    A.       Yes.

10   Q.       You say they were based out of Los Angeles,

11       California?

12   A.       Yes.

13   Q.       Now,  if somebody were to send child pornography

14       over the internet or via a Kik app,  do CyberTips

15       sometimes get created to flag that distribution that are

16       sent out by Kik?

17   A.       Yes.

18   Q.       Now,  I want to direct your attention to a

19       particular CyberTip from Kik that occurred or was sent

20       on May 27th,  2024.   Can you tell us a little bit about

21       that CyberTip and how it came to law enforcement's

22       attention?

23   A.       NCMEC indicated from the CyberTip that Kik user

24       joebidennnn69,  joebidennnn spelled with four Ns,

25       distributed approximately 50 files containing child

1    pornography on March 31st.

2  Q.        Of which year?

3  A.        2024.

4  Q.        Okay.  You said joebidennnn69 with four Ns, that

5     is joebidennnn all one word as the former president

6     spelled his name and then three additional Ns --

7  A.        Yes.

8  Q.        -- on top of that and then 69?

9  A.        Yes.

10  Q.        Okay.  And so that was sent out on March 31st,

11     2024.  Was there a particular IP address associated with

12     that CyberTip?

13  A.        Yes.  The IP address associated with the

14     distribution of the child pornography was 16223418843,

15     which is registered to an AT&T account.

16  Q.        Out of which area?

17  A.        West Columbia, South Carolina.

18  Q.        And then once the South Carolina Attorney

19     General's office gets that, where do they send it or

20     what do they do with it?

21  A.        They sent the CyberTip to the Lexington County

22     Sheriff's office to their ICAC affiliate.

23  Q.        Because West Columbia is in Lexington County?

24  A.        Correct.

25  Q.        Now, what does Lexington County Sheriff's office

1    do once they receive it?

2    A.      Lexington County Sheriff's office submitted a

3    search warrant to AT&T as well as Kik and Google.

4    Q.      All right.   Tell me about the AT&T search

5    warrant,  where or what did that reveal and was it

6    complied with?

7    A.      The search warrant returned user who downloaded

8    the child pornography was joebidennnn with the four Ns,

9    69,  which was registered  -- registered account on

10   March 30th using a Samsung model SM-G781U1 Android

11   smartphone and provided the email address

12   joehoe1238@gmail.com (sic) as the registered Gmail

13   address.

14   Q.      Okay.   Well,  I think you answered regarding what

15   the Kik search warrant revealed,  tell me about the AT&T

16   search warrant,  specifically about that 162 IP address?

17   A.      The 162 address,  the billing party for that AT&T

18   internet was Robert May at his home address  -- his home

19   address in West Columbia 338 Lake Francis Drive, West

20   Columbia,  South Carolina.

21   Q.      So the billing party associated with that IP

22   address used to send the child pornography is registered

23   to Robert John May, III?

24   A.      Yes.

25   Q.      Now,  tell us,  you were telling us about the

1    results of the Kik search warrant,  if you could,

2    please, recap those results.

3  A.        I apologize for that.

4         The Kik return user registered account for the

5    joebidennnn69 was registered on March 30th,  2024, using

6    a Samsung SM-G781U1 Android smartphone, provided the

7    unconfirmed email address of joehoe1238@gmail.com.

8  Q.        Was that joehoe12368?

9  A.        12368@gmail.com,  yes.

10 Q.        And so it gives you that or provides that

11   information, says it was used,  did it say which  IP

12   address was used to register that account?

13 A.        Yes,  it was the 16223418843,  AT&T IP address

14   registered to Robert May at 338 Lake Francis Drive,

15   West Columbia,  South Carolina.

16 Q.        Using a very particular phone?

17 A.        Yes,  correct.

18 Q.        Now that you have determined that,  did you then

19   -- tell us about -- did you take any steps to confirm

20   whether Robert John May, III, actually lived at that 338

21   Lake Francis Drive address?

22 A.        Yes.   We conducted physical surveillance,

23   determined two vehicles parked in the driveway were

24   registered to Robert May and Beth Slawson, who is his

25   wife.

1    Q.         Okay.    And did you also check property records to

2         ensure they lived there?

3    A.         Yes.   Yes.    Property records indicated that they

4         resided at that residence,  as well as the South

5         Carolina Department of Motor Vehicle records indicated

6         that Beth Slawson and Robert May lived at that address.

7    Q.         And using that information,  did you then obtain a

8         federal search warrant for that premise at 338 Lake

9         Francis Drive?

10   A.         Yes.

11   Q.         Tell us about when you executed the search

12        warrant,  were you able to locate any phones that

13        matched that Samsung SM-G781U1 description?

14   A.         Yes.    Located two cell phones at the residence in

15        the master bedroom.

16   Q.         Tell us about where you found those.

17   A.         The first phone we found was in the master bedroom

18        on the bedside table of the master bed,  the side

19        closest to the bathroom next to a CPAP machine.    The

20        second one was found on the other side of the bed on the

21        nightstand and it was  -- that was Ms. Slawson's side of

22        the bed; the CPAP side of the machine belonged to

23        Mr. May.

24   Q.         Did she acknowledge that was her phone on her side

25        of the bed as you described it?

1    A.       Yes.

2    Q.       Did Mr. May in turn acknowledge in writing that

3         the phone next to the CPAP machine was his phone?

4    A.       Yes.

5    Q.       Okay.   And he did that in order for you to get a

6         number out of there for him?

7    A.       Correct.

8    Q.       Now,  tell us,  did you find any other electronics

9         there at the scene?

10   A.       Yes.   We located and seized roughly 30 other

11        devices and storage media.

12   Q.       Tell us,  did Mr. May -- did you confirm whether

13        he had a Wi-Fi address or a Wi-Fi network at his house?

14   A.       Yes.

15   Q.       Okay.   And was that Wi-Fi network password

16        protected?

17   A.       It was.

18   Q.       Meaning that somebody would need to have the

19        password to the Wi-Fi network in order to log onto it?

20   A.       Correct.

21   Q.       Now,  did you subsequently get a -- obtain a

22        federal search warrant for Mr. May's phone,

23        Ms. Lawson's phone, and these other electronic devices?

24   A.       Yes.

25   Q.       Tell us,  did you find anything in Homeland

1    Security's examination of the phone,  Mr. May's phone

2    that is,  that would indicate the presence of a Kik

3    application or specifically the user joebidennnn with

4    four Ns 69?

5  A.        Yes,  we were able to determine that the Kik

6    application had been deleted off of his phone on April

7    4th,  2024, along with several other applications,  as

8    well as a user dictionary for the SM phone, which

9    indicated commonly used wording and phrases such as

10   joebidennnn with four Ns as well as joehoe Gmail

11   account,  12368 Gmail -- at Gmail were also located on

12   the user dictionary of his cellphone.

13  Q.        Did you find any other applications on the phone

14   other than the Kik?

15  A.        Yes.   We were able to determine that the

16   application Telegram,  Mega and Loki or Sessions were

17   also on the phone and deleted the same day around the

18   same time that Kik was deleted.

19  Q.        So,  all of these apps were deleted at the same

20   time on April 4th, 2024?

21  A.        Yes,  within 20 seconds of one another.

22  Q.        And you briefly described the user dictionary,

23   can you please explain to the Court what that is

24   exactly?

25  A.        S user dictionary is found on the cellphone -- in

1    the structure files of a cellphone and it indicates,

2    saves commonly used words that are typed into the

3    cellphone and autopopulates throughout the time when you

4    are text messaging and maybe using your emails,  as

5    well.   But the phone is able to save those commonly

6    used phrases and words so you don't have to completely

7    type them in every time,  it autopopulates.

8  Q.       So, if you use a unique phrase like a nickname for

9    your spouse or your child, that would autofill, in other

10    words?

11  A.       Yes.

12  Q.       Okay.   And those specific terms that were found

13    in the user dictionary were joebidennnn with four Ns and

14    joehoe12368@gmail.com?

15  A.       Correct.

16  Q.       Now,  remind the Court again,  if you would,

17    please, what are the significance of those terms?

18  A.       Joebidennnn69 was the account name for the Kik

19    account that was distributing child pornography and the

20    email joehoe12368@gmail.com was the email that was used

21    to register the same Kik account.

22  Q.       Okay.   Now,  in this examination of Mr. May's

23    phone,  did you find, as of today's date, any child

24    pornography files on that phone?

25  A.       Not on the device itself.

1    Q.       Okay.   But to be clear,  you were sent child

2        pornography files by Kik meaning that those files were

3        belonging to or associated with the joebidennnn account?

4    A.       Yes.   Upon the service of the search warrant to

5        Kik,  we were able to determine there were 220 unique

6        files containing child pornography in that joebidennnn69

7        account.

8    Q.       And you mentioned that there were sometimes

9        duplicate files,  the total number of files was

10       somewhere around 260 or so?

11   A.       Two hundred sixty-sive (265).  We were able to

12       determine some of those files were duplicates,  so we

13       determined that 220 unique files were child pornography.

14   Q.       Now,  did you conduct any other analysis of the

15       phone to reveal possibly how many times that phone had

16       connected to the Kik application or that account rather

17       had connected to the Kik application?

18   A.       Yes,  we were able to determine that the account

19       was used over 1,100 times.

20   Q.       And that is from March 30th,  2024 until April

21       4th,  2024?

22   A.       Yes, a five-day period.

23   Q.       And does Kik provide chats or can you  ---can Kik

24       users communicate with each other back and forth?

25   A.       Yes.

1    Q.      And did they, in response to the search warrant,

2           provide chats between joebidennnn and other users?

3    A.      Yes,  they did.

4    Q.      And we will get to this later,  but are some of

5           those or most of those chats explicit in nature

6           regarding CSAM material?

7    A.      Yes.

8    Q.      Now,  you also  -- you said that approximately

9           1,100 messages were sent,  were you able to break that

10          down to figure out how many times Kik was accessed at

11          the home Wi-Fi network versus Mr. May's mobile Wi-Fi or

12          any other source?

13   A.      Bear with me, I would have to look further in my

14          records, Mr. Matthews.

15   Q.      Okay.  But you were able to come up with a

16          breakdown with that?

17   A.      Yes.

18   Q.      That is included in the Government's motion or the

19          Government's brief in support of its motion here today

20          for Her Honor's consideration?

21   A.      Yes.

22   Q.      Tell us about Wi-Fi networks on phones.   You

23          mentioned earlier that -- or rather IP addresses on

24          phones,  did you attempt to verify through legal

25          process, including a federal search warrant, to Verizon

1    what Mr. May's particular phone,  what IP addresses that

2    phone used?

3  A.       Yes.   We were able to determine there were five

4    specific IP addresses used on Mr. May's cellphone during

5    that time period.

6  Q.       Okay.   And so if that IP address is used or

7    accessed, that means that Mr. May's phone and only

8    Mr. May's phone was accessing the internet at that time?

9  A.       Correct.

10  Q.       And was Mr. May's phone password protected?

11  A.       Yes.

12  Q.       Okay.   So that means somebody would have to have

13    a password to get into it?

14  A.       Correct.

15  Q.       Let's talk a bit about your search of Mr. May's

16    wife's cellphone.   Were you able to search that?

17  A.       Yes,  we were.

18  Q.       Did you find any indication of any Kik application

19    or anything on her phone to indicate she was involved in

20    the trade or possession of child pornography?

21  A.       No,  we did not find anything of that nature on

22    her phone.

23  Q.       Tell us who is, as alleged in the Indictment,

24    Eric Rentling?

25  A.       Eric Rentling is an alias that we were able to

1    determine belonged to Robert May.   He used this alias

2    to chat with people on Facebook Messenger and to make

3    travel arrangements and use the email Eric Rentling at

4    Gmail dot com to sign up for PayPal account and various

5    different applications to include Telegram and Mega.

6  Q.      So,  he used this Eric Rentling persona to

7    register the Mega account that was on his phone and also

8    used it for PayPal?

9  A.      Yes.

10  Q.      And then did he also have an Eric Rentling Gmail

11    account or Facebook account?

12  A.      Yes.   That Eric Rentling@gmail.com was found in

13    the artifacts of the cellphone,  as well.   Along with

14    his RobertJohnMayIII@Gmail and

15    IvoryTuskConsulting@Gmail.com.

16  Q.      Okay.   Now,  you said travel arrangements,  did

17    you  -- were you able to determine whether Mr. May or

18    Eric Rentling travelled out of the country any time in

19    the period of 2023 and 2024?

20  A.      Yes.

21  Q.      Tell us about where he travelled to.

22  A.      We had records indicating that he travelled to

23    Bogota, I Colombia as well as Medellin, Colombia.

24  Q.      And you were able to  -- you searched all of the

25    devices that you found,  did you locate anything of

1    interest?  Your investigation on his laptop or phone

2    regarding his trips to the nation of Colombia, not the

3    city.

4  A.      Yes,  we were  -- we located nine separate videos

5    of Robert May having sexual relationships with ladies

6    who appeared to be from Colombia who spoke Spanish and

7    who he was paying pesos to.

8  Q.      Does he pay those ladies on camera?

9  A.      Yes.

10 Q.      And we say "ladies,"  you have done this

11   investigating of child pornography for 20 years and had

12   a chance to view the age of victims,  just tell us any

13   of it that stuck out about these young women in terms of

14   their anatomy or physiology?

15 A.      They looked fairly young.   I personally think

16   that they could be under the age of 18 or right at 18.

17   We were not able to identify them;  however,  the  --

18   their anatomy was smaller than a fully developed woman.

19 Q.      By that you are referring to breasts?

20 A.      Correct.

21 Q.      Now,  did Homeland Security make attempts in trips

22   by other officers to Medellin and the Medellin region to

23   find these young ladies and figure out who they were?

24 A.      Yes,  HSI -- two different offices from HSI

25   travelled to Medellin, Columbia for additional

1    investigation on an unrelated investigation, but also

2    spoke with all of their victims and tried to help

3    identify our victims or potential victims, excuse me.

4  Q.    I'm sorry to cut you off.  As of today's date,

5    have you been able to identify these victims or these

6    young ladies or verify whether they were under the age

7    of 18 or not?

8  A.    No, not at this time.

9  Q.    Now, you said there were messages sent from the

10   Eric Rentling Facebook account to these young ladies,

11   what was  -- are they in Spanish?

12 A.    Yes, they are in Spanish.

13 Q.    What are the general topics of conversation?

14 A.    The general topic was a meeting and asking about

15   payment.  Certain hours they were able to videotape

16   their meetings and their dates.

17 Q.    Okay.  And you viewed those videos, you said

18   there were nine videos of three different young ladies?

19 A.    Yes.

20 Q.    And were you able to verify through Customs and

21   Border Protection records if -- and TSA records if

22   Mr. May had, in fact, flown into Bogota, Colombia during

23   the dates discussed in the messages?

24 A.    Yes.

25 Q.    And he did in fact fly there?

1    A.        Yes,  he did.

2    Q.        So that is evidence you consider that Eric

3         Rentling is Robert John May, III?

4    A.        Correct.    Facebook profile for Eric Rentling also

5         resembles Mr. May from the back,  the back side of his

6         head,  his back and his hands.

7    Q.        All right.    Now,  I am going to get the -- Judge

8         Hodges can consider a number of factors in determining

9         whether Mr. May should be detained pending trial.    One

10        of those is the nature and circumstances of the offenses

11        charged,  including whether these offenses involve minor

12        victims.    Now,  I am not  -- these are graphic videos

13        that are alleged in the Indictment,  is that safe to

14        say?

15   A.        Yes,  they are very graphic.

16   Q.        And is it also fair to say they involve extremely

17        young children, including toddlers?

18   A.        Yes.

19   Q.        Okay.    Now,  I am going to ask you to describe

20        some of the Counts,  just general descriptions, and I am

21        going to direct you to them just so the Court has an

22        idea of the content being sent from this joebidennnn

23        account.    So,  I am going to direct your attention to

24        Count 2, and, first of all, I will ask, these ten Counts

25        alleged in the Indictment,  what IP addresses are these

1        videos sent from?

2   A.        They are sent from 162 residential address,  the

3        residence belonging to Robert May, as well as several

4        174 IP addresses that belong to Verizon wireless, which

5        is also associated with Mr. May's cellphone.

6   Q.        And specifically, so they are sent from either

7        home address, one of the addresses associated with this

8        phone, and there are ten to consider -- or ten that have

9        been now attributable and an Indictment returned on,  in

10       your investigation, were there more than ten

11       distributions?

12  A.        Yes,  there were over 400 distributions.

13  Q.        In a five-day period?

14  A.        A five-day period.

15  Q.        Now,  again,  if you would, in general terms,

16       describe so the Court has an idea of the content of

17       these videos,  Count number 2,  please?

18  A.        The video is 14 seconds in length and depicts an

19       adult male penetrating the vagina of a toddler female.

20       The toddler female is wincing, and has tears in her

21       eyes, and is clearly in pain.

22  Q.        Okay.   And you have viewed that video?

23  A.        Yes.

24  Q.        Okay.   Now,  I am going to direct your attention

25       to Count 4,  as well.   Now is that a compilation video

1    or collection of clips?

2    A.      Yes.

3    Q.      Okay.   And tell us, generally, and please don't

4    describe all nine clips,  but, generally, what do those

5    nine clips depict?

6    A.      The nine clips depict various minor females

7    performing oral sex on various adult men's penises.

8    Q.      And is there a message at the end of that video?

9    A.      Yes,  the message reads "greets fly out to all the

10   little cocksuckers."

11   Q.      And going through  -- I think you said there were

12   examples of where his phone IP address had sent videos

13   and his home address,  are counts 1 and 8 examples of

14   videos sent both on his phone and his residential IP

15   address?

16   A.      Yes.

17   Q.      All right.   Now,  I mentioned chats earlier

18   because one of the elements of this offense is that a

19   defendant knowingly sends child pornography and I

20   referenced whether these were sexually explicit in

21   nature.   Have you considered a representative chat for

22   the Court's consideration here today regarding the

23   content that these users were discussing?

24   A.      Yes.

25   Q.      And is this particular example relevant to Count

1    10 of the Indictment,  the user that was sent to?

2  A.      Yes.

3  Q.      Okay.  Can you please begin and notate who is

4    reading what or who is saying -- typing what and tell us

5    about the conversation between joebidennnn and another

6    Kik user on or about April 4th, 2024.

7  A.      On April 4th:

8          Joebidennnn asks:  Send the good

9          stuff.  Mom daughter, mom son

10         fucking, and vids in English.   Or

11         girl boy fucking."

12         PCJames99:  "Okay."

13         Joebidennnn69:  "What is your

14         preference?"

15         PCJames99:  "Father daughter.

16         You?"

17         Joebidennnn69:  "Father mom

18         daughter."

19         PCJames:   "I don't see many father

20         mother daughter."

21         PCJames again.   "Is there a good

22         amount going around?"

23         Joebidennnn69:   "No."

24         PCJames99:   "Actually I might have

25         one,  let me look."

1          PCJames again:    "Do you have any

2          age 6 to 12?"

3          Joebidennnn69:    "Yeah.   Isn't that

4          what I have sent?"

5     Q.    Okay.   And generally speaking,  are the

6     conversations between joebidennnn69 and the other Kik

7     users alleged in the Indictment all various forms of

8     discussions of child pornography and CSAM?

9     A.    Yes.

10    Q.    Do they use slang terms involving CSAM?

11    A.    They do.   They ask for cheese pizza.

12    Q.    And that means?

13    A.    Child pornography.

14    Q.    Child pornography in your training and experience?

15    A.    Correct.

16    Q.    And some of them are more explicit than that?

17    A.    Correct.

18    Q.    Now, this is a difficult question to ask,  but in

19    that chat you just read us there is reference to "father

20    mom daughter," things of that nature,  there are other

21    references throughout chats to the concept of "bad dads"

22    or "bad moms."

23    A.    Yes.

24    Q.    What is that --

25    A.    That --

1   Q.      -- in your training and experience in?

2   A.      In my training and experience, "bad dads, bad

3       moms" are moms and fathers having sex with their -- and

4       abusing their children or children they have access to.

5   Q.      In your investigation, did you determine whether

6       Mr. May has children?

7   A.      Yes.

8   Q.      Are they both under the age of ten?

9   A.      Yes.

10  Q.      And is this the same category that joebidennnn69

11      expressed an interest in in receiving videos?

12  A.      Yes.

13  Q.      In your review of these materials, these videos,

14      do these videos depict toddlers and infant children

15      being abused?

16  A.      Yes.

17  Q.      One of the factors Her Honor can consider is the

18      weight of the evidence here. Did you -- we have

19      already kind of gone over the IP address and that

20      evidence and the presence of the deleted apps, the user

21      dictionary to indicate that joebidennnn is in fact R. J.

22      -- Robert John May, III, did you review his cellphone

23      to determine if any other communications were being made

24      that would indicate who possessed the phone at the time

25      that the CSAM videos were sent?

1   A.      Yes.   Some of the times these child pornography

2      videos were being distributed he was on the phone,  on

3      his cellphone talking with his wife or called her right

4      before or after -- after he distributed the child porn.

5      Also was on the phone with some colleagues and also some

6      of his clients from his personal business,  his private

7      business.

8   Q.      Okay.   Well,  please touch on that for a minute.

9      Mr. May is a Legislator in the South Carolina House of

10     Representatives; is that correct?

11  A.      Yes.

12  Q.      Okay.  And is he  -- you said he runs a business,

13     tell us about his business.

14  A.      He runs a business by the name of Ivory Tusk

15     Consultant.   He consults on different campaigns around

16     the South Carolina GOP.

17  Q.      And speaking of that,  is there business related

18     to the  -- or communications and actions taken on the

19     phone related to his business to Ivory Tusk Consulting

20     regarding South Carolina either elected legislators or

21     candidates for elected office?

22  A.      Yes.

23  Q.      Such as an example,  any particular  -- well,  you

24     don't have to say which candidates he was working on

25     behalf of,  but just generally things related to

1    campaign literature and things of that nature?

2    A.    Yes.  And conducting Facebook searches using his

3    Eric Rentling account he was searching for different

4    clients on his Facebook.

5    Q.    And also legislation and other matters that were

6    currently being considered at the same time?

7    A.    Yes.

8    Q.    And those occur either simultaneously with or

9    around the same time that CSAM videos are sent?

10   A.    Correct.

11   Q.    Using either the home Wi-Fi address or his phone's

12   Wi-Fi address?

13   A.    Correct.

14   Q.    All right.  Under that joebidennnn account.

15         Let's talk about personal texts and direct your

16   attention to texts that were sent April 1st, 2024,

17   regarding a discussion of amateurs and what appeared to

18   be a personal text with a contact in his phone, can you

19   tell us about that?

20   A.    Under the April 1st Kik chat?

21   Q.    Well, it was a chat regarding maybe the Easter

22   holiday at the same time?

23   A.    Oh, yes, there was -- he sent a text message to

24   one of his -- the chat begins with -- he is on his Kik

25   account and he is talking about he asked, "How amateur

1    is amateur question mark."   And then within a few

2    seconds he responds with, "Excellent," on the text

3    message using his cellphone.   And then another second

4    later he sends a text message that says, "Hey, man,

5    Happy Easter."   Within two minutes he sends a child

6    pornography file video using his Kik account.

7  Q.      These dates that are alleged in the Indictment

8    around the period of March 30th, 2024 to April 4th,

9    2024,  are those around when Easter was scheduled --

10   celebrated last year?

11 A.      Yes.

12 Q.      Is there also activity indicating that he is using

13   his Eric Rentling Facebook account at the same time to

14   make arrangements to travel to Colombia at the same time

15   these videos are sent?

16 A.      Yes.

17 Q.      Okay.   Tell us, in your training and experience,

18   what is a hebephile?

19 A.      A hebephile is a minor between the age of 11 and

20   15 approximately.

21 Q.      Okay.   Were you able to examine Mr. May's laptop

22   and determine if he used that laptop to search for

23   anything on the internet?

24 A.      Yes.   On April 4th, 2024,  May used his laptop

25   in a Google search requesting "hebe," meaning -- h-e-b-e

1    --    hebephile meaning, and then he conducted a web

2    history using Wikipedia hebephilia.

3 Q.        And is that in or around the time he was

4    discussing something similar with another Kik user?

5 A.        Yes.    Someone asked about hebe in the Kik chats,

6    chat wise,  one of the other users asked if he had any

7    hebe files.

8 Q.        One of the factors Her Honor can consider is the

9    history and characteristics of the defendant.    One of

10   the factors you have touched on already is the fact that

11   Mr. May is gainfully employed and has young children.

12   At the same time he has been employed in his business,

13   was he also engaging in this kind of behavior that is

14   being alleged in the Indictment?

15 A.       Yes.

16 Q.        So these things are, as I think you have outlined,

17   that are occurring simultaneously discussing campaign,

18   state legislative business,  at the same time as sending

19   child pornography?

20 A.       Yes.

21 Q.        And he does have children who are substantially of

22   the age as the expressed interest on these chats?

23 A.       Correct.

24       THE COURT:    Mr. Matthews,  may I interrupt you?

25       MR. MATTHEWS:  Yes.

1        THE COURT:   Would you obtain a definition for

2   hebe for the record?

3               DIRECT EXAM CONTINUED

4  BY MR. MATTHEWS:

5  Q.     Can you tell us what a hebe or hebephile is for

6   the record?

7  A.     Hebe is the  -- meaning is erotic preference for

8   prepubescent children roughly ages 12 to 14.

9        THE COURT:   Pubescent?

10       THE WITNESS:  Prepubescent.

11             DIRECT EXAM CONTINUED

12  BY MR. MATTHEWS:

13  Q.     Would that be pubescent?

14  A.     Oh, I'm sorry.

15  Q.     If they are 12 to 14?

16  A.     Yes, yes.

17  Q.     Okay.

18  A.     Excuse me.

19  Q.     And that is in contrast to a different  -- the

20   interest you have already expressed in prepubescent

21   children being discussed on these chats?

22  A.     Correct.

23  Q.     Indicating perhaps that is why he didn't know what

24   it was?

25  A.     Correct.

1  Q.     All right.

2        Her Honor can consider many factors here, one

3  is the weight of the evidence against this Defendant,

4  could you briefly recap for Her Honor some of the

5  evidence in this case to indicate that Robert John May,

6  III is the same person operating and using the

7  joebidennnn69 account?

8  A.     Joebidennnn69 was registered using May's home

9  password protected IP address, using Samsung model

10  phone SM-G781U1.  May had a Samsung -- same model

11  Samsung phone with a Kik app on it, which was on his

12  phone December 20, 2023, until it was deleted on April

13  4th, 2024.  May --

14  Q.     Briefly, if you would -- I am sorry to cut you

15  off.  I don't think I asked you this previously, how

16  many people live in Mr. May's home?

17  A.     Four.

18  Q.     Okay.  So it would be him, his wife, and two

19  children?

20  A.     Correct.

21  Q.     And I was asking you the use, in your

22  investigation, in evaluating the significance of the

23  password protected Wi-Fi network.

24  A.     Correct, and password-protected phones.

25  Q.     So, only four people live there and two

1    presumably old enough to access the Wi-Fi?

2    A.    Correct.

3    Q.    Continue please.

4    A.    May's phone had the terms "joebidennnn" spelled

5    with four Ns and joehoe12368@gmail.com used in the user

6    dictionary of his cellphone.   These are the same user

7    name and email addresses for the joebidennnn69 Kik

8    account.   Counts 1 and 8 were sent from  IP addresses

9    that matched the  IP addresses used by Robert May's

10   cellphone.   Counts 2 through 7 and 9 through 10 were

11   sent from May's  IP address registered to his home.

12   May had possession of his phone during these

13   distributions as evidenced by his personal use of the

14   phone to call his wife and clients of the business, as

15   well as phone calls with legislative colleagues at the

16   same time or approximately the same time the

17   distributions of child pornography were made from the

18   joebidennnn69 account.

19   Q.    Now,  I would certainly never try to estimate what

20   guidelines our probation office would calculate,  but

21   one of the factors to consider for Her Honor is the

22   length  -- a lengthy period of incarceration if

23   convicted.   I am not going to ask you about Mr. May's

24   guidelines, but I do want to ask you about some

25   potential aggravating factors.  If you could recap the

1    contents of these videos, did any of them involve

2    prepubescent children?

3  A.        Yes,  they did.

4  Q.        And do they also involve toddlers,  infants,

5    and/or sadomasochistic violence?

6  A.        Yes,  as well as bestiality.

7  Q.        As well as best  -- was that one of the clips that

8    was considered?

9  A.        Yes.

10 Q.        And which clip was that?

11 A.        It was in the compilation clip,  one of the nine.

12 Q.        Count 4?

13 A.        In Count 4 showed bestiality as well.

14 Q.        And,  of course,  also the use of a cellphone

15    being the use of a computer?

16 A.        Yes.

17 Q.        And you mentioned --

18 A.        In Count 4 showed bestiality as well.

19 Q.        And of course,  also,  the use of a cellphone

20    being the use of a computer?

21 A.        Yes.

22 Q.        And you mentioned the total number of videos was

23    what?

24 A.        The unique videos was 220.

25 Q.        So, that would correlate to a number of images?

1    A.        Correct.

2    Q.        Please touch, if you would, on ties outside the

3        United States that Mr. May may have or use of any

4        aliases or false documents, and specifically direct your

5        attention just to recap the evidence on the Eric

6        Rentling persona.

7    A.        The Eric Rentling persona, which we have

8        determined belonged to Robert May, the Eric Rentling

9        persona had a Facebook page that he used to communicate

10        with various different people and individuals in the

11        country of Colombia to set up travel arrangements and

12        VRB areas and different places to stay.  He was in

13        contact with various different people in Colombia and

14        those contacts were in his phone and he still had access

15        to them.

16    Q.        So, you mentioned he had  -- do you know how many

17        times he travelled to Colombia during that two-year

18        period or so?

19    A.        I believe three or four.

20    Q.        And the most recent was July of last year?

21    A.        August.

22    Q.        August?

23    A.        Very end of July, very beginning of August 2024.

24    Q.        To your knowledge, in your search of Mr. May's

25        home back in August of last year, does Mr. May possess

1     any firearms?

2   A.      Yes.

3   Q.      Do you know how many he possesses?

4   A.      I do not remember, I was not in the room to

5     render them safe.

6           MR. MATTHEWS:  Your Honor, may I have just a

7     moment, please?

8           THE COURT:   Sure.

9           MR. MATTHEWS:  Thank you, Special Agent Lorenzen.

10    Could you please answer any questions that Mr. Phillips

11    may have for you on cross-examination?

12          THE WITNESS:  Yes.

13          THE COURT:   Cross-examination.

14          MR. PHILLIPS:  Thank you, Your Honor.

15                         CROSS EXAM

16  BY MR. PHILLIPS:

17  Q.      Good morning, Agent Lorenzen.

18  A.      Good morning.

19  Q.      So, out of the devices seized, there was no CSAM

20    material found?

21  A.      Correct.

22  Q.      Now, was there any artifacts related to CSAM

23    material found on any device?

24  A.      No, just in the Kik account.

25  Q.      Okay.  So, out of the devices seized -- could

1    you run through the list of devices that you seized from

2    the home?

3  A.        I do not have that in front of me, but there were

4    various cellphones,  hard drives and different  SD cards

5    and different other stored media devices.

6  Q.        On every single device that was seized, there is

7    no CSAM material and there is no artifacts of CSAM

8    material?

9  A.        Correct.

10 Q.        Okay.  So,  everything is related to,

11   essentially, the Kik app in this case?

12 A.        Yes.

13 Q.        And you reference that the Kik app had been used

14   1,100 times within this four- to five-day window?

15 A.        Correct.

16 Q.        Through your investigation,  did you check to see

17   whether during any of those 1,100 times there is any

18   inconsistencies with his text messages, or location, or

19   whereabouts as far as being inconsistent with somebody

20   that is able to post one of those 1,100 times for him

21   doing some other activity at that exact time?

22 A.        We did not come across any inconsistencies such as

23   that.

24 Q.        But have you looked for them?  In other words,

25   for every 1,100 time occurrence through that four- to

1    five-day period,  have you tried to match up because you

2    made, certainly, reference to that, that there is other

3    Facebook messages,  there is other text messages going

4    on,  have you went through to see whether there is any

5    inconsistencies that he is doing any other activity in a

6    location at the time that is inconsistent with being

7    able to post on the Kik app at that time?

8    A.      Not  -- we have not conducted a search of all 11

9    -- I believe 1,144 times he accessed the account,  no,

10   we have not been able to do that yet.

11   Q.      And when was that Kik app created?

12   A.      March 30th,  2024.

13   Q.      So,  the Kik app itself was created on March 30th

14   and then deleted on April 4th?

15   A.      I need to correct myself.   He installed --

16   originally installed the Kik app in December of 2023.

17   Q.      Okay.   That is what I thought.

18   A.      Yes.

19   Q.      So,  he installs this app on his phone, presumably

20   him, you are saying it is his phone,  so you are saying

21   this app is installed on his cellphone on December 23rd,

22   is that what you said?

23   A.      2023,  I don't know the exact date.

24   Q.      So December of 2023?

25   A.      Correct.

1  Q.       Is there any activity in any of those groups until

2       that March 30th?

3  A.       No.   The way Kik maintains their files and their

4       group, the content of the groups is very difficult

5       unless you actually know the user name.

6  Q.       But you are alleging that that specific user name

7       is connected -- is the nexus to Mr. May; is that

8       correct?

9  A.       Correct.   We were able to determine that user

10      name when NCMEC sent the CyberTip, so that is how we

11      were able to establish the user name and were able to

12      obtain the contents through a search warrant through Kik

13      because we did have a user name.

14 Q.       So, you have all of the contents from December of

15      2023 up until the app was deleted?

16 A.       No, we have the search warrant, it starts  -- it

17      requested content from the CyberTip displaying  -- when

18      it started from the CyberTip, it was some time in 2024.

19 Q.       But prior to the March day of 31st, correct?  The

20      tip itself came?

21 A.       Yes.   It was the tip itself -- bear with me, I

22      have it right here.   The tip  -- so, we have March 31,

23      so the search warrant would have been  -- would have

24      requested content from March 31st through the current

25      time, which was, I believe, in June,  the middle of June

1        . when the search warrant was issued to Kik.

2   Q.        Now,  you referenced about an alias and there was

3        a Facebook account and email with a PayPal account,

4        have you done any further investigation to confirm that

5        the PayPal account is set up to his bank account?  Any

6        other nexus that is tied to him to this alias?

7   A.        No,  we did not find any other nexus.

8   Q.        And so with that alias,  is there any other

9        connection to him other than the fact that there is a

10       Facebook account?  I believe it is Eric Rentling is the

11       alias name that has been provided by the Government,  is

12       there any other connection to him and that alias

13       specifically?

14  A.        The Facebook profile picture resembles Mr. May; it

15       is a picture of someone sitting on the beach from the

16       backside and it resembles Mr. May.

17  Q.        And when you say it "resembles Mr. May,"  it is

18       the backside of a white male's head?

19  A.        Yes, that looks very similar to Mr. May from

20       behind.

21  Q.        What identifying characteristics?

22  A.        The dark hair,  broad shoulders,  and his hands

23       were off to the side and they look very similar to

24       Mr. May's hands.

25  Q.        All right.  So,  I mean,  candidly, and,  again,

1        you have done this a long time,  you are under oath,

2        that is pure speculation,  you couldn't say with any

3        degree of certainty that that is him?

4    A.       I can't say 100 percent,  no.

5    Q.       Certainly.   And so with these devices,  was there

6        any other downloads,  anything else that connects him to

7        CSAM material on any of the devices?

8    A.       No.

9    Q.       Now,  as far as the search warrant that was

10       actually executed on the residence was on August 5th of

11       2024?

12   A.       Correct.

13   Q.       And it has now been ten months as far as this

14       investigation?

15   A.       Correct.

16   Q.       All right.   And there was an interview with one

17       of his children?

18   A.       Yes,  there was a forensic interview.

19   Q.       And there is no -- as far as the evaluation that

20       is done there,  there is no evidence of any type of

21       child abuse that has been presented to the Government?

22   A.       No,  but the interview was one of the more unusual

23       interviews I have ever seen in the 20 years I have been

24       a part of these types of investigations.

25   Q.       Well,  I will be more specific:  Did the child

1    indicate any abuse?

2  A.        He did not indicate any abuse because he said he

3    wasn't supposed to talk about the pictures.   He became

4    agitated, and began to slap himself, and then put tape

5    over his mouth.

6  Q.        And so did he say he had any abuse?  Again,  it

7    has been ten months,  when did this interview occur?

8  A.        Last July perhaps.   I would have to look at my

9    records.

10  Q.        After August?

11  A.        Yes, sir,  it was after August.

12  Q.        And so in this ten months that the investigation

13    has been ongoing, again,  I understand with the

14    Government's motion they have summarized your report,

15    when did you have all of this information, for the most

16    part,  that has been given to you,  in terms of pretty

17    much a summary of your testimony,  when had that pretty

18    much been solidified?

19  A.        I had most of the information through Kik was

20    finally delivered to us by March and the findings from

21    the HSI investigators who travelled to Bogota and

22    Medellin both at the end of last month.

23  Q.        Is he charged with anything related to Bogota?

24  A.        No, sir.

25  Q.        Is he charged with anything related to Colombia?

1   A.      No, sir.

2   Q.      You don't know the ages of these individuals in

3       the videos?

4   A.      Correct,  we were not able to identify them at

5       this time.

6   Q.      And in the communications with the individuals

7       that you are saying is (sic) tied to the videos,  is

8       there any reference to any age?

9   A.      There was one reference to an age where he asked

10      how old the person was he was talking to,  the response

11      was I was 17,  he said, oh, that is young,  but you can

12      still show me around.

13  Q.      Okay.   And you believe that is one of the

14      individuals in the video?

15  A.      I can't say "yes" or "no" because we have not been

16      able to positively identify the females in the videos.

17  Q.      She said she is 17, he says that is young?

18  A.      Correct.

19  Q.      But he says you can show me around?

20  A.      Correct.

21  Q.      You can't identify that person or have any other

22      type of evidentiary value connecting those videos that

23      are on the device to any individual communication

24      related to Colombia or Bogota?

25  A.      No, sir.

1    Q.        Now,  in terms of the timing,  again,  as far as

2         the logins,  there has not been a review to see if there

3         is any inconsistencies in terms of the timing?  In other

4         words,  if he is in one location doing something on a

5         device sending messages and then there is, at the exact

6         same time of those 1,100, you have not reviewed that to

7         see if there is any inconsistencies,  have you?

8    A.        We have not reviewed all 1,100 accesses.

9    Q.        Now,  as far as the user name and email addresses,

10        how were  -- which device,  was it solely the cellphone?

11   A.        Oh, for joebidennnn the Kik account, that was

12        solely on the cellphone because it is a mobile app.

13        The email he received and checked email on his laptop,

14        as well.

15   Q.        Are you talking about referencing his personal

16        email?

17   A.        Personal email and Eric Rentling email,  as well.

18   Q.        Okay.   The Eric Rentling email, as far as being

19        identified, is directly on his personal laptop?

20   A.        Yes.

21   Q.        Was there anything that is in that email that

22        connects him to child CSAM?

23   A.        He used that email account to register for

24        additional applications, Telegram and Sessions.

25   Q.        Anything that actually references CSAM or has any

1    connection to CSAM other than a reference to this Kik

2    app?

3  A.    No, it just establishes the laptop and Eric

4    Rentling are one in the same.

5  Q.    Was there anything else then related to his

6    personal email that connects him to any CSAM material?

7  A.    No.

8  Q.    So, everything just scope-wise is limited to this

9    four- to five-day period on this Kik app, is that fair

10    to say?

11 A.    Correct.

12 Q.    Okay.  And as far as during the course of your

13    investigation, have you been provided anything from the

14    Government related to a picture that his wife had posted

15    on Facebook that had their Wi-Fi password in the

16    background on a chalkboard?

17 A.    We never found that on her Facebook page, but we

18    did find a similar picture on her phone.

19 Q.    Okay.  That was potentially posted on social

20    media.  Have you become aware of that during the course

21    of your investigation?

22 A.    We have become aware of that, we did not find a

23    post from Facebook or we did find a very similar picture

24    of the description.

25 Q.    And that dates back to 2023, as well as March of

1    2024 right before this?

2   A.      Correct.

3   Q.      All right.   And,  again,  during the course of

4       your investigation,  would it be fair to say that you

5       have come across -- that there are a significant amount

6       of people who do not like Mr. May?

7   A.      There is (sic) a significant amount of people that

8       don't like me either,  Mr. Phillips,  so -- I don't

9       know.   I don't follow social media or really politics

10       around South Carolina,  so --

11   Q.      So,  there wasn't any investigation in terms of

12       that part  --

13   A.      No.

14   Q.      -- as far as what you received on his phone?  Did

15       you receive anything else?  Any specifics about any

16       political enemies related to that that came up during

17       the course of your investigation?

18   A.      No.  Only what I have read in the newspaper here

19       and there.

20   Q.      With the IP addresses, you referenced that there

21       were five specific  IP addresses.   Where are the

22       locations for all five IP addresses?

23   A.      They are associated to his cellphone and the

24       authorizing mobile had issued those five IP addresses

25       attached to his phone number.

1  Q.      So, you are saying that the five IP addresses are

2         all issued by the same service provider for that

3         specific phone, it is not one specific IP address, it

4         is five individual ones?

5  A.      Correct.

6  Q.      All right.  And so as far as the five specific

7         IP addresses, was there one over the other that is

8         connected to this investigation specifically or is there

9         -- all five were used as far as what you are saying is

10        relevant to this investigation?

11 A.      Four of them were used either to distribute or

12        receive messages on the Kik account.

13 Q.      All right.  And how could you determine how the

14        IP addresses are selected?

15 A.      You would have to ask somebody from Verizon, they

16        call it natting IP.  They assign multiple different

17        IP addresses to mobile devices.  And during certain

18        times  -- that would be a little technical over my head

19        as to how that is assigned, we just know that those

20        were assigned to him by Verizon  -- to his cellphone by

21        Verizon Wireless.

22 Q.      And you haven't been provided anything as far as

23        how those were individually used in terms of how

24        selected that the  -- not specific IP addresses  -- used

25        from that cellphone?  In other words, how it is chosen?

1    A.      Not how it is chosen,  no.

2            MR. PHILLIPS:  One moment,  Your Honor.

3            THE COURT:    Sure.

4                      CROSS EXAM CONTINUED

5    BY MR. PHILLIPS:

6    Q.      This alias account that you are referencing that

7       you are saying is a picture of Mr. May,  was there any

8       metadata search or reverse image search related to that

9       picture to see because embedded -- in a criminal

10      investigation --

11   A.      Correct.

12   Q.      -- you understand what --

13   A.      Correct.

14   Q.      -- is embedded as far as metadata you will have

15      location,  you will have a lot of different specifics

16      that will tie it to a specific device --

17   A.      Correct.

18   Q.      -- specific location.   Was any of that done by

19      the Government?

20   A.      No.   There was no metadata found on that picture.

21   Q.      Was there any metadata outside of or connected to

22      any device that connects him to CSAM material?

23   A.      No.

24           MR. PHILLIPS:  Nothing further,  Your Honor.

25           THE COURT:    All right.

1       Redirect?

2              MR. MATTHEWS:  Thank you,  Your Honor.

3                    REDIRECT EXAM

4   BY MR. MATTHEWS:

5   Q.        Special Agent Lorenzen,  Mr. Phillips asked you if

6       there were any artifacts related to CSAM or CSAM

7       material found on the cellphone.   There were apps that

8       were located that were deleted,  correct?

9   A.        That is correct,  yes.

10  Q.        So, meaning that a Kik app,  a Telegram app,  a

11      Sessions app,  a Mega app had one time been downloaded

12      and used on that phone?

13  A.        Correct.

14  Q.        And you haven't testified much about Telegram and

15      Mega and Sessions,  but since he asked you about that,

16      in your training and experience,  have you ever

17      investigated cases where those apps are used to trade

18      and distribute CSAM?

19  A.        Yes,  they are encrypted apps and they are foreign

20      based so they are used a lot for distribution and

21      receipt of child pornography.

22  Q.        And also Mr. Phillips asked you about whether any

23      of the files had been located and whether you had found

24      CSAM on any device.   In your training and experience,

25      is it common for users and distributors of child

1    pornography to use anonymous names in their social media

2    platforms?

3  A.       Yes.

4  Q.       To avoid detection by law enforcement?

5  A.       Correct.

6  Q.       And are those sometimes multiple names used in

7    order to facilitate the transfer of CSAM and to avoid

8    detection?

9  A.       Correct.

10 Q.       And in your training and experience, do users of

11   mobile apps like this sometimes delete their accounts

12   after they have gratified themselves with the child

13   pornography?

14 A.       Yes.

15 Q.       Okay.  So, it is not unusual for you to find

16   files that have been deleted?

17 A.       Correct.

18 Q.       All right.  Now, I think Mr. Phillips was trying

19   to ask you when he asked about verifying or

20   inconsistencies, discrepancies, I think he may have

21   been referring to cell site location information meaning

22   where somebody physically was when a connection was made

23   to a cell tower.  Did you submit a search warrant to

24   Verizon to attempt to obtain that information?

25 A.       Yes, we did.

1   Q.      And that was not provided, for lack of a better

2       term, in a usable form?

3   A.      Correct.

4   Q.      Where you could do a cell site mapping?

5   A.      Yeah, we were not able to map it through Verizon.

6   Q.      I'm sorry, go ahead.

7           He also asked you about whether you had been

8       through all 1,100 messages and other messages of his

9       phone to determine what IP address they came from.    You

10      could have  -- Kik provided you the IP?

11  A.      Yes.

12  Q.      Addresses that all the messages came from?

13  A.      Yes.

14  Q.      They either came from Mr. May's home, one of

15      those five addresses for his cellphone, or something

16      called a VPN.    Tell us what a VPN is.

17  A.      VPN is virtual private network.    People use that

18      to mask their  IP address so it doesn't revolve back to

19      their physical residence, their business, it keeps

20      them more anonymous.

21  Q.      And at least two of the users that he sent CSAM

22      material to used VPNs themselves?

23  A.      Correct.

24  Q.      And that is what the Kik search warrant told you?

25  A.      Correct.

1   Q.      Mr. Phillips also asked about the difference

2      between the account and the user name or, you know, the

3      app itself I should say being on the phone versus the

4      user name.   I think you answered this, but the app

5      itself was downloaded some time in December of 2023?

6   A.      Correct.

7   Q.      On Mr. May's phone, the Kik app?

8   A.      Correct.

9   Q.      Okay.   And then that particular user,

10     joebidennnn69 was registered and started on March 30th,

11     2024?

12  A.      Correct.

13  Q.      And then the account and the app were both deleted

14     on April 4th, 2024?

15  A.      Correct.

16  Q.      All right.

17        Mr. Phillips asked you about CyberTips and how

18     long they take to register.   The original CyberTip was

19     related to March 31st, 2024; is that right?

20  A.      Correct.

21  Q.      And it is not uncommon for that CyberTip to be

22     delayed?

23  A.      No.   The NCMEC received a CyberTip from Kik on May

24     27th, 2024.   The South Carolina Attorney General's

25     office received the CyberTip on June 18th, 2024.

1    Lexington County Sheriff's Department received the said

2    CyberTip on June 26th, 2024.

3    Q.    So, it is not instantaneous --

4    A.    No.

5    Q.    -- that the company sends it out and that law

6    enforcement gets it?

7    A.    Correct.

8    Q.    There is a little bit of a delay there, maybe in

9    this case two months?

10   A.    Correct.

11   Q.    Mr. Phillips also asked about naked pictures of a

12   child, specifically his son or actually asked about

13   abuse, allegations of abuse?

14   A.    Correct.

15   Q.    Did you in your examination of Mr. May's phone

16   locate naked pictures of his son?

17   A.    Yes, we did.

18   Q.    And to be clear, those images are not CSAM, are

19   they?

20   A.    No.

21   Q.    Or child pornography?

22   A.    They are not defined as child pornography.

23   Q.    But there was a sufficient number of them and the

24   photos were of such content you felt they needed to be

25   further investigated?

1    A.        Yes.    We submitted them to NCMEC to ensure that

2         they had not been shared for the purposes of child

3         pornography and self gratification of other users.

4    Q.        And NCMEC did not return a match for the images?

5    A.        Right,  did not return a match.

6    Q.        You have summarized briefly,  but the forensic

7         interview was concerning but did not rise to the level

8         of abuse?

9    A.        Correct.

10   Q.        And can you recap just briefly what the statements

11        made by his son were regarding pictures when he was

12        asked about pictures?

13   A.        When the forensic interviewer asked Mr. May's son

14        about pictures in a very innocuous manner asking about

15        pictures of a birthday party and Mr. May's son said he

16        didn't want to talk about it.    The subject of pictures

17        came back around and he then said I am not supposed to

18        talk about pictures and started using his hands to

19        slightly slap himself.    The third time pictures were

20        brought up by the forensic interviewer, Mr. May's son

21        found a piece of Scotch tape and placed it over his

22        mouth, and the interview ended at that point because the

23        forensic interviewer was concerned about the mental

24        health of the child at that time.

25             MR. MATTHEWS:  Your Honor,  may I have just a

1    moment?

2         THE COURT:    Sure.

3         MR. MATTHEWS:    Thank you,  Special Agent Lorenzen.

4    I don't have any other questions.

5         THE COURT:    Any recross?

6         MR. PHILLIPS:    Thank you.

7                     RECROSS EXAM

8      BY MR. PHILLIPS:

9    Q.        Agent Lorenzen,  you specifically mentioned these

10   other apps,  were search warrants done on those apps?

11   A.        No, sir.    They are based in foreign countries and

12   they don't accept American court process.

13   Q.        So, there is zero evidence related to those apps

14   connecting Mr. May to CSAM material?

15   A.        Correct.

16   Q.        All right.

17             As far as you talk about some generalities a

18   little bit about general cases of these things occur,

19   how often is it that you prefer  -- execute a search

20   warrant and there is no CSAM material or artifacts on

21   any of the devices found?

22   A.        Oh, it is very common.

23   Q.        Very common?

24   A.        Yes.

25   Q.        So,  if there is a search of federal cases that we

1    will find many,  many cases where there is zero evidence

2    on any devices after execution of a search warrant?

3    A.       With the technology of cloud-based systems,  yes,

4    you are going to find that there  -- commonly there are

5    not items actually saved on the camera roll of a phone.

6    Q.       On device or artifacts.   We can include the cloud

7    because you don't have any CSAM material in a cloud that

8    connects that to Mr. May; is that right?

9    A.       Well,  we can connect the Kik accounts with him,

10   which is essentially a cloud-based storage system for

11   their photos and their content.

12   Q.       Yeah,  but what you are referring to is say Google

13   Drive,  Dropbox,  that is generally referred to?

14   A.       Correct.

15   Q.       As, quote, unquote, the cloud?

16   A.       All his CSAM and all his child pornography was

17   still in his Kik account,  correct.

18   Q.       As far as the allegations are concerned,  correct?

19   A.       Yes.

20   Q.       That's right.

21           And so as far as execution of search warrants

22   either through a cloud service or through a direct

23   device,  it is your testimony that it is very,  very

24   common to  -- have an execution of a search warrant in a

25   federal case and there be no CSAM material or artifacts

1      in any of that, either on the devices or in a cloud

2      storage?

3   A.        Of federal and state, yes.

4            MR. PHILLIPS: Okay. Nothing further, Your

5      Honor.

6            THE COURT: All right. Any further need for

7      this witness to remain?

8            MR. MATTHEWS: No, Your Honor, that is the

9      presentation from the Government.

10           THE COURT: Okay. You may step down. Thank

11     you, Agent Lorenzen. No further witnesses from the

12     Government?

13           MR. MATTHEWS: No further witnesses.

14           THE COURT: All right.

15              Any witnesses on behalf of the Defendant?

16           MR. PHILLIPS: Your Honor, may I have one moment

17     to speak with his wife?

18           THE COURT: Sure.

19        (Whereupon, there was a pause in the record.)

20           THE COURT: Mr. Phillips.

21           MR. PHILLIPS: Your Honor, at this time we have

22     no further witnesses -- no witnesses, Your Honor.

23           THE COURT: No witnesses. All right. Very

24     well then, I am happy to hear from you on the arguments,

25     Mr. Matthews, if you would like to go first.

1       MR. MATTHEWS:  Thank you,  Your Honor.   The

2   Government has submitted a brief in support of our

3   Motion for Detention that lays out the Government's

4   argument in detail,  but I will briefly highlight some

5   of them regarding the factors that we ask Your Honor to

6   consider.

7       As Your Honor has noted again, and Mr. Phillips

8   acknowledged,  this is a presumption case involving the

9   particular offense violation 18 USC 2252A(a)(2),

10  distribution of child pornography.   The Government

11  submits that Mr. May has not rebutted that presumption.

12  Specifically,  the concerns the Government have are both

13  related to the safety of any person in the community and

14  whether a bond could in fact ensure Mr. May's appearance

15  for trial.

16      I will begin with the safety of any person  --

17  any other person in the community.   Your Honor,  what

18  the evidence that has been presented before you here

19  today shows that Mr. May in secret lived -- had a

20  lifestyle of using alias accounts on the internet.

21  First, the joebidennnn69 account related to Kik,  the

22  Kik app,  and also the Eric Rentling account, which he

23  used to travel in international commerce,  which I will

24  address more on ensuring his appearance.  But the chats

25  between other folks,  other users of the Kik app

1   indicate that Mr. May had an interest in child

2   pornography,  it was explicit.   There is not much room

3   for interpretation, and not only that,  there was a very

4   specific category of child pornography that Mr. May was

5   interested in that was  -- the variation of child

6   pornography involving "bad moms,  bad dads,  bad

7   children," and the videos that have been highlighted for

8   Your Honor in the Government's Motion and are alleged in

9   the Grand Jury's Indictment are all related to children,

10  toddlers,  infants that are of the same age or similar

11  age to Mr. May's children.

12      Your Honor,  Mr. Phillips asked Special Agent

13  Lorenzen about steps taken by law enforcement to ensure

14  that no abuse had taken place.  Law enforcement took

15  those appropriate steps by notifying the Department of

16  Social Services,  having a forensic interview done.

17  The disclosure was not one that Mr. May could be charged

18  with as far as a state crime,  no affirmative allegation

19  of abuse,  but disturbing disclosures nonetheless.

20      Your Honor,  those things combined, the

21  Government is concerned about Mr. May being a threat to

22  his children,  but not only that,  other minor children.

23  The content of the chats is such that there is

24  definitely a dark rabbit hole that those users have gone

25  down and the Government's concern is with what may begin

1   as just watching videos and sending messages could

2   escalate to actual abuse, particularly when these

3   videos and their specific content is geared towards

4   parents abusing their children.

5        Your Honor, we submit that the weight of the

6   evidence is strong. That the Department of Homeland

7   Security has determined that through various search

8   warrants and legal processes that the account or rather

9   the IP address he used to register the Kik account is

10  Mr. May's home IP address. It is significant because it

11  is password protected, there are only four people who

12  live in that residence: either Mr. May or his wife.

13  Kik also identified the very specific model phone used:

14  only two of those model phones were found and collected

15  in the residence, one of them belonged to Mr. May, the

16  other one belonged to his wife.

17       There is no evidence on the wife's phone to

18  indicate that she was involved in the distribution of

19  CSAM, but the Government submits there is abundant

20  evidence that Mr. May was involved. The presence of

21  deleted apps that were all deleted on the same date and

22  time, the user dictionary highlighting that the term

23  joebidennnn with four Ns had been used in such a way

24  that it came up on a user dictionary. Not only that,

25  but the account -- the email account used to register

1    the joebidennnn account with Kik was

2    joehoe12368@gmail.com,  a very specific term that would

3    not show up in a user dictionary unless somebody had

4    been typing it in.

5         Beyond that,  Your Honor,  there is user

6    attribution evidence that Your Honor can consider

7    regarding use of his phone.   Even if somebody, somehow,

8    someway came in and hacked in to Mr. May's home Wi-Fi

9    account,  that same person would also have to have

10   access to his cellphone, which is password protected.

11   His cellphone was possessed by Mr. May,  we know this

12   because he was using it to do things like call his wife,

13   text friends.   He was using it for campaign business

14   through his consulting business.   He was using it for

15   legislative business thereby indicating that the user of

16   that phone was, in fact, Robert John May, III at or

17   around the same time that he is sending CSAM videos.

18        Your Honor,  I didn't ask Special Agent Lorenzen

19   this,  but you can multitask on your phone,  you can put

20   it on speaker,  search the internet while talking to

21   somebody, and some of the videos that were sent were

22   done exactly when he was doing something else on his

23   phone,  sending an email,  talking with somebody on the

24   phone,  texting.   One person can certainly multitask on

25   their phone.

1      Your Honor,  the evidence that we have presented

2    that conditions of bond may not reasonably assure the

3    appearance of the Defendant are his international ties:

4    he has travelled to the country of Colombia,  the nation

5    of Colombia,  at least three times.   He has made

6    arrangements to stay at various hotels or Airbnbs in the

7    Medellin area, and he is engaged in sex work or paying

8    for sex work while he is there.   While the Government

9    does not have evidence sufficient to proceed with a

10   criminal charge at this point that Mr. May had sex with

11   minors,  it is the testimony of Special Agent Lorenzen

12   that Mr. May was having sex for money,  paying money for

13   sex on videotape with women who -- or young ladies

14   rather who appear to be underdeveloped,  did not have

15   fully developed breasts.   And when that is combined with

16   his interest,  expressed interest in child pornography

17   via the joebidennnn account,  all those things are

18   certainly concerning regarding his danger to the

19   community,  specifically his children,  but also his

20   risk of flight knowing that he has these ties to the

21   nation and has visited as recently as July and August of

22   2024 the nation of Colombia.

23      Your Honor,  he uses an alias or has used

24   aliases,  this Eric Rentling persona:  he has a Gmail

25   account,  a Facebook account,  a PayPal account.   Those

1　are certainly items and accounts that could be used to

2　arrange to travel if he were seeking to attempt to flee

3　prosecution,　so all of those things we ask Your Honor

4　to consider.

5　　　　We touched on the presence of weapons in the

6　home,　he does have weapons and,　Your Honor,　one of

7　the concerns is not just concern for Mr. May's children

8　and his family,　but concern for himself.　The concern

9　that he may self harm.　I have highlighted for Your

10　Honor that a significant period of incarceration could

11　be in order if Mr. May is convicted.　Guideline 2G2.2

12　outlines those guidelines.　Certainly the probation

13　office will make a determination if and when there is a

14　conviction,　but,　Your Honor,　it is a significant

15　sentence.　The statutory period is five to 20 years and

16　the Government submits, based on some of the aggravating

17　factors laid out for Your Honor, that Mr. May's sentence

18　would be closer to the 20 year mark,　the 240 month mark

19　than it would be to the five year mark.　With

20　distribution it is a base level of 22,　you add

21　additional levels,　I believe,　five levels for exchange

22　for valuable consideration.

23　　　　Your Honor has seen in the memo exchanges were

24　made,　send to receive,　you know,　five for five,

25　videos sent in exchange for other videos.　They involve

1    prepubescent minors, but not only that, they involve

2    toddlers and sadomasochistic violence.   Also

3    considering the number of images, 220 videos times 75

4    is way more than 600 images.   So, Your Honor, all of

5    those things being considered, we submit that Mr. May

6    has not rebutted the presumption against detention and

7    our specific concerns, as laid out in exacting detail,

8    are that he is a danger to the community, specifically

9    to his children, and also that he is a risk of flight

10   and ask Your Honor to detain him pending trial.

11          THE COURT:   Thank you, Mr. Matthews.

12          Mr. Phillips.

13          MR. PHILLIPS:   Thank you, Your Honor.   There are

14   a combination of conditions that will reasonably assure

15   his appearance in court and ensure the safety of the

16   community.   Specifically, we can have not only

17   monitoring, home detention, any restrictions on travel

18   even from local level, as well as a removal of the

19   weapons.   As far as the Government's position related to

20   the children, this investigation executed was  -- the

21   search warrant was executed on the residence in August

22   of 2024, it has been ten months.   He has had ten months

23   to make any specific decisions or  -- for the Government

24   to have some type of evidence that he would try to flee

25   from prosecution.   Instead, he has retained myself

1    during the investigation phase, as well as another

2    attorney from New York, Marc Mukasey, for the

3    investigation phase.   We have been in constant contact

4    with the Government,  had multiple meetings and

5    discussions with the Government.   Not only did the

6    Government send out or it was presented, even through

7    the media, that there would be a pending indictment

8    potentially within months back in October,  he,  again,

9    no evidence that he would flee from prosecution.   He

10   stayed in his residence of West Columbia.   We had a

11   recent virtual meeting with the United States attorney's

12   office,  they indicated they would be seeking an

13   indictment imminently.   He has been made aware of that.

14   Again,  he was found at his home.  We had sent

15   correspondence to the Government saying that if an

16   indictment was issued that we would voluntarily

17   surrender; the Government chose not to notify us to

18   allow him to have that opportunity, but instead came

19   directly to his residence.

20       Again,  there is exactly no competent evidence

21   to show that he would flee from prosecution and there is

22   a combination of conditions that would reasonably assure

23   his appearance in court with having monitoring,  home

24   detention,  travel restrictions, removal of the weapons.

25       With related to the discussions as far as the

1    child interview is concerned, there was, I believe, an

2    attorney represents them separate that had its own

3    issues with Agent Lorenzen.  We are not going into that

4    today,  but what we know, even from a state level

5    reference DSS,  there was no emergency protective

6    custody issue.   It is not whether there is even

7    probable cause to arrest him,  but there is no specific

8    -- if there was any sufficient evidence, even from a

9    state level DSS,  there would have been an emergency

10   protective custody hearing, there have been none of

11   those.   He has been taking the children to school,

12   they have been going on trips to LEGOLAND, to be

13   specific,  different things.   He has been integral in

14   the home for this ten months.  Retained counsel.   I

15   understand I am here for a special appearance because we

16   weren't aware that the Government was going to pursue

17   the arrest yesterday.   With that being said,  I believe

18   that with those combination of conditions,  we do meet

19   that rebuttable presumption that would reasonably assure

20   his presence in court and ensure the safety.

21        Another condition I forgot to mention is that

22   Your Honor can also instruct that he have no access to

23   the internet.   So,  again,  with whatever special

24   conditions that Your Honor seeks to address,  we

25   certainly have  -- we voluntarily request that Your

1    Honor put every one of those restrictions, as well as no

2    access to internet to ensure that, one, he can help

3    prepare his defense.   He has not tried in any way,

4    shape, or form in the last ten months, despite all the

5    conversations with the Government, to do anything that

6    would even a shred of evidence to show he is going to

7    flee from prosecution.

8         He is 38 years old, he has been married for

9    nine years.  His wife is present, Your Honor.  He does

10   have the two children in the home.   He has a Master's

11   degree.  What brought him to South Carolina 20 years ago

12   was he had a marine  -- scholarship with the Marines

13   through the ROTC program at the University of South

14   Carolina.   He has been in South Carolina for 20 years.

15   He has strong ties to the community.  He has  -- they

16   have a home, over these 20 years he has built a life,  a

17   family,  he has built a successful business.  He has had

18   a successful political career.   I understand with these

19   accusations he is presumed innocent,  but his successful

20   business and political career are certainly at stake

21   with the nature of these allegations.   Obviously,

22   there is media involved in this case.  I understand that

23   there is many different things.

24        Another point of issue is that during the ten

25   months that this investigation is going on with him

1    being a Representative,  he didn't miss one day at the

2    General Assembly.    Again,  if he was going to hide,  if

3    he was going to run,  there is zero evidence of that.

4    He attended every session of the General Assembly during

5    this investigation and had been in direct contact with

6    us as we have been in contact with the Government.

7            Again,  based on that, I have to highlight, I

8    think the last major thing is, and I disagree strongly

9    with Agent Lorenzo's testimony is that it is common,

10   there is zero evidence found of any artifacts or CSAM

11   evidence found on any of the devices on any cloud.

12   This is limited to a very,  in my opinion,  a rare

13   situation of four to five days on a Kik account that

14   was, again,  no evidence on any device seized,  multiple

15   devices seized in the home,  memory cards,  laptops,

16   hard drives.   No CSAM material connected to any of it,

17   no artifacts.   Not any metadata or artifacts which

18   generally comes up in these types of cases that connect

19   Mr. May to CSAM material.

20           THE COURT:   So,  are you suggesting because the

21   presumption is that the  -- there is no condition or

22   combination of conditions due to the nature of the

23   offenses charged, and I haven't heard any presentation

24   of evidence from the Defendant,  you chose not to

25   provide a witness,  is the argument that the  -- this

1    four- or five-day period was an anomaly in Mr. May's

2    life or it was that somebody took control over his IP

3    address or front  -- what is the theory of the case

4    here?

5        MR. PHILLIPS:  To be specific,  our question

6    directly to Agent Lorenzen was,  during the course of

7    the investigation,  is it known that there was a picture

8    that showed the Wi-Fi password because the Government

9    has been hanging on that this was a Wi-Fi protected

10   network.  So,  yes,  our position is that it was not

11   Mr. May that had access to the account during that time

12   if that account is even directly  -- again,  I don't

13   have all of the evidence to understand, at this point,

14   to fully be able to address every specific issue that we

15   would like to be able to do, which is why I asked

16   questions related to the 1,100 incidents.  And having

17   things happen simultaneously,  which,  in my opinion,

18   from a logistical standpoint,  I don't know how there

19   can be, in one breath, communicating with individuals,

20   but also uploading CSAM, and as the Government tried to

21   present, gratifying himself,  all three things happened

22   simultaneously.

23       As far as the location,  the cell site location

24   data that we requested, they said the Government's issue

25   was they weren't able to read that document.  Certainly

1    we will go through that -- conduct our own

2    investigation, but the defense theory is certainly that

3    he did not distribute child pornography.   And the other

4    issues that were certainly presented shows that there is

5    a combination of conditions that would reasonably assure

6    his appearance.

7         THE COURT:   Well, we don't get there --

8         MR. PHILLIPS:  Understood.

9         THE COURT:   -- until you overcome the

10   presumption.   You have presented no evidence.

11        MR. PHILLIPS:  I understand.

12        THE COURT:   You have presented no defense

13   witness.   So, you don't get to talk to me about

14   conditions until you have overcome the presumption, and,

15   you know, then rebut the presumption, and then we get to

16   talking about conditions.   And so you kind of have to

17   --  you have to put the horse before the cart, right?

18        MR. PHILLIPS:  Understood, Your Honor.  So, I

19   guess, going specifically again to that, I understand

20   that with the rebuttable presumption to be as specific,

21   since, again, I don't have a direct witness as to the

22   defense other than that he was not the one who had

23   access at that time or used that user name or created

24   those user names.   And, again, it is one of those

25   things where trying to disprove that someone hacked his

1    account or that it was some type of political enemy is

2    very difficult to produce a witness without having all

3    of the discovery for us to be able to conduct our own

4    independent --

5         THE COURT:   You elected to have this Detention

6    Hearing today.

7         MR. PHILLIPS:  And he and I discussed that,  and

8    he understands that very nature.   But I don't know if

9    it is a situation where within a small period of time we

10   would have been able to do that,  as well.   That is one

11   of the factors that he took into consideration.

12        THE COURT:   So, he denies that he travelled to

13   Colombia as well.   That this Eric Rentling is his -- it

14   is not just the images on the Kik account, you are

15   talking about the Mega,  you are talking about the

16   PayPal,  all of these other Telegram accounts.

17        MR. PHILLIPS:  Certainly,  Your Honor,  I can

18   address that.   Not only having no CSAM material on the

19   devices in the cloud,  but as far as the Mega app,  the

20   Government did no search warrants to those apps.   There

21   is no CSAM material connected to any --

22        THE COURT:   Well,  they can't.   They are foreign

23   owned.   So,  I mean,  I signed a search warrant for

24   this.

25        MR. PHILLIPS:  Understood.

1          THE COURT:    Because TikTok is  -- excuse me --

2     Kik is --

3          MR. PHILLIPS:  There is no evidence  -- that's

4     right, but there is no evidence with those apps

5     connecting him to it.

6          THE COURT:    There is evidence that an individual

7     under the name  -- under the alias of Eric Rentling

8     engaged in chats and discussions,  travel, and engaged

9     with sex workers in Colombia over a period of several --

10    three to four times over last summer that corresponds,

11    I believe,  to the time that Mr. May was out of the

12    country.   Are you suggesting that that is just a

13    coincidence and that is not his alias either?

14         MR. PHILLIPS:  Specifically,  I just want to  -- I

15    apologize,  Your Honor,  I just want to be as specific

16    as possible in my responses as far as Eric Rentley

17    (sic),  I want to make sure --

18         THE COURT:    Rentling.

19         MR. PHILLIPS:  -- as far as providing that.   As

20    far as the travel Colombia,  specifically,

21    out-of-the-country travel --

22         THE COURT:    Out-of-the-country travel to follow

23    up on the email communications with the nine ladies or

24    young women that he  -- that are associated with the

25    account connected to his phone and laptop.

1          MR. PHILLIPS:  And in regards to rebuttable

2     presumption and his  -- the allegation of the

3     out-of-the-country travel with that not being tied

4     directly to the charge itself or no charges coming in

5     result of any of those allegations,  as far as the

6     rebuttable presumption,  trying to make sure as far as

7     the nexus to --

8          THE COURT:   The nexus is,  whoa,  I have no idea

9     that there is child sexual abuse material on my phone

10     and I don't know how it got there,  but meanwhile,  back

11     at the ranch,  there is this other account,  email

12     address,  PayPal, and Telegram,  Mega,  Gmail, Facebook

13     connected to this individual who the Government alleges

14     is your client using the alias Eric Rentling, who

15     coincidentally is travelling for sex in another country

16     at the same time that your client happens to be in that

17     country.   That is the nexus is, I have no idea what is

18     going on, but there is some information evidence related

19     to the same type of prurient sexual interest that,

20     frankly, corroborates more closely the information

21     obtained from the Kik account over this four- to

22     five-day period than the denials of, I don't know how it

23     got there, or it is not on my phone, or it is not on

24     these devices.

25          I am wondering if you have anything to offer to

1    me in order to argue that the rebuttable presumption

2    does not apply?  And if you don't,  you don't,  then I

3    am happy to rule.   But I don't want to  -- I want to

4    make sure that I don't miss any argument that you have

5    to make to the Court.

6         MR. PHILLIPS:  The specific response,  again,

7    would be that the out-of-country travel is completely,

8    in our opinion,  distinct in terms of there are

9    individuals that they are saying are on these videos,

10   which,  again,  I have not seen,  but with that being

11   said,  these individuals,  there is not an allegation

12   that they are underage.   There is testimony that they

13   say appear to be young,  but not enough for the

14   Government to make the indication that these individuals

15   were prepubescent or pubescent teenagers.  That,  again,

16   there was one specific communication referenced in

17   cross-examination that they are not able to tag

18   directly, even to those videos that the person said they

19   were 17 and his specific response was,  well, that is

20   young.   And that was just as far as being,  again,

21   those communications were not directly related to sex

22   themselves or connected to those videos.   So,  our

23   position is that those videos do not support the

24   distribution of CSAM material specifically.

25        I don't believe there is any denying that he had

1   left the country during the period of time,  certainly

2   not going to provide any type of misrepresentation on

3   that,  but I believe there is certainly a

4   distinguishable or distinct connection of trying to say

5   that whether there was videos of him with women that

6   that correlates to the distribution of CSAM material

7   when there is none found on any of his devices.

8           And specifically related,  I know you touched on

9   the PayPal account,  that wasn't connected to his bank

10  account.  There is,  again,  this alias as far as their

11  connection to that is they are saying the connection of

12  setting up specifically that -- the Kik account.   And

13  so that is where I think the contention is that he did

14  not, at that point, have access to any type of account

15  to create that user name,  did not create that user

16  name, and was not involved in the distribution of child

17  pornography.

18          THE COURT:   All right.   Thank you.

19          Any rebuttal?

20      MR. MATTHEWS:  Your Honor,  we just share Your

21  Honor's concerns about the extreme likelihood of a

22  coincidence.   Your Honor has highlighted the

23  Government's evidence regarding the password protected

24  IP address,  the use of his phone's IP address and how

25  for somebody else to have done this they would have had

1    to had access to his home,  access to his password,

2    access to his phone.  And as Your Honor highlighted,

3    that he travels outside the country at the same time

4    that somebody on his phone with PayPal account,  Gmail

5    account,  and Facebook account is also making

6    arrangements to travel to that same country to engage in

7    sex work to suggest that it is not Mr. May operating an

8    Eric Rentling account is not credible and we think the

9    strength of the evidence presented to Your Honor today

10   weighs in favor of detention.

11        THE COURT:   Thank you.

12        Anything further?  Anything further?

13        MR. PHILLIPS:  Nothing,  Your Honor.

14        THE COURT:   Okay.   All right.   Having held a

15   hearing pursuant to Title 18,  United States Code,

16   Section 3142,  I find that the rebuttable presumption

17   that arises under Title 18, United States Code, Section

18   3142(e)(3) involving an offense  -- ten offenses

19   involving minor victim under Title 18, United States

20   Code, Section 2252A(a)(2) and 2252A(b)(1),  that that

21   rebuttable presumption that there is no condition or

22   combination of conditions that would reasonably assure

23   the appearance of the Defendant as required and the

24   safety of the community has not been overcome by the

25   Defendant because there is probable cause to believe

1    that he did commit one or more of those offenses.

2          The Defendant has failed to introduce sufficient

3    evidence to rebut that presumption and detention can be

4    ordered on that basis alone.

5          Independently,  I find, having considered the

6    factors set forth in Title 18 of the United States Code,

7    Section 3142(g),  that there is no condition or

8    combination of conditions of release that would guard

9    against the risk of flight and a danger to the

10   community.   Specifically,  I make my findings as to the

11   safety of the community by clear and convincing evidence

12   and by a preponderance of the evidence that there is no

13   condition or combination of conditions of release that

14   would reasonably assure the Defendant's appearance as

15   required.

16         The findings that I make on the record I am

17   going to incorporate by reference into my Order of

18   Detention pending trial, which I anticipate putting on

19   the docket later on this afternoon.   But, specifically,

20   the main findings or reasons are the weight of the

21   evidence against the Defendant being strong; the lengthy

22   period of incarceration, if he were convicted; the

23   significant ties outside of the United States,

24   specifically Colombia and South America; his use of

25   aliases; and the fact that the background information is

1    unknown or unverified.

2         Specifically, the weight against  -- the weight

3    of the evidence against Mr. May is significant,  it is

4    very strong.  Homeland Security Agent -- Special Agent

5    Britton Lorenzen testified as to the investigation into

6    the Defendant.  Law enforcement received a CyberTip

7    here locally on -- around June 18th,  2024, concerning

8    50 files of child sexual abuse material,  CSAM,

9    distributed on March 31st,  2024.  That Kik user

10   joebidennnn with four Ns 69 using a Samsung  SM-G781U1

11   phone, and using an AT&T IP address registered to Robert

12   May at his West Columbia residence.  Law enforcement

13   confirmed the residence was Mr. May's using property

14   records and two cars registered to the Defendant and his

15   wife.

16        A search warrant executed at his residence on

17   June 27th,  2024, resulted in the seizure of two phones

18   that were password protected using password protected

19   internet service.  Law enforcement obtained a federal

20   search warrant for the contents of that Samsung G  --

21   SM-G781U (sic) phone that revealed Kik, Telegram,  Mega,

22   and Loki apps had been deleted on April 4th,  2024.

23   While CSAM was stored locally on the Samsung phone,  law

24   enforcement's analysis revealed 220 unique CSAM files

25   had been sent through that Kik account using the

1     joebidennnn69 user name.   This account had been used

2     over 1,100 times over near a five day period of March

3     31st to April 4th,  2024, even though the Kik app had

4     been installed a few months prior on December 2023.

5          There were no CSAM or Kik applications revealed

6     on Mr. May's wife's phone.   And there were only four

7     people who lived in that residence, including the two

8     minor children, who I do not believe were using the Kik

9     account.

10         The Defendant appears to have used the alias

11    Eric Rentling to register Mega Gmail,  Facebook,  and

12    PayPal accounts along with travel arrangements in the

13    Eric Rentling's name.   Coincidentally or maybe not,

14    Mr. May travelled to Bogota and Medellin in Colombia

15    over the course of some three or four times and these

16    resulted in some nine separate videos of what is

17    believed to be Mr. May engaging in prostitution with the

18    young ladies whose anatomy appear to reflect their age

19    of under 18.

20         Mr. Phillips,  would you like to hear my ruling

21    or is your conversation more important?

22         MR. PHILLIPS:   It is not more important,  Your

23    Honor.

24         THE COURT:   Thank you.

25         Messages between Mr. Rentling and the lake --

1    nine ladies discuss the prostitution meet-ups.   Law

2    enforcement recovered over 500 distributions of CSAM by

3    the Defendant,  though they  -- the Federal Government

4    currently has only charged ten Counts against Mr. May.

5    The Counts are connected to the  IP address of his home

6    or his phone through Verizon.

7         These distributions include videos involving

8    sexually explicit chats and images involving

9    prepubescent minors.   The chats include a

10   representation of Kik user joebidennnn69's preference to

11   CSAM involving, quote, father,  mom,  daughter, end

12   quote; bad dads,  bad moms,  which Agent Lorenzen

13   indicated an interest in CSAM of fathers and mothers

14   sexually abusing their own children.

15        Some of the time it appears the Defendant used

16   -- was using his phone for distribution of CSAM,  he was

17   also simultaneously using the phone to communicate with

18   his wife and for his business, Ivory Tusk Consulting,

19   including conducting research for legislation and

20   sending "happy Easter" text messages to his friend.

21        I will note that simultaneous use of

22   applications on a phone is not surprising and I don't

23   find it unusual that one would be able to simultaneously

24   do one activity as another.  As we have been sitting

25   here listening to testimony,  I have been taking notes,

1    I have been rescheduling other hearings, I have been

2    communicating with my law clerk, but I don't think that

3    is a big leap to think that one uses a phone for

4    multiple purposes at the same time.

5         On April 4th, 2024, Mr. May's laptop was --

6    his laptop searched for the meaning of "hebe," which is

7    erotic preference for pubescent children after the term

8    arose in Kik messages and that laptop also connected to

9    the Eric Rentling accounts according to the testimony of

10   Special Agent Lorenzen.   Images obtained from those Kik

11   accounts include CSAM of prepubescent minors,

12   sadomasochism and bestiality, and the Eric Rentling

13   account was used for international travel for sex

14   purposes for at least three or four times to Colombia.

15        The search warrant also revealed the presence of

16   firearms at Mr. May's residence.   And his phone

17   contained naked pictures of his own son, which did not

18   appear as CSAM, but which led law enforcement to have a

19   forensic interview conducted of his son.   And when he

20   was asked about pictures related to a birthday party,

21   he appears to have shut down, said he was not supposed

22   to talk about pictures, slapped his own face or head,

23   and ultimately the third time when he was asked about

24   pictures, he obtained Scotch tape and put it over his

25   mouth leading to the conclusion of the forensic

1    interview for fear of his mental health being perhaps

2    further harmed.

3         I am concerned about the danger to the

4    community, specifically to Mr. May's own minor

5    children, as well as to other children who are

6    somebody's children.  He is subject to a lengthy period

7    of incarceration if convicted:  he is facing five to 20

8    years and the Government's information leads them to

9    submit that he is facing closer to the 20 years, the

10   240 month guideline range, given that the images lead to

11   potentially heightened penalties including for

12   distribution for the age of the children or for the

13   number of images and for the types of images, including

14   the sadomasochism, bestiality, and so on.

15        As I mentioned, he has significant ties outside

16   of the United States:  Colombia, South America.  He

17   appears to have used aliases and false documentation

18   concerning his legitimate identity, and as I mentioned,

19   background information has been unverified by the

20   probation office.

21        So, for all of those reasons, I find that

22   detention is appropriate.  I will enter an Order of

23   Detention later today.  You are welcome to appeal that

24   ruling to the presiding district judge on this case who

25   has not yet been determined.  The case has not yet been

1  assigned to a district judge.

2      That is my ruling.  Anything further from the

3  Government?

4      MR. MATTHEWS:  No, Your Honor.

5      THE COURT:   Anything further from the Defendant?

6      MR. PHILLIPS:  No,  Your Honor.

7      THE COURT:   All right.   Best of luck to you.

8  (Whereupon, at 12:p.m., 45 the hearing concluded.)

9                  CERTIFICATE

10

11

12      I certify that the foregoing is a correct transcript

13  from the official electronic sound recording tape number

14  221 of the proceedings in the above-entitled matter.

15

16

17  _____          July 2, 2025

                S/Debra R. Bull            Date
18

19

20

21

22

23

24

25