# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:25-cr-778-CMC |
| | ) | |
| vs. | ) | |
| | ) | |
| **ROBERT JOHN MAY, III,** | ) | |
| a.k.a. "joebidennnn69," | ) | |
| a.k.a. "Eric Rentling" | ) | |

### Government's Sentencing Memorandum and
### Response to May's Objection to the Pre-Sentence Report

"Send the good stuff. Mom daughter, Mom son, fucking, and vids in English" May said, requesting another Kik user send him videos of children being sexually abused by their parents. PSR ¶ 25. "Okay," responded the other user, who then asked May his preference. *Id.* "Father daughter," May said. *Id.* "Do you have any age 6-12?" the other user asked. *Id.* "Yeah. Isn't that what I sent," May responded, referencing videos of children between kindergarten and sixth grade. *Id.* From his home and cell phone, May freely talked about the type of child abuse videos he preferred as he sent 220 unique videos to child pornographers in 18 states and six countries over a 5-day period. May was a hub of child pornography distribution. At the same time, he was voting to criminalize and impose severe penalties for child pornography distribution.

On January 14, 2026, this Court will sentence May. The Sentencing Guidelines provide an advisory range of 210 months to 262 months, with a period of five years to lifetime supervision to follow. PSR ¶ 86 (guidelines), 89 (supervision). To reflect the severity of May's crimes, to protect the public, to deter May and others, to promote respect for the law, and to vindicate victim rights, the Government respectfully requests a guideline sentence of 240 months, lifetime supervision to follow, and restitution in the amount of $73,000 as requested by May's victims. PSR ¶ 107 (restitution).

# I. May's Child Exploitation Scheme and the Federal Investigation

On May 27, 2024, the National Center for Missing and Exploited Children (NCMEC) received a tip from Kik, a mobile messaging application, indicating that an account with username "joebidennnn69" uploaded 50 child pornography files on March 31, 2024. PSR ¶ 23. The tip indicated the email address joehoe12368@gmail.com was used to register the account and that an AT&T IP address in West Columbia was used to send the files. *Id.*

The tip was initially routed to the Lexington County Sheriff's Department (LCSD), who confirmed the files depicted female children being made to engage in oral and vaginal sex with adults. *Id.* AT&T records obtained by LCSD confirmed the IP address used to distribute the child pornography was subscribed to May and Kik records showed the Kik account was created on March 30, 2024 using a Samsung SM-G781U1 smart phone (the type of phone May used) using May's home Wi-Fi. PSR ¶¶ 23-24. The substantial scale of May's distribution scheme quickly became clear. LCSD served a search warrant on Kik for the contents of the joebidennnn69 account and found 220 unique child pornography videos were sent 479 times, together with 1,147 messages to more than 100 users, all in the five-day period between March 31, 2024 and April 4, 2024. PSR ¶ 25. The messages were explicit, and it was clear the account user was seeking videos of children being sexually abused and that the user was widely distributing those videos to others.

After the Lexington County investigator discovered that May was a sitting member of the South Carolina House of Representatives, the case was referred to Homeland Security Investigations. PSR ¶ 26. HSI Special Agent Britton Lorenzen began conducting surveillance at the May home, confirmed that May lived there, and that his home Wi-Fi was password protected. PSR ¶ 27. Given that evidence, the Honorable Paige J. Gossett, United States Magistrate Judge, approved a federal search warrant for May's home, and agents executed that warrant on August 5,

2024.  PSR ¶ 30.  Agents seized a Samsung SM-G781U1 cell phone from May's bedroom, and May admitted the phone was his.  *Id.*

May's phone connected him to the joebidennnn69 Kik account and the child pornography scheme he operated.  On May's cell phone, HSI found the user dictionary, a feature that stores a phone's commonly typed words and phrases, contained the terms "joebidennnn" and "joehoe12368@gmail.com."  PSR ¶ 31.  Those were the same distinctive terms associated with the initial tip.  PSR ¶ 32.  Agents also found that May had deleted the Kik and MEGA applications from his phone on April 4, 2024 within 30 seconds of each other.  *Id.*  The joebidennnn69 account routinely discussed using MEGA to distribute child pornography. For example:

| | |
|---|---|
| Bdjzhabebdbdu: | **Send a mega** |
| joebidennnn69: | S2r [send to receive] |
| joebidennnn69: | Bad moms? S2R |
| joebidennnn69: | **I got mega. Trade?** |
| letscumsluts68: | I got a mega with 20 vids. Down to trade for that? |
| joebidennnn69: | Sure. |
| letscumsluts68: | Proof I got it. Drop some more vids first please. Unless you got a mega to share too? |

PSR ¶ 31.  May's phone also received an e-mail in the name of a fake identity—Eric Rentling—to set up a MEGA account at the same time joebidennnn69 was discussing the MEGA application.  PSR ¶ 32.

The connections between May's phone and the joebidennnn69 account didn't stop there.  May's phone downloaded the Telegram and Sessions encrypted chat applications at the same time that joebidennnn69 was discussing the chat applications.  *Id.*  And Telegram records show May used his cell phone and his home Wi-Fi to set up an account in the name he liked to use to distribute child pornography, "Joe Biden."  *Id.*

IP session information pointed to May. The joebidennnn69 account shared illegal content from May's home Wi-Fi account and using five IP addresses associated with May's cell phone. PSR ¶ 27. The Kik account also began using a VPN to access the internet on April 3, 2024, the same day that May installed a VPN application on his phone. PSR ¶ 32.

As detailed below, agents found that over a five-day period, May used the joebidennnn69 account to distribute 220 unique child pornography videos to more than 100 Kik users in 18 states and 6 countries. PSR ¶¶ 28, 35. May sent the files out 479 times; 432 from his home Wi-Fi, 19 from his cell phone's IP address, and 28 times from a VPN network. *Id.*

## II.     Federal Charges and May's Convictions

On June 10, 2025, a federal grand jury indicted May on 10 counts of distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2). PSR ¶¶ 1-11. May was arrested on June 11, 2025, and ordered detained by the Honorable Shiva V. Hodges, United States Magistrate Judge, on June 12, 2025. ECF No. 21. After this Court declined to suppress the federal search warrants, ECF No. 83 and 84, on September 29, 2025, May tendered a guilty plea to Counts One through Five of the indictment pursuant to a written plea agreement. ECF No. 87, PSR ¶ 14.

## III.    Sentencing Guidelines

On December 2, 2025, U.S. Probation issued a presentence report (PSR). The Government has no objections to that report. May filed a single objection, as detailed below, which remains outstanding for the Court to resolve at sentencing. For the reasons below, the Government respectfully submits that the Cour should overrule May's objection.

The U.S. Sentencing Commission Guidelines Manual provides that May's guideline imprisonment range is 210 months to 262 months based on a total offense level of 37 and a criminal

history category of I.  PSR ¶ 88.[1]  May's base offense level is 22 given his offense of conviction, 2 levels were added because May's files involved prepubescent minors, 5 levels are added because May traded the child pornography in exchange for a thing of value, including other child pornography, 4 levels are added because the files depicted sadistic and masochistic abuse, violence, and/or the sexual abuse of an infant or toddler, 2 levels are added for May's use of a computer, 5 levels are added for May's offense involving more than 600 child pornography files, and 3 levels are removed for May accepting responsibility.  PSR ¶¶ 53-58.  The guideline term of supervision to follow is 5 years to Life.  *Id*. ¶ 94.

## IV.     Response in Opposition to May's Sentencing Objection

### a.  May's Objection

May's only legal objection is to the application of a 5-level enhancement for the offense involving more than 600 images within the meaning of U.S.S.G. § 2G2.2(b)(7)(D).  PSR ¶ 58. Instead, he asks for a 4-level enhancement.  May acknowledges he is responsible for 479 videos, which he argues supports a 4-level enhancement under § 2G2.2(b)(7)(C).  PSR Addendum at 1 and 5.  In support of his argument, May contends the term "image" is unambiguous.  PSR Addendum at 1.  Therefore, May asserts that pursuant to *Kisor v. Wilkie*, 588 U.S. 558 (2019) and *United States v. Boler*, 115 F.4th 316 (4th Cir. 2024), the Court may not defer to the Guidelines' commentary to define terms.  *Id*.  He further argues that each video, no matter how long and how many frames it depicts, should count as a single image.  In the alternative, May argues that if the term "image" *is* ambiguous, the 1 video equals 75 images rule prescribed by the commentary is not a reasonable interpretation of the term.  *Id*.[2]

---

[1] The maximum penalty allowed by statute for the counts of conviction is 240 months. That is a guidelines sentence and for the reasons below, it is warranted.

[2] After briefing and argument, on November 3, 2025 Judge Anderson considered and rejected the same objection advanced here in *United States v. Daniel Paul Shealy*.  *See* 0:23-cr-971-JFA at ECF No. 195.

As an initial matter, even if the Court agrees with May that the term "image" is unambiguous, the Court need not defer to the commentary to conclude that May possessed more than 600 images. Second, because the term "image" is ambiguous, particularly as it applies in the context of a video, reference to the commentary is appropriate. May's argument otherwise overlooks the text, structure, history, and purpose of the Guideline and commentary. May's objection should be overruled.

### b. Legal Framework

When deciding whether to defer to the Guidelines' commentary, courts apply the framework set forth in *Kisor*, 588 U.S. 558; *see also Boler*, 115 F.4th 316 (applying *Kisor*). Pursuant to *Kisor*'s directive, "[Commission] deference 'can arise only if a regulation is genuinely ambiguous.'" *Romero v. Barr*, 937 F.3d 282, 291 (4th Cir. 2019) (quoting *Kisor*, 588 U.S. at 573). And a regulation can only be deemed "genuinely ambiguous" if uncertainty exists "even after a court has resorted to all the standard tools of interpretation," including consideration of the "text, structure, history, and purpose of a regulation." *Kisor*, 588 U.S. at 575. "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means— and the court must give it effect, as the court would any law." *Id.* at 574–75. Thus, concluding whether a rule is "genuinely ambiguous" is step one of the analysis. *See Kisor*, 588 U.S. at 573.

Once a regulation is determined to be genuinely ambiguous, "the agency's reading must still fall 'within the bounds of reasonable interpretation'" in order to be accorded deference. *Id.* at 559 (quoting *Arlington v. FCC*, 569 U.S. 290, 296 (2013)). In other words, the agency's interpretation of its regulation "must come within the zone of ambiguity" created by the ambiguous text of the regulation. *Id.* at 576. If it does, courts "make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* This inquiry ensures that courts defer only to those agency readings "that Congress would have wanted

[them] to." *See id.* While there is no "exhaustive test" to determine whether the character of an agency's interpretation is entitled to deference, the Supreme Court has "laid out some especially important markers." *Kisor*, 588 U.S. at 576–77. First, the interpretation must be the "official position" of the agency. *Id.* at 577 (cleaned up). "Next, the agency's interpretation must in some way implicate its substantive expertise." *Id.* at 579. "Finally, an agency's reading of a rule must reflect its 'fair and considered judgment.'" *Id.* (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

Section 2G2.2(b)(7), provides an enhancement of up to 5 levels for the number of child pornography images involved:

> (7) If the offense involved—
>
>> (A) at least 10 images, but fewer than 150, increase by **2** levels;
>>
>> (B) at least 150 images, but fewer than 300, increase by **3** levels;
>>
>> (C) at least 300 images, but fewer than 600, increase by **4** levels; and
>>
>> (D) 600 or more images, increase by **5** levels.

U.S.S.G. § 2G2.2(b)(7). The text of the Guideline provides nothing further, including no language related to how Courts are to count the number of images involved in video files. However, in the Guideline commentary that follows, the Commission provides two relevant definitions:

> 6. **Application of Subsection (b)(7).**—
>
>> (A) **Definition of "Images".**—"Images"" means any visual depiction, as defined in 18 U.S.C. § 2256(5), that constitutes child pornography, as defined in 18 U.S.C. § 2256(8).
>>
>> (B) **Determining the Number of Images.**—For purposes of determining the number of images under subsection (b)(7):
>>
>>> (i) Each photograph, picture, computer or computer-generated image, or any similar visual depiction shall be considered to be one image.
>>>
>>> (ii) Each video, video-clip, movie, or similar visual depiction shall be considered to have 75 images.

U.S.S.G. § 2G2.2(b)(7) app. n. 6.

c. __Analysis__

First, even if the term "image" is unambiguous, because each video frame containing child pornography qualifies as one image, the Court need not defer to the commentary to conclude that May possessed more than 600 images. May's child pornography videos described in PSR ¶ 29 represent more than 6,900 frames associated with the five counts of conviction alone, the majority of which depict child pornography. Attachment A – PSR ¶ 29 Frame Count; *United States v. Kluge*, 147 F.4th 1291, 1300 (11th Cir. 2025) (in considering § 2G2.2(b)(7), "there is no doubt that "image" means "frame" in the context of a video").

Second, because "image" and how it applies in the context of a video is ambiguous, commentary deference is appropriate. May's argument to the contrary overlooks the text, structure, history, and purpose of the Guideline and the commentary. The image table at § 2G1.2(b)((7)(D) clearly demonstrates both Congress' and the Sentencing Commission's intent to punish defendants more severely for higher amounts of content. The 75:1 rule prescribed by the Sentencing Commission to count the number of images in a video is not unreasonable or arbitrary. It is a reasonable interpretation of how to apply the guideline in the context of a video, and it works to the benefit of defendants like May.

i. **Even assuming the Court cannot consult the commentary, May's offense involved more than 600 images given his receipt and distribution of thousands of frames of child pornography within the videos.**

Even if the Court agrees with May that "image" as used in § 2G2.2(b)(7) is unambiguous, May's argument ignores the fact that videos contain far more than one image each. The enhancement applies based on the only reasonable interpretation of the term "image."

As described above, because the Guideline does not define "image," the analysis begins with the ordinary meaning of the term. *Boler*, 115 F.4th at 323 (loss); *Kluge*, 147 F.4th at 1298

(image). The Eleventh Circuit in *Kludge* looked to the 2003 *Merriam-Webster's Collegiate Dictionary* to conclude "image" referenced "a visual representation of something" such as "a likeness of an object produced on a photographic material" or "a picture produced on an electronic display." 147 F.4th at 1298. Other dictionaries (American Heritage Dictionary, Shorter Oxford English Dictionary, and Oxford English Dictionary) provided similar results. *Id.* In short, "image" references a "fixed visual depiction." *Id.*; *citing United States v. Haggerty*, 107 F.4th 175, 184 (3rd Cir. 2024); *United States v. Phillips*, 54 F.4th 374, 391 (6th Cir. 2022) (Larsen, J., concurring in the judgment).

A video, in contrast, "contains multiple images," since a video is nothing more than a "sequence of images processed electronically . . . to create the illusion of motion and continuity." *Id. citing Phillips*, 54 F.4th at 392 (Larsen, J., concurring in the judgment) (cleaned up). For that reason, numerous courts have held that "the plain meaning of § 2G2.2(b)(7) unambiguously instructs that each video frame that contains child pornography counts as one "image" for purposes of calculating any sentencing enhancement." *Kluge*, 147 F.4th at 1300-01 ("We conclude that § 2G2.2(b)(7) unambiguously dictates that each video frame containing child pornography counts as one image."); *Haggerty*, 107 F.4th at 189 ("[W]e hold that, based on the ordinary meaning of both terms, an "image"—in the video context—is a "frame."); *Phillips*, 54 F.4th at 391 (Larsen, J., concurring in the judgment) ("Happily, the answer is clear. An 'image' means exactly what one would think: a "still representation" of something. And, in the context of a video, that means a 'frame.'").

If courts were limited to the text of the Guideline alone, and no deference to the commentary was afforded, the plain reading of "image"—as the Third Circuit, the Eleventh Circuit, and Judge Larsen in the Sixth Circuit have concluded—would consider every frame of a child pornography video as an "image" in applying § 2G2.2(b)(7). And the five child pornography

videos that form May's offenses of conviction contain more than 6,900 frames. *See* Att. A at 2. The majority of the frames in those videos are child pornography. *Id*. And that is an analysis of just five of May's 220 unique child pornography videos that he distributed 479 times. *See* PSR ¶ 28. May is responsible for far more than 600 images.

In other words, even with a framework that avoids the commentary entirely, May is responsible for more than 600 images of child pornography. U.S. Probation was right to apply the 5-level enhancement because the offense involved more than 600 images. May's objection should therefore be overruled.

### ii. Because the Guideline is genuinely ambiguous, the commentary's 75:1 rule is entitled to deference, and the five-level enhancement should be applied.

Should the Court wish to resolve the *Kisor* issue, it should hold the Guideline is genuinely ambiguous and refer to the commentary. As shown below, that rule falls within the zone of ambiguity, its character and context entitle it to deference, and it is a rule that helps, not hurts, defendants like May.

### 1. The Guideline is ambiguous

First, "image" within the meaning of § 2G2.2(b)(7)(D) is ambiguous after considering the traditional tools of statutory construction: the text, structure, history, and purpose. Step one of the *Kisor* analysis asks whether a genuine ambiguity exists in § 2G2.2(b)(7)'s use of the term "image." *See Boler*, 115 F.4th at 323 (same as for "loss"). The traditional tools all point in one direction.

The text shows ambiguity. As in *Boler*, "dictionary definitions do not reveal any single definition of the term." 115 F.4th at 323-24. "The term 'image,' of course, means different things in different contexts." *United States v. Phillips*, 54 F.4th 374, 382 (6th Cir. 2022). Even the most applicable definition demonstrates ambiguity:

> The most relevant definition of "image" is a "physical or digital representation of something, originally captured using a camera from visible light, and typically

reproduced on paper, displayed on screen, or stored as a computer file." *Image*, Oxford English Dictionary (2022). And a "video" is, most relevantly, "a recording of moving visual images ... in a digital format." *Video*, Oxford English Dictionary (2022). So it is clear that a "video" is comprised of some number of images. But how many?

*Id*. "Image" can mean something entirely different in the context of a movie. A "powerful image" communicated in a film, as the Sixth Circuit reasoned, may reference something far broader than a still visual depiction or the single frame of a video. *Id*. Merriam Webster also shows multiple options where it defines "image" as "a visual representation of something, such as (1) a likeness of an object produced on a photographic material [or] (2) a picture produced on an electronic display (such as a television or computer screen)." *Image*, Merriam-Webster, https://www.merriam-webster.com/dictionary/image (last accessed Dec. 31, 2025). The term can also refer to the optical counterpart of an object produced by an optical device, such as a lens or mirror, it may refer to a mental picture or impression, or an idea or concept. *Id*. Meanwhile, "video" is defined as "a recording of an image or of moving images," or "being, relating to, or involving images on a television screen or computer display." *Video*, Merriam-Webster, https://www.merriam-webster.com/dictionary/video (last accessed Dec. 31, 2025).

Even if the Court were to conclude that "image" could only reference a still visual representation and that "video" could only reference a collection of images displayed, the text of the Guideline provides nothing as to how the term "image" is to be applied in the context of a video. That alone supports a finding of ambiguity. Indeed, although the meaning of the term "image" is the right question "in some sense," "the ambiguity is wider than that." *Phillips*, 54 F.4th at 380. "[H]ow many images are in a video? and how do videos map on to the image table?" *Id*. (cleaned up). Ambiguity is apparent here in that nothing in the text of the Guideline answers the question. However, the commentary does.

Fourth Circuit caselaw supports a finding of ambiguity. "Image" within the meaning of § 2G2.2(b)(7) bears the same fate as other Guidelines texts that are not plainly defined or when the term can have more than one meaning. Such terms are ambiguous within the meaning of *Kisor*, and commentary deference is therefore appropriate. *See, e.g., Boler*, 115 F.4th 316 ("Because no single meaning of 'loss' is evident from the plain text of section 2B1.1, even after employing the traditional tools of interpretation, we conclude that a genuine ambiguity exists."); *United States v. Sanders*, 146 F.4th 372, 380 (4th Cir. 2025) (finding "sophisticated means" is genuinely ambiguous because "there is no single right answer to the meaning of sophisticated means based on its plain reading" (cleaned up)); *United States v. Bright*, 125 F.4th 97, 101 at n.4 (4th Cir. 2025) (holding court could consider commentary because "criminal activity" and "jointly undertaken criminal activity" are ambiguous). A finding of ambiguity here would fit well within that body of caselaw. *See also United States v. Brewer*, 2025 WL 2739025, at *7 (4th Cir. 2025) (unpublished) (assuming "position" is genuinely ambiguous as it is used in the Guidelines); *United States v. Richardson*, 146 F.4th 394, 402-03 (4th Cir. 2025) (citing with approval consideration of the Guidelines commentary to determine if "a dangerous weapon" was possessed within the meaning of the Guidelines). Because "image" can have more than one meaning, and because the text of the Guideline provides nothing as to how it is to be applied in the context of a video, it is ambiguous within the meaning of *Kisor,* and deference to the commentary is appropriate.

The history, structure, and purpose of the Guideline also weigh in the favor of ambiguity. As for the history, the image table at issue "came about in response to the PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650," through which "Congress took the unusual step of amending the Guidelines directly." *Phillips*, 54 F.4th at 378; citing *United States v. McNerney*, 636 F.3d 772, 777 (6th Cir. 2011). Through that Act, Congress required the Guidelines incorporate an image table to increase penalties "based on the amount of child pornography involved in the offense."

*Id.*; citing H.R. Rep. No. 108-66 at 59. The Sentencing Commission adopted the image table verbatim as directed by Congress at § 2G2.2(b)(7). *Id.*

But Congress did not define "image," and it did not explain in any way how to determine the number of images in a video when applying the table. *Id.* So, the Sentencing Commission then solicited public comment on the question, and in response adopted the 75:1 rule, which it placed in the commentary at U.S.S.G. § 2G2.2 cmt. n.6(A). *Id.*; citing *History of the Child Pornography Guidelines*, Oct. 2009, at 43–44, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf (last accessed Dec. 31, 2025). With that, the purpose of the Guideline "is not in doubt; it was intended to increase the penalty by an amount corresponding to the number of images involved in the offense." *Phillips*, 54 F.4th at 383. "And it did so by increasing the penalty when the number of images reached specific numerical thresholds, capping out at 600." *Id.*

Completely inconsistent with that purpose, May asks for each video to count as a single image, PSR Addendum at 1, which would not meaningfully differentiate between offenders who have less child pornography from those, like May, who have more. *See, e.g., United States v. Lynde*, 926 F.3d 275, 280 (6th Cir. 2019) ("[V]ideos and movies cause more harm and so should be weighed much more heavily than photos or pictures."). With May's proposal, an offender with ten thumbnails would receive a 2-level enhancement (for having between 10 and 150 images), where the offender who has a high-definition child pornography video with many thousands of frames would receive no enhancement (because he would have one "image"). *But see Phillips*, 54 F.4th at 383; *citing* Antonin Scalia, A Matter of Interpretation 23 (1997) ("A text should not be construed strictly, and it should not be construed leniently; it should be construed reasonably, to contain all that it fairly means."). Such a result would lead to a sentencing disparity, which as the

court noted in *Boler*, is precisely what the Sentencing Guidelines are designed to prevent. *See Boler*, 115 F.4th at 327 ("Were we to accept Appellant's limited reading of 'loss' it could result in sentencing disparities for defendants with similar culpability. And this is contrary to the Guidelines' purpose."). May's position is unreasonable and cannot be squared with the history, purpose, or structure of the Guideline.

May's argument that one video—apparently no matter how long, how many victims it depicts, and how many frames it includes—must only count as one image, PSR Addendum at 1 and 5, is based in a misapplication of how the Guideline commentary references certain statutory definitions. The Sixth Circuit has considered and rejected this same argument. *See Phillips*, 54 F.4th at 381. In short, the argument is that "image" and "visual depiction" are in effect the same thing, by referencing two statutory definitions: "visual depiction" at 18 U.S.C. § 2256(5), and "child pornography" at 18 U.S.C. § 2256(8). *Id.* To make the argument, May inherently relies on Application Note 6—the same Application Note he asks this Court to avoid in the 75:1 rule. In that, "visual depiction" in relevant part is defined to include "undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image . . . ." 18 U.S.C. § 2256(5). "Child pornography" is then defined to include "any visual depiction, including any photograph, film, video, or computer or computer-generated image . . . ." depicting a minor in sexually explicit conduct. 18 U.S.C. § 2256(8). The final jump in May's argument is that Application Note 6(A)— as May asks this Court to avoid Application Note 6(B)—defines "image" for the purpose of the Guideline as "any visual depiction, as defined in 18 U.S.C. § 2256(5), that constitutes child pornography, as defined in 18 U.S.C. § 2256(8)." U.S.S.G. § 2G2.2 cmt. n.6(A). To May, this means that the Commission itself in Application Note 6 equated "visual depiction" with "visual

image." "We do not agree," the Sixth Circuit held in rejecting the same argument in *Phillips*. 54

F.4th at 381. As that court explained:

> Instead, the definition of "visual depiction" broadens the reach of the term to
> include various items that might not otherwise normally be considered a "visual
> depiction," such as undeveloped film, or computer data that is capable of being
> converted into a visual image. And while the definition of "child pornography"
> does explain that videos are a type of visual depiction, it provides no indication that
> each individual visual depiction is equivalent to one "image" as that term is used in
> the Guideline.

*Id.* And even if May's logic was *a* reasonable interpretation, as the *Phillips* court held, "it is not

the *only* reasonable interpretation." *Id.* Instead, the *Kisor* guideposts favor a finding of ambiguity

and deference to the commentary's reasonable interpretation and application of the image table.

Taken together, the traditional tools of statutory construction—the text, structure, history,

and purpose—show that a genuine ambiguity exists in Guideline's use of the term "image" and

how the term is to be applied to videos. *See Phillips*, 54 F.4th at 384 ("We conclude that after

applying the traditional tools of statutory construction, determining the number of images in a

video is the kind of genuinely ambiguous exercise that the Commission was entitled to address in

commentary."). Given that, the analysis turns to the second step.

**2. The 75:1 rule falls within the "zone of ambiguity" and an
inquiry into the character and context of the commentary entitle
it to controlling weight**

Next, because the 75:1 rule in Application Note 6(B)(i) falls within the "zone of ambiguity"

created by the ambiguous text of the Guideline, the commentary should be given deference. *Boler*,

115 F.4th at 323. Step two of the *Kisor* analysis asks whether the commentary falls "within the

bounds of reasonable interpretation" in order to be afforded deference. *Id.*; citing *Kisor*, 588 U.S.

at 559. That analysis requires a look at the text, structure, and history of the Guideline "to see if

the 75:1 Rule is a reasonable way to interpret the image table as applied to videos." *Phillips*, 54

F.4th at 384.

Here, because the 75:1 rule "falls within the bounds of reasonable interpretation by . . . the Commission," the Application Note "falls within the zone of ambiguity." *Boler*, 115 F.4th at 327 (cleaned up). And as the Sixth Circuit concluded, the 75:1 rule fits within the zone of ambiguity because it considers:

> (1) the fact that videos contain multiple images; (2) the image table's purpose of tying offense levels to the number of images; and (3) Congress's choice to create four different tiers of punishment, based on a scale of 10 to 600 images. The 75:1 Rule is not based on an independent policy choice by the Commission to implement some other sentencing or adjudicative goal. Instead, the Commission chose that ratio in direct response to the challenges of applying the image table laid out by Congress. For that reason, it is a reasonable interpretation of the term "images" as applied to videos.

*Phillips*, 54 F.4th at 384. It is also clear that while child pornography videos contain multiple "images," and therefore substantially more child pornography content, a rule like the one found in the Application Note is necessary to protect against every video collector from receiving the maximum enhancement. As the Sixth Circuit reasoned, if courts counted each frame of child pornography from a video as a separate image, "possessing any video would nearly automatically vault the offender to the top of the range." *Phillips*, 54 F.4th at 383. And with that, "differences of only a few seconds lead to vastly different penalties." *Id.* For example, the 1-minute-8-second-long video comprising count 1 of the indictment in paragraph 29 of the PSR alone contains 1,996 frames. *See* Att. A at 2-3. That video alone would support the maximum enhancement under a frame count rule. The 75:1 rule caps the image count at 75. In other words, the 75:1 rule works to the benefit of defendants like May, rather than hurts them.[3]

---

[3] For these same reasons, the Court should reject May's alternative argument that the 75:1 rule, assuming it is referenced, is "arbitrary and unreasonable." PSR Addendum at 4. On the contrary, it is well reasoned, grounded in factors such as those noted above, and it inures to May's benefit, capping the number of images he is held accountable for, rather than counting his many thousands of child pornography frames each as separate images. Because the 75:1 rule falls within the bounds of reasonable interpretation, it falls within the zone of ambiguity. The second step is satisfied.

Finally, because the zone of ambiguity requirement is satisfied, the analysis turns to an inquiry into whether the "character and context" of the commentary entitles it to "controlling weight." *Boler*, 115 F.4th at 328. For that, courts consider "whether the commentary is the Commission's "official position, whether it implicates its substantive expertise in some way, and whether it reflects the fair and considered judgment of the Commission such that it is not simply a "convenient litigating position." *Boler*, 115 F.4th 327; *citing Kisor*, 588 U.S. at 577–79 (cleaned up).

Here, the character and context of the 75:1 rule entitles it to controlling weight. First, it is the Sentencing Commission's "official position" in that in 2003 the Commission amended the Guidelines to incorporate the rule. *Phillips*, 54 F.4th at 378. It did so in response to Congressional directives in the PROTECT Act, "a plethora of comments," including from the public, prosecutors, and public defenders, and through its own considered judgement, all in light of the fact that "image" was not defined. *See Haggerty*, 107 F.4th at 186 (history of the 75:1 rule becoming the Commission's official position). The 75:1 rule has long been the position of the Sentencing Commission, and that position was adopted as a result of fair and considered judgment. The commentary represents the Sentencing Commission's substantive expertise in that it is a product of a vast amount of data collected by the Commission, together with research, direction from Congress, and input from the criminal justice community. *See Boler*, 115 F.4th at 328. The "character and context" of the commentary entitles it to controlling weight.

For these reasons, commentary deference is appropriate, the 75:1 rule applies, and the objection should be overruled.[4]

---

[4] The Fourth Circuit routinely affirms sentences even where it concludes an error occurred in the calculation of the Guidelines if the record makes clear the district court "would have imposed the same term of imprisonment as a variance sentence," and the "§ 3553(a) factors, on the whole, justified the sentence" imposed. *See, e.g., United States v. Gomez–Jimenez*, 750 F.3d 370, 383 (4th Cir.), cert. denied, —— U.S. ——, 135 S.Ct. 305, 384, 190 L.Ed.2d 222, 271 (2014); *United*

## V.    The Appropriate Sentence

The Government respectfully requests a guideline sentence of 240 months, $73,000 in restitution payable to the eight victims who have submitted requests, and lifetime supervised release. PSR ¶¶ 88 (guidelines), 107 (restitution), 94 (supervision). A downward variance is not warranted in light of the sentencing factors for the reasons below.

### a.    Nature and Circumstances of the Offense

May showed no mercy towards the children he exploited. As the victims make clear below, May's distribution has substantially compounded their suffering. A guideline sentence of 240 months is necessary to reflect the seriousness of the offense, to protect the public, to deter May and others like him, and to vindicate victim rights.

### i.    May's Words

"Do you have any age 6-12?," one Kik user asked. PSR ¶ 25. May responded, "Yeah. Isn't that what I sent?" *Id*. May talked about sexually abused elementary school-age victims as if they were something to consume, not as if they were children. When another user asked if he had any child pornography depicting "anyone that [is] in highschool," May responded, "I don't have much of that, but lots younger." PSR ¶ 26. For May, high school was too old. To another user, May asked for videos of children being sexually abused by their parents, "Send the good stuff. Mom daughter, mom son, fucking, and vids in English. Or girl boy fucking." *Id*. When the user asked his preference, May asked for incest content, "Father mom daughter." *Id*. To another, May asked, "Got any more bad moms?" ECF No. 70-1 at 1. And when another user asked, "Got any moms and daughters," May responded, "Yea send 3 and I'll go find it. You got more mom daughter?" *Id*. at 9. May sought files showing toddler age children being sexually abused not just

---

*States v. Diosdado–Star,* 630 F.3d 359, 366-67 (4th Cir. 2011). If that is this Court's conclusion, the Government respectfully asks the Court to note the same at sentencing.

by any adult, but by their parents. The victims May sought out were so young they were unable to protect themselves. Some were too young to realize the abusers were hurting them.

The text displayed across one video that May sent to others was equally as shocking. After sharing a video of adult men ejaculating on the face of three toddler-age girls, and of adult men ejaculating into the mouths of two more children, the text across the video was "greetings" "to all the little cock suckers." PSR ¶ 29. Despite the apparent humiliation and pain of the children in the video, May sent that file from his home to another user. May's words were degrading and exploitative, and they support a guideline sentence.

### ii. The Volume

The volume of the abuse files that May received, possessed, and distributed also supports a guideline 240-month sentence. In the five-day period for which the Government recovered content, May possessed 220 unique child pornography files, which he distributed collectively 479 times. He also sent more than 1,100 messages to other child pornographers, all in a five-day period. The volume of files that May received and distributed in the short window for which data is available shows the danger to the community May represents and supports a guideline sentence.

### iii. The Content

May's videos depicted children, including toddlers, suffering rape. They show his interest in extreme forms of child pornography, including videos of children being sexually abused by their parents. Some videos show children in apparent physical pain, in tears, and being made to engage in sex acts with an animal. All of the victims in May's videos were too young to protect themselves, but many were old enough such that they will remember their abuse. The content May sought out, possessed, and distributed represents some of the most degrading and damaging content that comes before any court. Consider the five files that May pleaded guilty to distributing:

### 1. Count 1 – Forced Oral Sex While an Infant Nurses

May distributed the video charged in Count 1 to five different Kik users between April 1 and April 3, 2025 – four times from his home Wi-Fi and once from his cell phone's internet connection. PSR ¶ 29(1). The 1 minute and 8 second video showed an adult woman nursing an infant in the front seat of a car until the camera panned to the back seat to show a sexually aroused man with his penis exposed. *Id*. The man then forced a young child in the back seat to perform oral sex on him before the video panned back to the infant nursing. *Id*.

### 2. Count 2 – Toddler Crying While being Penetrated

May distributed the video charged in Count 2 from his home on April 4, 2024. PSR ¶ 29(2). The 14 second video showed an adult male penetrating a toddler girl's vagina with his penis. *Id*. The victim was visibly wincing in pain and there were tears in her eyes. *Id*. At the same time May sent that video, he was discussing with another user whether either had any "mom daughter" videos. ECF No. 70-1 at 9. Rather than reporting the video or doing anything to help the child, who was crying while she was being subjected to forced sex, May sent the file to another user. That content, and May's conduct, was depraved, and it supports a guideline sentence.

### 3. Count 3 – Abusing a Toddler with a Sex Toy

May distributed the video charged in Count 3 from his home on April 3, 2024. PSR ¶ 29(3). The 1 minute and 35 second video showed a toddler girl on her hands and knees with the camera lens focused on her vagina and anus while an adult female performed oral sex on the child and manipulated her with a sex toy. *Id*. In another dark moment, the woman then made a heart shape with her hands towards the child, and made the child look at her through the child's legs. *Id*. Less than one minute after May distributed that child pornography file, he called a political client. ECF No. 70-1 at 8. May distributed that video together with 11 other videos in 11 minutes to numerous users. *Id*. For May, switching from business to child abuse videos appears natural.

### 4. Count 4 – "Greetings to All the Little Cock Suckers" after Ejaculating on Four Children

May distributed the video supporting Count 4 from his home on April 3, 2024. PSR ¶ 29(4). The 1 minute and 57 second video was a compilation of nine children, some toddlers, being sexually abused in degrading and humiliating ways.

In the first clip, an adult tried to force a child in a Mardis Gras mask to perform oral sex on him, but the victim's mouth was too small. *Id*. In the second clip, a prepubescent girl winced and closed her eyes tightly when she was made to lay on her back while an adult ejaculated on her face. *Id*. That file was one of many that May received, possessed, and sent to others that showed men ejaculating on a child's face and in a child's mouth. *See, e.g., Id*. (describing several more). Bestiality then followed. In the third clip, a prepubescent girl was forced to perform oral sex on the gentiles of either a dog or goat. *Id*. The fourth, fifth, and sixth clips all showed adult men ejaculating on the face of toddler age girls. *Id*.

In the seventh clip, an adult male ejaculated in a toddler girl's mouth; the victim then looked at the camera and was made to show the semen in her mouth. *Id*. The eighth and ninth video clips show the same, except this time the toddler girls were videoed spitting semen out of their mouth. *Id*. Text spanned across the screen at the end of the video that read: "greeting" "to all the little cock suckers." *Id*.

May sent that video minutes before he called a number associated with another S.C. House member and just before he e-mailed a state party official. ECF No. 70-8 at 4. In a 30-minute window surrounding that distribution, May switched between receiving child pornography (10 files), distributing child pornography (14 files), sending e-mails as a political consultant, and searching the internet for Joe Biden and Anthony Fauci. ECF No. 70-8 at 4. As was apparently typical for him, May quickly switched from business and politics to child pornography.

### 5. **Count 5 – Two Adult Men Having Sex with a Toddler**

May distributed the video supporting Count 5 from his home on April 3, 2024. PSR ¶ 29(5). The 12 second video showed a toddler female being forced to perform oral sex an adult male while a different adult male was penetrating the toddler's vagina or anus from behind with while "Hello Kitty" bedsheets hang in the background. *Id.* Days before sending this video, May and the same user discussed whether either of them possessed any "young" children featuring "cumshot(s)" or "fucking." ECF No. 70-1 at 15.

### 6. **The other 215 videos**

The five videos described above represent two percent of the 220 files May distributed in a 5-day period. Those are merely the files he pleaded guilty to. The 215 files left undescribed are equally as dark. The content supports a guideline 240-month sentence.

### iv. **May's Distributions**

A sentence of 240 months is also warranted because May multiplied the abuse of his victims by distributing the files hundreds of times over. This is not a possession case. May was a prolific child pornography distributor. He sent child abuse videos to others 479 times in the five-day period for which the Government recovered content. In doing so, he expanded the harm his victims suffered. It is impossible to quantify the downstream harm and spread of the files that resulted from May's choice to distribute those files so freely.

May distributed abuse videos to users in 18 states and six countries – the U.S., Canada, the U.K., the Netherlands, Romania, and Australia. The domestic distributions show the breadth of his scheme:



By distributing the files, May chose to amplify the abuse. Countless others have consumed these videos because May shared them broadly. In the process, May re-victimized the minors with each distribution, brought others deeper into child pornography, and propped up child abuse networks online. He did so despite the apparent suffering of the children in the videos. May was a prolific distributor, and his sentence must reflect that harm.

v. **Victim Impact**

Perhaps more than anything, May's sentence must reflect the severe harm May caused his victims. Nine victims submitted an impact statement (eight of whom May distributed), and an additional 12 were positively identified but did not submit statements. May distributed an

additional 40 victims' files and received and possessed files depicting one more. A sentence of 240 months is warranted given the victim impact.

### 1. <u>Words from May's Victims</u>

A portion of some of the victim statements are below. A 240-month sentence is necessary to reflect the severe victim impact, to punish and deter May, and to protect the public.

- <u>*Andy*</u>:[5] Andy wrote that he was between the age of 6 and 12 when the abuse occurred, and the fact that others receive and distribute his abuse files today "is something that I think about and have to deal with every day of my life." "There is not one day that goes by that I don't think, with hatred, about the sick and disgusting people who view, trade, save, and get off on my abuse when I was just a little kid and couldn't defend myself. It is sickening."

  The pain has gotten worse, not better, as time went on. "Now that I am over the age of 18, I am in more fear. I worry about these perpetrators coming after me and harming the children in my life. I think about this every day. Andy is harmed by the recirculation of his files, and he asked this Court for justice and to hold this defendant accountable.

- <u>*Dalmatian*</u>: "How do you tell a child whose been manipulated, terrorized, and victimized that everything will be okay, how do you tell the same child, tell the truth and justice will avail?" The pain remains. "It leaves a knot in your stomach and a hole in your heart that can never be fixed, anyone who says they understand how you feel, and has never had a child close to them sexually assaulted, can't even imagine until it happens to you, you have no idea. I don't know if a thousand years would make me feel like justice had been served."

- <u>*Taylor*</u>: Taylor made clear that the pain doesn't end. "The abuse stops, but the feeling of hurt and confusion never does. . . Over a decade later I still feel every bit of anger, confusion, emptiness, and sadness, and still have the fear of real intimacy . . . It's almost like I'm ashamed of myself because of what happened. Like I'm just damage goods; I can't be special to anyone because of my past."

  Taylor described an inability to live a normal life because others were still sharing the files. "Over a decade later, and ongoing till the end of time my story will be out there, and nothing makes a person feel so helpless than to know there is nothing you can ever do about it. Every one of those pictures and videos has my story in them; have the reason I can't live a normal live ever again in them. Who does that to a three-year-old? Who does that to anyone? I am so ashamed to be myself." Taylor went on to describe the impact "these ongoing crimes" have on Taylor's medical, mental health, work life.

- <u>*Pia*</u>: Pia described abuse from someone who was supposed to protect her. "I was just a toddler, when one day, fate stamped itself upon me. Just a young child that had no

---

[5] "Andy" is a pseudonym; the same is true for the rest of the victim names listed.

choice but to solely entrust my life to the hands of an adult. An adult who was supposed to protect me from harm, teach me right from wrong and love me."

"I have countless flashbacks that haunt me as I sleep. I am anxious and scared. I can't even leave the house alone. I am fearful of people.

Ongoing distribution magnifies the harm. "Child predators have saved and shared images and videos of my tiny body lying naked and contorted in provocative ways. My privates are no longer private. My smile, my laughter, and my innocence have all been taken from me. How I am portrayed in those pictures and videos is not how I want to be perceived. That little girl is dead."

It feels like "murder" to Pia each time offenders "download, view, save, and share my inappropriate pedophilia merchandise." She asks for accountability because it is the ones who continue to distribute her files who have caused her to seclude herself and avoid others as copping mechanism. "I feel that I am damaged beyond repair. I want the memories to vanish. Even when I'm truly dead the memories will still somewhere be in existence. The evolution of technology is my nemesis. I cannot escape the abuse, nor can the abuse escape me."

- _**Lily**_: Lily described healing from the original abuse, but how continued distribution has caused "unending grief." "Grief, anger, disgust, nightmares, difficulty trusting people I don't know well, these are all things I feel or experience regularly when I think of the CSAM activity, which is daily. I feel that I have healed quite as thoroughly as one can, from the original abuse, and I rarely think of it. What I do think about is who has seen these images of me and what have they done with them. Are they using them to harm or groom others? I know they have been used to make copycat versions of CSAM of me, but with other children here in the US and in other countries and it breaks my heart and makes me so angry. It makes me feel used constantly. It hurts how I view the public that so many perpetrators have been caught with these images. I also fear retaliation as there have been people in positions of power and prestige that have been caught with these images."

  "Knowing that images and videos of my sexual abuse as a child continue to be distributed on the internet causes me unending grief."

  The pain is worse now than it was when she was younger. "Yes, my experience is different than my experience of it ten years ago. I had assumed that it would affect me less by now than it does. … I feel more angry now than I used to. … My kids are around the ages that I was when sexually abusive things happened to me including the creation of CSAM; seeing how innocent my children are makes me understand more – not just how vulnerable I was – but also even more how sickening it is that perpetrators view the images of me being sexually abused at those ages. It hits me harder emotionally."

Three parents also submitted statements. One mother emphasized the pain that re-distribution causes her and her family. "These offenders are still victimizing and torturing her,

bringing pain and shame every time they look at those images of her. As her mother, I share this heartbreaking pain and the sadness this brings me is unending." *See* Lily's Mother's Statement. "They say time is a healer of all wounds, but I have yet to feel this pain subside." *Id*. The victim's father emphasized the same. "It sickens me and hurts me to the core knowing that so many perverts are viewing my little daughter as she was . . . molested and raped time and time again. I am heartbroken knowing that I couldn't protect my daughter. This father's heart is broken." *See* Lily's Stepfather's Statement. Another mother emphasized that the family cannot enjoy a family meal in public for fear that someone will recognize their daughter and intervene with their family. "I repeat, we are afraid for her physical and mental health. While out shopping or eating at a restaurant, we are constantly worried and afraid one of these online monsters would recognize her from videos." *See* Violet's Mother's Statement. Several victims said the same. May's distributions have caused "unending grief," in the words of one victim.

## 2. Research Corroborates Impact on May's Victims

Research confirms what May's victims have told this Court. Child victims of sex abuse have higher risks of suicidal behavior, drug addiction, and long-term "psychological difficulties […] ranging from depression and anxiety to sexual problems and dissociative symptomatology." JOURNAL OF CONSULTING AND CLINICAL PSYCHOLOGY, *Predicting the impact of child sexual abuse on women: The role of abuse severity, parental support, and coping strategies*, 992-1006, 1001 (2001); JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Dube, S. R., Anda, R. F., Felitti, V. J., Chapman, D. P., Williamson, D. F., & Giles, W.H., *Childhood abuse, household dysfunction, and the risk of attempted suicide throughout the life span: Findings from the adverse childhood experiences study,* 3089-3096, 3089 (2001).

In addition to higher rates of anxiety, disruptive behaviors, substance abuse, alcoholism, sexual maladjustment, interpersonal problems, educational difficulties, self-harm, loss of self-esteem, and criminal behavior, victims targeted by parents suffer particularly severe harm. One

study "found that sexual abuse perpetrated by father figures and involving genital contact and force was the most damaging child sexual abuse experience." Paolucci, E. O., M. L., & Violato, C. (2001), A meta-analysis of the published research on the effects of child sexual abuse. *The Journal of Psychology*, 135(1), 17-36. Those were the very type of files May sought and distributed.

"Child sex crimes are among the most egregious and despicable of societal and criminal offenses . . ." *United States v. Cobler*, 748 F.3d 570, 582 (4th Cir. 2014) (citing *Sarras*, 575 F.3d at 1220 (discussing how courts have upheld lengthy sentences in cases involving child sex crimes as substantively reasonable)). Deterrence is important for crimes involving the sexual abuse of children. *See United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007). "Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *See id*. The Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class..." *Smith v. Doe*, 538 U.S. 84, 103 (2003). May fits within that class. He has shown a persistent interest in child pornography. Hundreds of times over he sought out, received, possessed, and distributed abuse files. The requested sentence would deter May from returning to such behavior and it would send the right message to others who would consider the same. A sentence of 240 months is necessary to reflect the seriousness of the offense and to vindicate victim rights.

### vi.  Guilty State of Mind: May's Evasion

The extraordinary steps May took to avoid detection are a part of the nature and circumstances of the offense that show how deliberate and intentional his conduct was.

May knew what he was doing was illegal, but that didn't stop him. Instead, he took on increasingly elaborate steps that he hoped would keep agents from identifying him. He set up a fake name and identity—Eric Rentling—that he used for risky and illegal behavior. He travelled, communicated, and paid people using that name. He also set up accounts in fake names registered to burner e-mail accounts. As the scheme went on, he moved from connecting to the internet using

his home and cell phone connections to a VPN. And rather than using traditional platforms, he moved to end-to-end encrypted applications. He deleted applications and deleted files, so successfully that when agents extracted the device he used to traffic in child pornography, there were neither the videos nor cache files on the device.

None of that was an accident. All of it was by design. And the evasion shows that May knew what he was doing was illegal. May's evasion shows his deep commitment to the conduct. The nature and circumstances of May's offense support a 240-month sentence.

### b. May's History and Characteristics

May's history and characteristics, including his grave abuse of the public's trust, also support a 240-month guideline sentence.

### i. May's Abuse of Public Trust

At the same time May was operating his child pornography distribution scheme he was also a sitting member of the South Caroliana House of Representatives casting votes to criminalize and severely punish child pornography distribution. In public, he represented more than 41,000 Lexington County residents in the legislature; in private, he abused infants, toddlers, and pre-pubescent minors in child pornography. *See* Census Reporter at https://censusreporter.org/profiles/62000US45088-state-house-district-88-sc/ (last accessed December 26, 2025).

Through the office he held, the public relied on May to shape law and policy related to child protection. In public, he proudly embraced that role. "We as legislators have an obligation to ensure that our children have no harm done to them," May said in January 2024. *See* AP: Ex-Republican South Carolina House member admits to distributing hundreds of child sex abuse videos at https://apnews.com/article/sex-crimes-south-carolina-lawmaker-a580b0dd523986a01cab9770997b4f2a (last accessed January 7, 2026). He was a different man in private. One month earlier, in December, he downloaded Kik, and by March he was distributing

hundreds of child sex abuse videos over a five-day period. May's breach represents a severe betrayal of the public's trust. Unlike most defendants, May had options, influence, and authority. And with that, rather than choosing to protect children, he chose to harm them.

There is a particular hypocrisy in May's breach given the public positions he took on child protection issues, including by supporting enhanced criminal penalties for child pornography distribution. For example, at times overlapping with his own child exploitation scheme, he used his district's public office to vote for:

- *Gavin's Law* (H 3583), in April and May 2023, which established sextortion as a new criminal offense, with enhanced penalties for targeting children. The law was named after Gavin Guffey, a victim of child pornography and sextortion, who was the son of one of May's colleagues.[6]

- *Joint Citizens and Legislative Committee on Children* (S 299), in April 2023, updating a committee to research policy affecting children with the motto: "We believe how we treat children is the most accurate indicator of our state's future."

- *Child Welfare* (S 612), in May 2023, which required another state agency investigate suspected child abuse within 24 hours of observing suspected abuse of a child.

- *South Carolina Social Media Regulation Act* (H 4700), in January 2024, which was designed to protect children from, among other things, sexual material on social media applications, and subjected companies to investigations and financial penalties for causing certain harms to children.

- *Child Online Safety Act* (H 3424), in February 2024, which imposed new financial penalties for distributing child pornography and material depicting child sexual exploitation; the bill also required companies "age gate" certain websites to protect children from harmful sexual content online.

- *Child Sex Trafficking and Luring a Child* (S 142), in April 2024, which established the crime of luring a child into unlawful conduct. The bill also added sexual exploitation of a minor by force or coercion as a means by which one can violate the state sex trafficking statute, and it provided additional protections for victims of child sex trafficking.

---

[6] May's public votes on each of these can be found at the House of Representatives Journal Archives at https://www.scstatehouse.gov/ajournal.php (last accessed January 7, 2026). The text of the bills can be found at Legislation Search at https://www.scstatehouse.gov/billsearch.php (last accessed January 7, 2026).

- *Obscene Visual Representations of Child Sexual Abuse* (H 3045), in April 2025, which criminalized using AI to generate child pornography criminalized the distribution of such files, and required offenders be placed on the sex registry.

- *AI Child Abuse* (S 28), in May 2025, which is similar to H 3045 by adding as a criminal offense the creation of AI-generated child pornography and prohibiting the distribution of such files.

May of all people knew better. He was in a unique position to understand the harm and the consequences he would face, yet he still chose to distribute child pornography. Hundreds of times over. May's breach carries a particular risk of undermining confidence in public institutions. The way to protect against that risk is to impose a guideline sentence.

### ii. <u>Protection of the Public from May's Conduct</u>

Finally, despite having no convictions, May's history and characteristics support a guideline sentence.

Videos that May took and kept in his truck show how he harmed women in the commercial sex trade in Colombia. PSR ¶ 74-75. He travelled to Bogota and Medellin at least three times in 2023 and 2024 under the false name Eric Rentling. PSR ¶ 74. When agents searched May's truck, they found a Go Pro camera and a memory card in his truck, and saved on that memory card were videos of May having sex with at three young Hispanic females. PSR ¶ 75. In one video, May forced a female's head onto his penis as she resisted and tried to pull away; when she did, May slapped her in the face. *Id*. He then directed the woman to lie on the bed, he recorded her crying and wiping tears from her eyes, and he then got on top of her and engaged in intercourse. *Id*. In another, a female was seen rubbing her eyes from crying and grimacing in pain. *Id*. The agent who reviewed the videos noted that the three females' body structures were more petite than that of adult women and their breasts were undeveloped. *Id*. Despite a month-long effort, including

with agents on the ground in Colombia, HSI was unable to locate the women. *Id*. These stories are a part of May's history and characteristics.

And despite May's lack of conviction history, there is evidence of his disregard for the law. After he was charged, the South Carolina House Ethics Committee has investigated May. *See* https://www.scstatehouse.gov/CommitteeInfo/HouseEthicsCommittee/Fines%20And%20Reprimands/HEC%20Advisory%20Opinion%20for%20HEC%202025-01%20with%20Attachments.pdf ("Report on Investigation" or "ROI") (last accessed January 7, 2025). The investigation found that the South Carolina Department of Revenue ("DOR") has no record of May filing income tax returns in 2022, 2023, or 2024. ROI at 5, 21. DOR also has no record of Ivory Tusk Consulting— the business May owned and operated—paying taxes in any year, despite bringing in more than $600,000 over a several year period. *Id*. at 21. May's history shows a persistent disregard for the law, and a guideline sentence is warranted.

## VI. <u>Conclusion</u>

"There can be no keener revelation of a society's soul than the way in which it treats its children." *United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010). "Given the current statistics surrounding child pornography, we are living in a country that is losing its soul." *Id*. A 240-month sentence is necessary to reflect the seriousness of the offense, to protect the public from May, to deter May and others like him, and to vindicate victim rights.

May operated an abusive and degrading child pornography distribution scheme that harmed and continues to harm hundreds of children. He sought out minors being sexually abused by their parents, and when he found those files, he sent them to others. He chose to amplify and compound their abuse, and victims have told the Court that the harm is lasting. May did all this while voting to criminalize and severely punish child pornography distribution as a sitting member of the South Carolina House of Representatives. The Guidelines are substantial for good reason. The

Government respectfully requests a 240-month sentence, lifetime supervision to follow, and $73,000 in restitution.

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By: */s/ Elliott B. Daniels*
*/s/ J. Scott Matthews*
Elliott B. Daniels (Fed ID No. 11931)
J. Scott Matthews (Fed ID No. 13779)
Dean H. Secor (Fed ID No. 7315)
Assistant U.S. Attorneys
United States Attorney's Office
1441 Main Street, Suite 500
Columbia, SC 29201

Austin M. Berry
Trial Attorney
Child Exploitation & Obscenity Section
United States Department of Justice
1301 New York Ave. NW
Washington, D.C. 20005
Email: Austin.Berry2@usdoj.gov

January 9, 2026
Columbia, South Carolina