**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CR. NO. 3:25-778 (CMC)** |
| | ) | |
| **v.** | ) | **SENTENCING MEMORANDUM AND** |
| | ) | **MOTION FOR VARIANCE AND/OR** |
| **ROBERT JOHN MAY, III** | ) | **DEPARTURE FROM GUIDELINES** |
| | ) | |
| | ) | |

Now comes the defendant, Robert John May, III, by and through his attorney, and respectfully moves this Honorable Court to impose a sentence below the recommended Guidelines range pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a). According to the Presentence Investigation Report ("PSR"), Mr. May's total offense level is 37, pursuant to the United States Sentencing Commission, Guidelines Manual ("USSG"). PSR ¶ 86. His criminal history category is I. PSR, ¶ 86. This gives rise to an advisory Guideline range of 210-262 months.

Mr. May, or "RJ" as he is known by many, contends that a Guideline sentence is greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). He asserts that the sentencing factors found in 18 U.S.C. § 3553(a) justify this Court in sentencing him to a term of imprisonment below the applicable Guidelines range. Specifically, the Court should grant a downward variance based on the 3553(a) factors.

**APPLICABLE LAW**

In deciding whether to accept the sentencing recommendation outlined in the PSR, the District Court must consider the Sentencing Guidelines. Federal sentencing law instructs the district judge in every case to "impose a sentence sufficient, but not greater than necessary," to fulfill the goals of sentencing. 18 U.S.C. § 3553(a); *see, e.g., Kimbrough v. United States,* 552 U.S.

1

85, 101 (2007). In addition to the Sentencing Guidelines themselves, the court must look to "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "any pertinent policy statement[s]" of the Sentencing Commission, *id.* § 3553(a)(5); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6).

I.    **The nature and circumstances of the offense and the history and characteristics of the defendant;**

    a.    **History and Characteristics of the Defendant**

       i.    *RJ's Upbringing, Schooling, and Career*

After overcoming a traumatic childhood, RJ earned several degrees, opened a business, and held a public office.  Since facing these offenses, RJ has lost everything he cares about.  He will not raise his children; his divorce will soon be finalized; he resigned from his position as a state representative and will likely never again hold a public office; he is now a convicted felon; and he will have to register as a sex offender.  In a letter to the court, RJ expresses his deep and genuine remorse over his actions.  *See* Court Letter attached hereto as Exhibit 1.[1]  "My viewing and sharing of CSAM will forever haunt me despite it not reflecting who I was, who I am, or who I will be . . . . I take full responsibility for my actions and recognize they deserve punishment."  *Id.* He explains the profound losses he has already faced while on pre-trial detention and the raw emotions and guilt that consume him.  He explains:

> As a result of my crimes, and perhaps justifiably so, the life I had is forever foreclosed. My arrest marked the swift and total destruction of all my hopes and dreams. Every plan has been shattered. Every worldly possession is gone. I have been made penniless. My crimes have been published to a global audience. I have

---

[1] For the benefit of the court, defense counsel has typed out RJ's letter to the court so that it is legible and free from scratched-out sections and other blurring effects.  The hand-written version is available should the court request this version.

2

brought shame and embarrassment to friends and family alike. My wife has left me and I am now forced to face the hardships of life alone without the one I love. Inevitably, the memories my children have of me will fade. Soon the features of my face and sound of my voice will be unrecognizable to them. Each hour of my existence now drags slowly and fills my heart, mind, and soul with immeasurable sorrow. Hours have magnified into days and months into years. Each passing moment brings a new sadness that cuts deeper than its predecessor.

*Id.*

Prior to this investigation, RJ had worked his way through college, earned several degrees, and was living a modest life in Lexington County. Originally from Virgina, he was born in Newport News to Robert and Mary May in October of 1986. Neither of his parents graduated high school. His father, a self-employed landscaper, and his mother, a drug addict and alcoholic, began a bitter 13-year divorce in the early 1990s. As a result, the family home was eventually foreclosed upon and his father briefly incarcerated.

RJ's early childhood is a black hole. He recalls few memories before age eleven. Those he does recall are heartbreaking: watching his mother physically attack his father; discovering gallon-sized Ziploc bags of marijuana in his mother's bedroom; and being left alone overnight, having to cook for himself and his little sister, Megan May. PSR ¶ 67. Once their parents separated, RJ and his sister then began residing solely with their mother. *Id.* After losing the family home to foreclosure, RJ, Megan, and their mother moved into low-income housing. Though RJ tried to shield his sister from the violence he witnessed, they were both exposed to it. PSR at ¶ 70. While riding his bike one evening, RJ witnessed his first murder at age 12. A car stopped in front of a home, the passenger exited, walked to the front door, and rang the doorbell. When the door opened, gunfire erupted. A husband and wife lay dead. About a year later, RJ witnessed another murder. A man with a hunting knife stabbed another man in the stomach and fled. This time, RJ ran over to provide aid. He held towels to the dying man's wound until paramedics arrived. RJ recalls that he

testified at that murder trial. *Id.*

Things at home were not much better. RJ's mother, often absent from the home, became more violent with RJ, and her drug use became more severe. PSR at ¶ 68. RJ recalls finding drugs as well as paraphernalia, such as bent spoons with burn marks, in the home. *Id.* RJ and Megan were often left to fend for themselves when their mother vanished for days. When she was home, strangers frequented the house to purchase or deliver drugs. Food, despite being on government assistance, was scarce. RJ's mother often sent him out to sell food stamps for cash that she would use to fuel her ongoing addictions. When he was only eleven years old, RJ flushed his mother's marijuana down the toilet and confronted her about the lack of necessities around the home. *Id.* Consequently, she beat him with a broom stick and chased him with a kitchen knife, forcing him to take refugee in his bedroom. Three years of physical and mental abuse followed.

RJ's mother continued to abuse drugs during his early teens and when he attempted to intervene, she became physically violent towards him. *Id.* He remembers that at some point during this time, his mother tried to pressure him into selling drugs to his friends in order to support her addiction. *Id.* When he was fifteen, RJ was driving his mother home from a dope house because she was too intoxicated to drive. RJ came to a stop because a schoolbus was stopped and letting children off. An argument ensued over whether or not he was required to stop for the bus. RJ's mother then punched him in the face repeatedly while he drove. His mother's large costume jewelry busted his lip and chipped his tooth. That night RJ left his mother's home, moving in with his father and stepmother.[2] Megan remembers this event and says that RJ called law enforcement on his mother afterward, who gave RJ an ultimatum of moving in with his father or going into

---

[2] After leaving his mother's home, RJ had limited contact with his mother who died in 2020 from cirrhosis of the liver.

foster care since they'd responded to the home so many times. *Id.* Moreover, Megan recalls her mother being physically violent toward their father prior to their separation, and she further recalls that the violence was redirected towards RJ upon their separation. PSR at ¶ 69.

Once RJ was under his father's roof, he was finally in a stable home, and he reports that his father and stepmother did not add anymore trauma to his childhood. *Id.* Despite his troubled upbringing, RJ excelled in highschool where he was a member of the National Honor Society, maintained a near-perfect GPA, and graduated in the top 10% of his class. He was awarded a 4-year NROTC Marine Corps Option Scholarship to the University of South Carolina and left Virginia for the Palmetto State in 2005.

Shortly after entering into the NROTC program, RJ injured his back during military drill training. *Id.* Specifically, in 2005, he sustained a traumatic back injury: his L4 and L5 discs exploded into his spinal cord. That December, at 19 years old, RJ had his first of three back operations. It was unsuccessful. He underwent a second surgery in the spring of 2006. This surgery improved his symptoms, but RJ was unable to continue with military training.[3] He medically disenrolled from the program, and his scholarship was revoked. Unable to afford school without working full time, RJ held down a number of odd jobs to make ends meet—he was a line cook, campus security officer, lifeguard, armored car security officer, and customer service representative.

Prior to graduating, RJ earned the William Jefferson Clinton Scholarship in 2008 to study Middle Eastern Studies at the American University of Dubai. *Id.* He returned to USC in early

---

[3] Beginning at age 19, RJ has had three lumbar back surgeries. *See* Medical Records attached as Exhibit 4. His last surgery was in 2018. *Id.* His surgeries include operations on L4-L5, L5-S1, and L3-L4. Id. He has continued to have back pain and spasms from time to time. *Id.* He has also had UCL repair on his hand. *Id.*

5

2009 and graduated that spring, earning two Bachelors of Arts degrees in Political Science and Criminal Justice.  RJ is a Phi Beta Kappa and a Magna Cum Laude graduate. Between 2009 and 2012, RJ entered politics and worked for a number of campaigns and organizations.  In 2012, RJ earned a Rotary Ambassadorial Scholarship to attend Tel Aviv University in Tel Aviv, Israel. *Id.* During his time in Tel Aviv, he earned a Master's degree in security and diplomacy, which he completed in 2013. *Id.* He also volunteered at refugee camps in Palestine and toured rotary clubs during that time period. *Id.* Upon returning home, RJ started and began to operate his own marketing and consulting firm, Ivory Tusk Consulting. RJ married Elisabeth May in 2015 and they have had two children since then, ages seven and three.[4]  In 2020, RJ was elected to the South Carolina House of Representatives, and he resigned in September of 2025.

### ii.  RJ's Family Support and Acts of Service

CSAM cases are difficult across the board, and for all involved.  However, these offenses are one part of who RJ is as a person.  Before these charges, RJ was a happily married father of two.  He has been described as a model student, funny, smart, reliable, talented, a hard worker, devoted to his family, protective, caring, and thoughtful.  *See* Support Letters from Family Members attached as Exhibit 2. All of RJ's family members are shocked over this case, but many still love and support RJ.  As indicated above, RJ was a protective older brother to Megan and came to the aid of others in the neighborhood where he grew up.  As a rising senior, RJ applied for and received an NROTC scholarship because he wanted to dedicate his life to the defense of our nation through military service. Unfortunately, his multiple back surgeries prevented him from achieving his dream.

---

[4] Upon entering a plea, RJ was served with divorce paperwork.

6

Still having the desire to serve, RJ pivoted from military service and worked in a congressional office, the governor's office, and as a campus safety officer. He earned numerous scholarships that sent him overseas to foster a greater understanding of different cultures and nations. While abroad, RJ engaged in a number of community service projects including volunteering in refugee camps and raising funds and supplies to provide necessities to the children of migrant workers. Additionally, RJ has participated in various volunteer activities here at home. He organized the effort to supply the troops at Fort Jackson with eclipse glasses in 2015; he participated in "Real Men Read;" and provided the local elementary school with an ice cream party. As indicated above he recently served in the South Carolina House of Representatives.

Letters from his family also indicate RJ's dedication to overcoming obstables and service. RJ's Aunt Debbie describes him as compassionate, selfless, kind, and empathetic. *Id*. His Aunt Laurie explains how RJ excelled in sports, school, and church and that he is intelligent and hardworking. *Id.* She also explains that RJ cared for his grandfather (her father) in his last days, even bathing and shaving him. *Id.* RJ's Aunt Lisa says that he has been supportive of multiple generations of the family not only emotionally but physically and monetarily as well. *Id.* She says that he conducted large family gatherings including home improvement projects for family members. *Id.* Most importantly, his Aunt Lisa explains that RJ's crimes are not indicative of who he is nor who he will become. *Id.* His Aunt Maryann explains how shocked she was to find out about the instant offense and says that RJ has always been kind, considerate, and a gentleman. *Id.* She futher states that she believes RJ has the "capacity to find and exhibit the good deep within himself." *Id.*

RJ's sister, Megan, writes about how they grew up with a large amount of ACEs (Adverse Childhood Experiences) and how they grew up in poverty. *Id.* She indicates that there was serious

neglect and abuse in the home with their mother and that RJ protected her in these situations. *Id.* She recalls a time in their youth when RJ witnessed a murder, and his first instinct was to protect her from seeing the aftermath. *Id.* She goes futher to state that he protected her in many instances from witnessing traumas that he had to witness. *Id.* Megan explains that this care for her extended into their adulthood as he drove six hours to make a dozen freezer meals for her upon the birth of her first child. *Id.*

RJ's stepmother, Karen, who helped raise him starting in his mid-teens, writes about his horrible childhood prior to coming into her home. *Id.* She states that her and her husband (RJ's father) attempted to gain custody of the children years prior to finally receiving it due to them learning about the "very cruel" behavior from their mother. *Id.* She details how RJ excelled in school and says he was a "model student" who was active in his political aspirations. *Id.* She describes him as funny, smart, and reliable and discusses how shocking these instant charges are for their family. *Id.* Karen says that the example this Court has been given of RJ is not the son that she knows and that he can give the world so much more than he has given. *Id.* Further, she discusses how she suspects that the demons RJ has been carrying came from the abusive relationship with his mother at such a young age. *Id.*

Finally, RJ's father, Robert, who has been in shock throughout this process at the instant offenses and has stood by RJ despite the things he has continually read in the news, has written a letter on his son's behalf. *Id.* Robert admits his confusion and sadness over RJ's actions but believes that RJ has an opportunity at redemption. *Id.* He says that RJ will have a support team of friends and family upon release because of the man they all know: a decent, giving man. *Id.* He states that he believes RJ has had a "long and tumultuous addiction to pornography and a childhood overshadowed with a mother who" tried to "destroy her own children." He further describes RJ as

8

being a loving father who taught, nourished, and protected his own children. *Id.* Robert discusses how RJ had a dream to serve this country that began early in high school and that it was directed towards the marines since RJ wanted to follow in the footsteps of his grandfathers. *Id.* He talks about how the loss of this dream likely affected him more than anyone else knows. *Id.* Robert recalls himself saving an article about RJ being one of the top ten South Carolinians to keep an eye on once he entered politics. *Id.* Robert also says that he is already making plans for RJ's recovery and says that he will work on their rural Virginia farm. *Id.*

**b. Nature and Circumstances of the Offense**

On September 29, 2025, RJ pled guilty to five counts of distribution pursuant to a written plea agreement.[5]  Though it is beyond difficult to explain his ultimate conduct, RJ has accepted responsibility for his actions and in looking back on his actions recognizes that he had (or still has) addition problems.  Like so many of us, RJ was addicted to screens whether because of work or family obligations.  Furthermore, he admits he was also addicted to viewing pornography on those screens.  Specifically, in his letter to the court, RJ states:  "If I am honest with myself and the Court, I had addiction to screens and pornography. It was more serious than I thought and led to a horrible place I never imagined it would go. For that, I am deeply sorry." Exhibit 1.

RJ also had certain health issues that contributed to this addiction.  Medical records show that he began testosterone treatment on March 8, 2022. *Id.*  Doctors prescribed RJ testosterone injections, and, over time, they increased the amount of the injections.  *Id.*  On August 31, 2023, doctors found that his testosterone levels were very high and began reducing the amount he was

---

[5] RJ entered his plea after electing to represent himself or go *pro se*.  It was important to RJ to write a motion to suppress in a certain way. In making the decision to represent himself, he was always polite, respectful, and appreciative of the Federal Public Defenders and staff who worked on his case.

taking though a significant dose was still prescribed. *Id.*[6] Due to the increased amount of testosterone, RJ experienced an increased sex drive and began to watch pornography even more than ever. This pornography addiction eventually led to a dark place he did not foresee it going.

Returning to his actual conduct, put succinctly, RJ is guilty of trading various images and videos of child pornography through Kik, a messaging app that allows users to send texts, photos, and videos to specific contacts. RJ did not create any images, sell any images, or build an organized or curated collection of the images. He did not disseminate the images to minors, solicit images from minors, or communicate with minors.

The Guidelines nevertheless treat his offense as if he were among the most culpable offenders, despite the absence of aggravating factors such as production, exploitation of a minor in his care, or long-term collection behavior. RJ is not the typical child sexual abuser, producer, or predator whom Congress and the Sentencing Commission had in mind when crafting the highest guideline ranges. The Guidelines here function less as a measure of just punishment and more as a mechanical escalation driven by outdated and harsh enhancements. For these reasons, the Court should limit reliance on the advisory range.

Numerous courts, scholars and even the Sentencing Commission have recognized the absurdity of the child pornography guidelines. Therefore, the Court should impose a sentence that reflects proportionality, fairness, and the individual circumstances of the case. Public discourse often collapses "child-pornography offender" into "child molester" or "pedophile." This belief

---

[6] In addition to these medical issues, he also has a plethora of other diagnoses, to include: a bifid uvula, a hepatomegaly in 2020, hypertension, obstructive sleep apnea for which he uses a CPAP machine, psoriasis, a right bundle branch block, malaise, and other diagnoses. *Id.* In addition to his physical diagnoses, he also suffers from situational anxiety and depression. *Id.* These diagnoses have clearly impacted him negatively during his pretrial detention, often causing him to cry for significant periods of time, which is noted in a letter from a fellow inmate. *See* Attached Letters.

10

persists although studies "support[] the view that while child molesters may possess child pornography, those that possess child pornography are generally not likely to engage in contact offenses against children." Melissa Hamilton, *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?*, 22 STANFORD L. & POL'Y REV. 545, 580 (2011). The current guideline structure does not reliably separate lower-culpability, online-only possessors from dangerous offenders. Using a range calibrated by enhancements that apply to almost everyone obscures the real question under § 3553(a): This court must determine a sentence is sufficient, *but not greater than necessary*, for RJ's actual conduct.

As indicated above, this case involved trading various images and videos of child pornography.  The government has failed to provide any basis to treat RJ as a hands-on danger. The empirical literature and the Commission's own data confirm that a non-production conviction does not, by itself, imply pedophilic disorder or a propensity for contact offending. A guideline range of 210-262—a range driven by enhancements the Commission says over-apply—therefore overstates both culpability and risk. A substantial downward variance is warranted to achieve a sentence that is reasonable and "sufficient, but not greater than necessary."

*i. The Child Pornography Guidelines Are Disproportionately Harsh*

As explained above, the advisory guideline governing non-production child pornography offenses, USSG. § 2G2.2, has been the subject of sustained criticism from courts across the country.[7] Unlike most guidelines, § 2G2.2 did not result from empirical study or the Sentencing

---

[7] "The unreasonable harshness of the Guidelines for an offense of child pornography possession, of which defendant is charged, has been recognized by courts and judges from across the country." *United States v. D.M.*, 942 F. Supp. 2d 327, 348 (E.D.N.Y. 2013). *See, e.g.*, *United States v. Pulsifer*, 469 Fed. Appx. 41, 44 (2d Cir. 2012) (describing the "unusually harsh impact of the child pornography Guidelines"); *United States v. Stone*, 575 F.3d 83, 97 (1st Cir.2009) (expressing the "view that the sentencing guidelines [for child pornography] are in our judgment harsher than

Commission's exercise of its characteristic institutional role, but rather from successive congressional directives that ratcheted penalties upward without regard to proportionality or offender characteristics. *See* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, Nat'l Fed. Defender Sentencing Res. Project 15 (2009).[8] The result is a framework that routinely produces sentences greater than necessary, fails to distinguish meaningfully among varying degrees of culpability, and can lead to "irrational" and "anomalously harsh" ranges. *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010). In light of this widespread judicial recognition, courts are justified in treating § 2G2.2 with caution and exercising their discretion under §3553(a) to impose sentences that better reflect fairness, proportionality, and the individual circumstances of the case.

The structure of § 2G2.2 exacerbates its harshness by relying on a series of overlapping enhancements that apply in nearly every case. Enhancements for use of a computer, age of the minor victim, and the number of images possessed were originally intended to separate the most culpable offenders from the rest. In practice, however, these factors now describe the least aggravating case. In a 2021 report, the Sentencing Commission found that in fiscal year 2019, the enhancement for use of a computer applied in 95% of cases, the enhancement for images of prepubescent minors applied in 99.4% of cases, the enhancement for images of sadomasochistic

---

necessary"); *United States v. Henderson*, 649 F.3d 955, 964 (9th Cir. 2011) (Berzon, J., concurring) (describing the "unjust and sometimes bizarre results" that follow from application of the child pornography Guidelines); Jelani Jefferson Exum, *What's Happening with Child Pornography Sentencing?*, 24 Fed. Sent'g Rep. 85, 89 (2011) ("growing consensus among district court judges and the broader legal community that federal sentences for possession of child pornography are too harsh"); U.S. Sent'g Comm., Results of Survey of U.S. Dist. Judges, Jan. 2010 through Mar. 2010, Question 8 (June 2010) (finding that 70% of United States District Judges believe Guideline range for child pornography possession is too high and 69% of United States District Judges believe range for child pornography receipt is too high).
[8] Available at https://neiliabiden.com/childrapeisok.pdf.

content applied in 84% of cases, and the enhancement for having 600 or more images applied in 77.25% of cases. *See e.g.* USSC, Federal Sentencing of Child Pornography: Non-Production Offenses 31 (2021) [hereinafter "2021 Child Pornography Report"].[9] Thus, nearly every offender today uses a computer; nearly every offender possesses thousands of images given the ease of digital storage; and distribution is often found even in cases involving no commercial purpose or profit. As a result, enhancements that were meant to aggravate only exceptional conduct instead apply mechanically and drive sentences to the highest ranges, regardless of individual circumstances. Courts have recognized that this piling-on effect strips the Guideline of its intended nuance, inflates advisory ranges to levels more appropriate for producers or hands-on offenders, and undermines the goal of proportional punishment.

These inherent enhancements are also illogical in light of the statutory maximum. As the Honorable Judge Hayden pointed out, having established a 20-year maximum sentence for a violation of § 2252(a), "Congress could not have intended for the average first-time offender with no criminal history to receive a sentence of 210-240 months." *United States v. Grober*, 595 F. Supp. 2d 382, 393 (D.N.J. 2008). And in the years following the Sentencing Commission's 2012 Report to the Congress: Federal Child Pornography Offenses, numerous courts have recognized that the child pornography guidelines are "outdated and disproportionate" by granting variances substantially below the recommended guidelines range. USSC, Report to the Congress: Federal Child Pornography Offenses 1 (2012) [hereinafter "2012 Child Pornography Report"].[10] *See e.g., United States v. Archer*, 6:15-CR-132-BHH (D.S.C. 2016) (60 months); *United States v. Dooley*,

---

[9] Available at https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses (last visited January 9, 2026).
[10] Available at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses (last visited January 9, 2026).

8:19-CR-533-BHH (D.S.C. 2023) (time served); *United States v. Tumbusch*, 7:21-CR-164-TMC (D.S.C. 2023) (time served); *United States v. Hensley*, 0:19-CR-310-MGL (D.S.C. 2022) (36 months); *United States v. Kingman*, 8:20-CR-768-DCC (D.S.C. 2022) (60 months); *United States v. Zambrano-Flores*, 8:20-CR-222-TMC (D.S.C. 2021) (60 months); *United States v. Payne*, 3:11-CR-232-CMC (D.S.C. 2011) (84 months); *United States v. Hawkins,* 4:18-CR-6007 (E.D. Wa. 2020); *United States v. Garcia*, 19-CR-793-JMF (S.D.N.Y. 2021); *United States v. Kirschenmann*, 2:21-CR-635 (D.N.M. 2021); *United States v. Young*, 1:19-CR-109 (W.D.N.C. 2021); *United States v. Danos*, 6:19-CR-282-RRS-PJH (W.D. La. 2021); *United States v. Finigan*, 3:19-CR-053 (D. Nev. 2020); *United States v. Keskin*, 17-CR-077-RBD (M.D. Fl. 2017); *United States v. Trent*, 17-04065 (W.D. Mo. 2017); *United States v. Jennings*, 15-CR-275 (D. Vt. 2015); *United States v. Zofchak*, 14-CR-20538 (E.D. Mich 2015); *United States v. Carswell*, No. 2:13-cr-00055-MHT-CSC, 2013 WL 12116243 (M.D. Ala. 2013); *United States v. Hall*, No. 12-CR-20119 (W.D. Tenn. 2013).

The total offense level here is the result of these ubiquitous enhancements: two levels because the material contained images of children under twelve, USSG § 2G2.2(b)(2); five levels for exchanging materials with others, USSG § 2G(b)(3)(B); four levels because the materials depicted "sadistic or masochistic conduct or other portrayals of violence," USSG § 2G2.2(b)(4); two levels for using a computer or online service to possess or access the material, USSG § 2G2.2(b)(6); and five levels because the offense involved 600 or more images, USSG § 2G2.2(b)(7)(D). Taken together, these enhancements elevate the case of a person who is not physically dangerous into one that, under the Guidelines, is treated as involving highly aggravated physical criminal conduct. Such a sentence eviscerates all any notion of fundamental fairness. Moreover, RJ is receiving enhancements for factors of his offense that are inherent elements of the

crime itself (receipt and distribution) or that give this court jurisdiction over the matter (use of a computer).

### ii. The Sentencing Commission's Alternative Framework To Sentencing Non-Production Child Pornography Offenders

The most recent pertinent analysis issued by the Sentencing Commission is the 2021 Child Pornography Report which updates and expands upon the Sentencing Commission's 2012 Child Pornography Report. The 2012 Child Pornography Report analyzed offenders sentenced under the federal child pornography sentencing guidelines and their corresponding statutes to assess how these offenders were prosecuted, sentenced and supervised following their reentry into the community. One reason the Commission was prompted to examine child pornography offenses was due to an increase in the percentage of sentences imposed below the guideline range in non-production child pornography cases, which reflected courts' belief that the sentencing scheme for offenders was "overly severe." 2012 Child Pornography Report, at 1. Furthermore, the changes in technology dramatically increased the accessibility and volume of child pornography images which resulted in an insufficient sentencing scheme that failed to adequately distinguish between production and non-production child pornography offenders. *Id.* After an extensive study which examined the sentencing outcomes and resulting disparities, the Commission concluded that the child pornography sentencing guidelines had "no rational basis." *Id.* at 13. These disparities were largely a result of the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today ("PROTECT") Act of 2003, which amended the guidelines to add new sentencing enhancements and mandatory minimum penalties. *Id.* at 9. However, due to technological advancements, enhancements that were intended to apply to the most serious offenses were applied to all offenders, including most non-production offenders. *Id.* Based on its findings, the

15

Commission recommended that three factors be considered when imposing sentences in non-production pornography cases:

> 1) the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology);
> 2) the degree of an offender's engagement with other offenders — in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and
> 3) whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

*Id*. at 320.

The 2021 Child Pornography Report provides updated data regarding content, community, and conduct; examines the evolution of technology since the 2012 Child Pornography Report and its impact on offender conduct and applicability of sentencing enhancements; and analyzes recidivism of non-production offenders. The Commission found that while the average sentence recommended by the federal guidelines for nonproduction offenses rose from 98 months in 2005 to 136 months in 2019, the actual sentences imposed by judges increased more gradually—91 months to 103 months. 2021 Child Pornography Report, at 5. Conversely, the percentage of nonproduction offenders who received sentences below the guideline range have increased exponentially as well—16 percent to 59 percent. *Id*. These trends "indicate[] that courts increasingly believed the sentencing scheme for such offenders was overly severe." *Id*. at 1. Again, the Commission concluded that the sentencing guidelines "have not kept pace with technological advancements" and have resulted in sentencing disparities among similarly situated offenders. *Id*. at 4. Furthermore, the Commission analyzed 1,093 nonproduction child pornography offenders who were released from prison in 2005 and found that 3.3% had been arrested for a non-contact

sex offense and only 1.3% had been arrested for a contact sex offense. *Id*. at 65. Thus, there was only a 4.3% chance of sexual recidivism among these offenders. *Id*. The Commission concluded § 2G2.2 "no longer effectively differentiates among offenders in terms of either the seriousness of the offense or culpability of the offender." *Id*. at 69.

The 2021 Child Pornography Report echoed the 2012 Child Pornography Report's recommendation that courts focus on the three factors that are not accounted for in the guidelines: content, community, and conduct. Application of these factors to RJ warrant a substantial downward variance.

First, no evidence indicates that RJ possessed a collection of pornography. The images were retrieved from Kik records. According to Samsung's website, the cache on a phone is not a permanent storage system chosen by the user, but rather a temporary data storage area. *See Samsung*, *How do I clear the cache on my device?* https://www.samsung.com/uk/support/mobile-devices/how-do-i-clear-the-cache-on-my-device/ (last accessed January 12, 2026). Its purpose is to make the device run more efficiently by saving small pieces of data that may be reused later. *Id*. When a person visits a website or opens certain applications, the phone automatically saves a temporary copy of the page's contents—including images—without the user actively downloading, saving, or organizing them. These files will appear in the phone's cache even if the person did not intend to keep them, and even if they never went back to look at them again. Importantly, this process is automatic and not a deliberate act of collection. A typical offender in child exploitation often demonstrates collection behavior—intentionally downloading, categorizing, or archiving images and storage behavior—saving files in folders, external drives, or cloud accounts. RJ, by contrast, did not create a collection, did not save images in albums or folders, and did not store them for future access.  Furthermore, records indicate that he permanently

deleted the KIK application in April of 2024, never reinstalling the application.

Second, though RJ shared images, this happened over a very short period of time. There is simply no evidence that RJ has been involved in an exchange community for an extended period of time—the government has not produced months or years' worth of Kik activity. Additionally, there is no evidence RJ used other applications known to enable CSAM distribution, such as peer-to-peer ("P2P") file-sharing software or forums. P2P file-sharing platforms allow users to connect directly to one another's computers to exchange digital files. In the child pornography context, these programs have long been recognized as common tools for offenders who deliberately seek out large collections of images and videos, often trading them to gain access to more material. *See United States v. Clifton*, 587 F. App'x 49, 54 (4th Cir. 2014). Participation in P2P networks is significant because it demonstrates intentional engagement with an online community built around the sharing of illicit content. RJ, however, never used P2P file-sharing software, and there is no evidence he joined such networks. His conduct is far removed from offenders who cultivate and reinforce deviant interests through organized online networks.

Third, RJ has absolutely no history of any hands-on, exploitative, or predatory sexual conduct. This is one of the strongest indictors of risk and culpability. There is no evidence whatsoever of any hands-on contact, attempted contact, or risk behavior towards children.

Therefore, in light of the framework articulated by the United States Sentencing Commission in its June 2021 report on non-production child-pornography offenses—specifically the three dimensions of content, community, and contact—it is clear that RJ falls at the lowest end of the spectrum across all three dimensions. The content was minimal and not affirmatively saved; there was no active participation in any online offender community; and he has no history of any prior contact conduct. Imposing a guideline sentence of 210-262 months—designed for offenders

with large collections, deep community immersion, and contact behavior—would treat this case as indistinguishable from the most aggravated. Such a result would be inconsistent with the Commission's own recommendations and the mandate of 18 U.S.C. § 3553(a) that the punishment be "sufficient but not greater than necessary."

## II.    The need for the sentence imposed—

### a.  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

RJ acknowledges the seriousness of his offense and is deeply remorseful, embarrassed, and ashamed of his conduct.  He knows the devastating consequences of his conduct—which mean he will not be able to parent his children or engage in the kind of work he so loved.  While the Court must impose a sentence that "afford[s] adequate deterrence to criminal conduct," it is not necessary to imprison RJ to a significant period of time to accomplish that goal.  As indicated above, RJ has already faced collateral consequences of his actions.

> Never again will I witness the smiles of my children on Christmas morning. Never again will I place money under their pillows in exchange for a lost tooth. Never again will I tuck them in and read a bedtime story. I'll never be invited to my daughter's tea parties in the living room. And I'll never get to cheer my son on from the stands of his soccer matches.

> I have been plunged into a darkness previously unimaginable. So torturous are the thoughts, I now understand how one decides having no life is better than the life they have and welcoming death as a permanent relief, an eternal sleep freeing them from the pain and troubles of their own existence. The extent of my pain is beyond the power of vocabulary to describe. So torturous are the thoughts of life without my wife and children. I now understand how one welcomes death as a permanent relief, freeing them from the punishment and troubles of their own existence.

Exhibit 1.

His time in pre-trial detention has been akin to torture.  He details the conditions of his pre-trial detention thoroughly in his letter:

> I now spend 24 hours a day alone, at least 23 of which are in a 96 square foot cell.

19

I have been reduced to an alphanumeric entry reflecting the housing unit and room I am assigned: Delta 1. The cell has a thin mat, small desk, toilet, and sink. A camera above the door records my every move. A narrow 4-inch-wide window provides an obstructed view of a wall mounted television and the empty day room devoid of life.

Lights illuminate my cell 24 hours a day. Only the sounds of slamming doors, security checks, and screams break the silence. I eat, sleep, wash up, and use the restroom all within an area smaller than a parking space. The cold and bare walls continually close in.

Every meal I've eaten has been consumed in isolation, served through a small door flap that otherwise remains closed. Fellowship has become foreign.

When provided out-of-cell time, it is at most an hour and by myself. I am expected to shower, exercise, and use the information kiosk within 60 minutes. Part of that time can be spent on the "yard", an empty outdoor cage with a concrete floor and 30 foot high walls that block out the sun.

Unlike general population inmates, my placement in isolation prevents me from accessing razors or nail clippers. I cannot possess books or magazines, I cannot attend church or engage in programming. My human interaction is limited to brief words with corrections officers and shouting to other inmates through a heavy solid steel door or through air vents.

*Id.*

Despite the horrible conditions of his confinement, RJ has been helpful and encouraging to others confied at the same facility. Two inmates have submitted letters on RJ's behalf. *See* Inmate Letters attached as Exhibit 3. Both indicate that they can speak to one another through the airvents. Further, they write that RJ reads them a Bible verse every night before they go to bed. One inmate writes that RJ talks about his children and misses them. The other inmate writes that he can often hear RJ crying through the vent, and he knows RJ has a lot of remorse for what he did. Finally, RJ has made the most of having access to a tablet by completing numerous rehabilitative and educational classes and reading several books. *See* Handwritten List of completed courses attached hereto as Exhibit 5.

Returning to the just punishment factor, in addition to the consequences RJ has already

experienced, he will face significant hurdles after he serves his sentene.  Not only is RJ now a felon, he will have to register as a sex offender upon his release from incarceration.  Further, he faces a lengthy period of supervision. These collateral consequences alone serve as a deterrent for others.  A significant variance in his sentence, followed by an appropriate period of supervision, will constitute adequate punishment for RJ and serve as a forceful, tangible reminder to the community of the seriousness of the offense.

       **b.  To afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant;**

RJ's risk of recidivism is low based on the above studies from the sentencing commission. He will receive treatment specifically tailored for sex offenders while imprisoned and will age while serving his sentence, further reducing his risk of recidivism.  Moreover, RJ has made a plan for his release which includes parameters so that this will never happen again.

RJ cannot and will not return to the same environment in which he committed his offense. Instead, upon his release, he will reside on the family farm in rural Virginia. The land's only human occupants are his parents. The property has no internet access or cable television. There are no schools, daycares, malls, parks, arcades, movie theaters, or playgrounds for miles. Further, RJ plans to build a tiny home next to his parents' dwelling. While incarcerated he has completed a design plan and will – with a few exceptions – complete the build himself.  Furthermore, Virginia State Police Regional Headquarters is located close to the farm where RJ can fulfill his mandatory sex offender registry reporting.  Additionally, mental health providers, who RJ will continue his treatment with after release, are a thirty-minute drive away.

RJ's plans to revive his father's landscaping business and expand it to include pressure washing, asphalt sealing, and line stripping. Earning an income will enable RJ to begin payment

21

of the restitution he owes and provide monetary support for his children. RJ has outlined the expenses associated with restarting the business, and he notes the startup cost will be minimal because the majority of the necessary equipment—vehicles, trailers, hand tools, power tools, etc.— were purchased long ago and remain in good condition. RJ will continue to work on a comprehensive business plan while incarcerated. His treatment, time in the BOP, and parameters of his release will ensure he does not recidivate and guard the public's safety.

### c.  Unwanted Sentencing Disparities

18 U.S.C. § 3553(a) provides that the court should consider the need to avoid unwarranted sentencing disparities among defendants with similar records that have been found guilty of similar conduct. In light of the increase in prosecutions involving CSAM distribution cases, the defense has pulled recent sentences in similarly situated cases.

This court has granted variances in distribution cases, likely noting the harsh and dated rubric in calculating the sentencing guidelines. In the 2018 case of *USA v. Bigelow*, 0:17-cr-01200-CMC-1 (D.S.C. 2018), this court varied to a sentence of 90 months where Bigelow's guideline range was 151-188 months. There, Bigelow was also trading CSAM via KIK. Like RJ, Bigelow has no criminal convictions and was a zero-point offender. This court imposed a similar sentence in the case of *United States v. Payne*, 3:11-cr-00232-CMC (D.S.C. 2011), varying to 84 months. Like Bigelow, Payne faced a guideline range of 151-188 months. In the case of *United States v. Wyatt*, 3:12-cr-00899-CMC-1 (D.S.C. 2012), this court sentenced Wyatt to 70 months imprisonment after he was indicted for possession of child pornography and distribution of it. Notably, Mr. Wyatt entered a plea to possession rather than distribution.

Other defendants have faced lowered sentences, even sentences of time served, when they were allowed to enter a plea to the lesser-offense of possession of child pornography rather than

distribution of it. In one such case, Judge Norton sentenced Mr. Jenkins to time served. *See United States v. Jenkins*, 9:13-cr-00286-DCN-1 (D.S.C. 2013). Jenkins pled to possession of CSAM but was initially charged with both possession and distribution. Judge Norton also sentenced Mr. Daniel to time served in a similar cases. *See United States v. Daniel*, 2:16-cr-00938-DCN (D.S.C. 2016) (where Daniel entered a plea to the lesser offense of possession but was indicted on both possession and distribution of child pornography). Judge Hendrix sentenced Mr. Archer to sixty months imprisonment after he pleaded guilty to possession of CSAM but was also initially charged with both possession and distribution. *See* United States v. Archer, 6:15-cr-00132-BHH-1 (D.S.C. 2015).

Other districts within the Fourth Circuit have imposed similar sentences and variances. *See e.g., United States v. Limon*, 1:20-cr-00047-MOC-WCM-1 (W.D.N.C. 2020) (sentencing defendant to 72 months imprisonment after he entered a plea to two counts of distribution); *United States v. Morris*, 5:13-cr-00063-RJC-DCK-1 (W.D.N.C. 2013); (where defendant received a 60 month sentence for transporting child pornography and possession); *United States v. Andrews*, 1:15-cr-00054-RDB (Maryland 2015) (sentencing Andrews to a 72-months sentence after he entered a plea to distribution of child pornography); *United States v. Turner*, 3:18-cr-00129-REP-1 (E.D.V.A. 2018) (sentencing Turner to a 60-month sentence for distribution of child pornography); *United States v. Sirry*, 7:17-cr-00074-MFU-1 (W.D.V.A 2017) (sentencing Sirry to 60 months imprisonment for receipt and distribution of child pornography); *United States v. McCort*, 1:17-cr-00053-JRR-1 (D. MD. 2017) (imposing 60 month sentence after McCort entered a plea to distribution).

Given the sentences imposed in the above cases, a significant variance would not create a sentencing disparity but would be consistent with previously imposed sentences, considering all

of the 3553(a) factors. Sentencing courts are varying well below the applicable guideline range when imposing sentences in these types of cases.

### d. The kinds of sentences available pursuant to 18 U.S.C. § 3553(a)(3)

The only kind of sentence realistically available to RJ is a lengthy term of imprisonment. The Bureau of Prison's policy will require him to serve 85% of his sentence at a minimum, and RJ will be prohibited from receiving programming credits under the First Step Act. The type of institution RJ will serve his sentence in depends upon a security point score combined with certain public safety factors.

It is widely known that sex offenders are typically subject to maltreatment in prison. The court in *United States v. Liwanag* referenced this maltreatment.[11] 372 F. Supp. 3d 68, 73 (E.D.N.Y. 2019). The court noted:

> The seriousness of the defendant's offense will likely result in an unsafe and challenging environment in prison. Sexual assault offenders are often at risk of violence at the hands of other inmates, since they are a "disfavored" group within prison populations. *See* Alice Ristroph, *Sexual Punishments*, 15 Colum. J. Gender & L. 139, 159–60 (2006) ("[S]ex offenders ... are subject to heightened abuse from both corrections officers and fellow inmates."); *see also* James E. Robertson, *A Clean Heart and an Empty Head: The Supreme Court and Sexual Terrorism in Prison*, 81 N.C. L. Rev. 433, 462 (2003) ("inmate norms call for the[ ] savage beating [of sex offenders convicted of victimizing children]"). He will presumably be required to spend time in solitary confinement or areas of increased security because prisoners "will often will go to great lengths to injure or even kill" sex offenders, especially those who have committed crimes against children. Dennis Giever, *Jails* in *Prisons Today and Tomorrow* 414, 448 (Joycelyn M. Pollock ed., 1997). Liwanag's time in prison will undoubtedly be difficult.

---

[11] In *Liwanag*, a 27-year-old was sentenced for sexual exploitation of a child. 372 F. Supp. 3d 68. That defendant recorded some of these interactions and posted some on the internet for others to view. *Id.* Liwanag had a criminal history category of I, and his offense level was 43. *Id.* This produces a guideline range of life imprisonment. Though he faced a 30-year maximum sentence, the district court imposed a 15-year sentence. *Id.* The government did not appeal. *Id.*

*Id.* RJ is facing a lengthy sentence and completing it will most certainly be in a challenging environment. The court should consider his inability to earn programming credits, his required registration as a sex offender, his lengthy (if not lifetime) term of supervised release, as well as the challenging environment he will be forced to survive in when imposing his sentence.

### e. The need to provide restitution to any victim of the offense.

There are several victims in this matter seeking restitution from RJ. Defense counsel has reached out to every attorney representing these victims to express RJ's genuine remorse over his actions and his sincere desire to pay restitution in full. RJ will face many, many challenges upon his release from prison. Notably, he qualified for a federal publid defender and upon his release he will not have any available assets. In an effort to put RJ in a position to actually pay restitution to these victims, defense counsel has contacted all attorneys who represent the victims in an effort to negotiate down requested restitution—these efforts acknowledge the realities RJ will face upon his release and will hopefully enable him to make full restitution to all the victims. Furthermore, a significant variance will enable RJ to start making restitution payments and fulfil other financial obligation to his own family.

In addition to restitution, RJ has a sincere desire to help eradicate child pornography through his actions. He believes he can use his unique and devastating experience to deter others from possessing and disseminating CSAM. By being open and honest about his failures, RJ can be a cautionary tale about the consequences of CSAM. He further hopes to be an example to other felons that successful reintegration into the community is possible. RJ has started working on a proposal for this non-profit which he plans to continue developing during his time in the BOP.

### CONCLUSION

Cases that involve sex offenders are especially devastating on victims, but they are also

25

devastating for families of the defendant and the defendants.  Losses to defendants are quick and profound.  Their futures are shattered.  RJ May deserves to be punished, but the law requires the court to impose a sentence that is just and proportional to his conduct. Federal Sentencing Guideline render incomprehensible numbers in these cases. These sentencing ranges are standardized, disproportionate, wholly unreasonable. RJ has experienced profound loss.  He will not return to the home and family he knew.  He will not be a father to his children.  His sin and shame has been broadcast throughout the country.  He is shattered.  Based on the reasoning set forth above, the collateral consequences of his crimes, the safety parameters that will be in place upon his release from the BOP, and the treatment he will receive within the BOP, the only reasonable sentence is a sentence substantially below the recommended guideline range.

          Respectfully submitted,

                                        s/Jenny D. Smith
                                        Jenny Draffin Smith
                                        Jeremy A. Thompson
                                        Assistant Federal Public Defender
                                        Federal Public Defender's Office
                                        1901 Assembly Street, Suite 200
                                        Columbia, South Carolina 29201
                                        (803) 765-5076
                                        Attorney ID No. 10803
                                        Attorney ID No. 10342
                                        jenny_d_smith@fd.org
                                        Jeremy_thompson@fd.org

Columbia, South Carolina
January 12, 2026.