IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| United States of America,<br><br>    v.<br><br>Robert John May, III,<br><br>    Defendant. | Cr. No. 3:25-778-CMC<br><br><br>**MEMORANDUM OPINION** |

On January 14, 2026, the court sentenced former state representative Robert John May, III to 210 months' imprisonment after he pleaded guilty to five counts of distributing child pornography. *See* 18 U.S.C. § 2252A(a)(2), (b)(1). At sentencing, the court sustained May's objection to the application of a five-level enhancement under U.S.S.G. § 2G2.2(b)(7) for an offense involving 600 or more images of child pornography. This memorandum explains the court's reasoning.

**I.     Background**

In May 2024, the National Center for Missing and Exploited Children received a tip from Kik, a mobile messaging application, that an account with the username "joebidennnn69" had shared child pornography on its platform. The IP address associated with the account traced to an AT&T subscriber in West Columbia, South Carolina.

The tip was routed through the South Carolina Attorney General's Office to the Lexington County Sheriff's Department, which served search warrants on AT&T and Kik. AT&T records identified May as the subscriber linked to the IP address,

and Kik records showed that the joebidennnn69 account had been created using a Samsung SM-G781U1 cell phone connected to May's home Wi-Fi network. Records from Kik further revealed that the account had distributed 220 unique videos of child pornography on 479 occasions between March 30 and April 4, 2024.

On August 5, 2024, federal and state law enforcement officers executed a search warrant at May's residence. During the search, officers seized various electronic devices, including a Samsung SM-G781U1 cell phone, which May acknowledged was his. A forensic examination of the phone revealed that the terms "joebidennnn" and "joehoe12368@gmail.com"—the email used to create the account—were stored in the phone's user dictionary. Investigators also confirmed that the joebidennnn69 account connected from May's home Wi-Fi network nearly 1,000 times before being deleted on April 4.

On June 10, 2025, a federal grand jury indicted May on ten counts of distributing child pornography, in violation of 18 U.S.C. § 2252A(a)(2), (b)(1). May subsequently pleaded guilty to five of the counts under a written plea agreement.

Ahead of sentencing, a probation officer prepared a presentence investigation report ("PSR") recounting May's offense conduct and criminal history. The PSR calculated an offense level of 37 and a criminal history category of I, yielding a sentencing range of 210 to 262 months' imprisonment. As relevant here, May objected to the PSR's application of a five-level enhancement under U.S.S.G. § 2G2.2(b)(7).

2

Section 2G2.2(b)(7) increases a defendant's offense level depending on the number of "images" involved in a child-exploitation offense:

(7) If the offense involved—

(A) at least 10 images, but fewer than 150, increase by 2 levels;

(B) at least 150 images, but fewer than 300, increase by 3 levels;

(C) at least 300 images, but fewer than 600, increase by 4 levels; and

(D) 600 or more images, increase by 5 levels.

U.S.S.G. § 2G2.2(b)(7).

The Guideline does not define "images" or explain how that term applies to videos. The Sentencing Commission's commentary, however, attempts to fill this gap. It defines "images" as "any visual depiction . . . that constitutes child pornography" and instructs that "[f]or purposes of determining the number of images" involved in the offense, "[e]ach video, video-clip, movie, or similar visual depiction shall be considered to have 75 images." *Id.* cmt. n.6. Applying this 75:1 ratio, the PSR attributed 35,925 images of child pornography to May (479 videos distributed × 75) and recommended the five-level enhancement.

In objecting to this enhancement, May argues the 75:1 rule should not be afforded deference because the plain meaning of the term "images" does not distinguish between videos and photos. In his view, one video should count as one image, the same as one photo. He alternatively argues that even if "images" is genuinely ambiguous, the commentary's rule that one video equals 75 images is not

3

a reasonable interpretation of the term. Either way, he asks the court to adopt a one-video-one-image calculation and attribute only 479 "images" of child pornography to his offense, not 35,925. The government in response concedes a "genuine ambiguity exists" as to the meaning of "images" and "how the term is to be applied to videos." But the government insists the five-level enhancement was properly applied because the 75:1 rule "falls within the bounds of reasonable interpretation" and the "character and context" of the commentary entitles it to deference.

## II.     Legal Standard

May's objection implicates the deference owed to Guidelines commentary, so the court applies the three-step framework set forth in *Kisor v. Wilkie*, 588 U.S. 558 (2019). *See United States v. Boler*, 115 F.4th 316, 322 (4th Cir. 2024). At step one of the *Kisor* analysis, the court asks whether the Guideline is "genuinely ambiguous" after "carefully consider[ing] [its] text, structure, history, and purpose." *Kisor*, 588 U.S. at 574–75. If no ambiguity exists, "there is no plausible reason for deference," and the court simply applies the plain meaning of the Guideline. *Id.* at 574–75.

But if the Guideline is genuinely ambiguous, the court proceeds to step two and considers whether the Commission's interpretation is "reasonable"—that is, whether it falls within the "zone of ambiguity" created by the text of the Guideline. *Id.* at 575–76.

Finally, if the Commission's interpretation is a reasonable one, the court then proceeds to step three and asks whether "the character and context" of the

4

commentary "entitles it to controlling weight." *Id.* at 576. Deference is warranted only if the interpretation represents the Commission's "official position," implicates its "substantive expertise," and reflects its "fair and considered judgment." *Id.* at 577–79 (internal quotation marks omitted).

**III.  Discussion**

    **A.  Section 2G2.2(b)(7) is genuinely ambiguous**

Starting with step one, the court concludes the meaning of "images" in § 2G2.2(b)(7) is genuinely ambiguous. "The term 'image,'" as the Sixth Circuit has recognized, "means different things in different contexts." *United States v. Phillips*, 54 F.4th 374, 382 (6th Cir. 2022). Depending on the situation, an ordinary English speaker could understand "image" to refer to a video or film. For example, a police officer reviewing surveillance footage might say, "The image is too blurry to make out the suspect's face." Likewise, after watching a particularly disturbing scene, a moviegoer might remark, "I can't get that image out of my head." In other contexts, however, "image" is naturally understood to mean a still picture. If a government website requires you to "upload an image" of your ID, no one would think to upload a video. And a frame shop that offers to "print and frame your favorite images" is clearly referring to photographs.

Dictionary definitions from around the time the image table was adopted reflect the same ambiguity. Some definitions do not distinguish between still and moving visual representations and thus permit reading "image" to include a video.

5

*See, e.g.*, *Image*, The New Oxford American Dictionary (2001) ("[A] visible impression obtained by a camera, telescope, microscope, or other device, or displayed on a video screen."); *Image*, Random House Webster's College Dictionary (2d rev. ed. 2001) ("[A] physical likeness or representation of a person, animal, or thing, photographed, painted, sculptured, or otherwise made visible."); *see also United States v. Roberts*, 787 F. Supp. 3d 219, 235 (E.D. Va. 2025) ("[D]ictionaries show that 'image' contains various means of displaying visual information, which can include *inter alia*, pictorially, photographically, as a statue, as a painting, or as a recording such as in video form.").

But other contemporaneous definitions suggest that an "image" is a static visual representation. *See, e.g.*, *Image*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("[A] visual representation of something" such as "a likeness of an object produced on a photographic material" or "a picture produced on an electronic display."); *Image*, Oxford English Dictionary (3d ed. 2009) ("A physical or digital representation of something, originally captured using a camera from visible light, and typically reproduced on paper, displayed on a screen, or stored as a computer file"; "any picture or graphic . . . in printed form.").

Relying on this latter understanding of the term, the Third and Eleventh Circuits have concluded that "image" unambiguously means "frame," such that each individual frame in a video constitutes a separate "image" for purposes of the enhancement. *See United States v. Haggerty*, 107 F.4th 175 (3d Cir. 2024); *United*

6

*States v. Kluge*, 147 F.4th 1291 (11th Cir. 2025). Under this approach, a 10-second video recorded at 24 frames per second, for example, would count as 240 "images."

The problem with this interpretation—apart from failing to account for countervailing evidence of the ordinary meaning of "image"—is that it is inconsistent with the structure and purpose of the image table. Congress added the image table to the Guidelines as part of the PROTECT Act, Pub. L. No. 108-21, 117 Stat. 650 (2003), to increase penalties "based on the amount of child pornography involved in the offense." H.R. Rep. No. 108-66, at 59 (2003). The structure of the table reflects this purpose, as a defendant's offense level increases at thresholds of 10, 150, 300, and 600 images. Yet if "'images' meant 'frames,' then possessing any video would nearly automatically vault the offender to the top of the range, thereby obviating the purpose of prescribing different levels." *Phillips*, 54 F.4th at 383. A 24 frame-per-second video of only 0.42 seconds would trigger a two-level enhancement, and "the video would need to be just 25 seconds long to warrant the maximum increased penalty" of a five-level enhancement. *Id.* Put simply, the deliberate structure of the image table indicates Congress sought to vary penalties based on appreciable differences in quantity, not "quarter-second differences" in video length. *Id.*

Adding to the ambiguity, as Judge Payne of the Eastern District of Virginia recently observed, the PROTECT Act amended the definition of "child pornography" in a way suggesting that a single video can constitute a single image. *See Roberts*, 787 F. Supp. 3d at 234–35. Under 18 U.S.C. § 2256(8)(B), "child pornography" means

7

"any visual depiction, including *any photograph, film, video, [or] picture* . . . of sexually explicit conduct, where . . . such visual depiction is *a digital image, computer image, or computer-generated image* that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct."

Judge Payne highlighted two features of the statute. First, it lists "photograph," "film," "video," and "picture" side by side in the singular, treating them as equivalent. Second, it contemplates that a photograph, film, video, or picture can itself be a "digital image, computer image, or computer-generated image." Judge Payne reasoned this language makes clear Congress intended a single video to count as one image for purposes of the enhancement, just like a single photograph or picture. *See Roberts*, 787 F. Supp. 3d at 234–35. Although the court does not share Judge Payne's conclusion in this regard, his analysis only underscores the ambiguity surrounding the text of § 2G2.2(b)(7).

\* \* \*

Having employed the traditional tools of interpretation, the court finds that the term "images" is genuinely ambiguous as used in § 2G2.2(b)(7). Therefore, the court turns to whether the commentary's 75:1 rule "fall[s] within the bounds of reasonable interpretation" of the enhancement. *Kisor*, 588 U.S. at 576 (internal quotation marks omitted).

8

### B.     The 75:1 rule falls outside the "zone of ambiguity"

Application Note 6(B)(ii) to § 2G2.2(b)(7) declares that "[e]ach video, video-clip, movie, or similar visual depiction shall be considered to have 75 images." U.S.S.G. § 2G2.2(b)(7) cmt. n.6(B)(ii). The government urges the court to defer to this commentary, arguing the 75:1 rule is a reasonable way to interpret the image table. But for the reasons ably explained by Judge Larsen in *Phillips*, the court concludes the Commission's 75-images-per-video ratio "cannot be derived . . . by a process reasonably described as interpretation." 54 F.4th at 390 (Larsen, J., concurring in judgment) (internal quotation marks omitted).

First, the commentary's use of the phrase "shall be considered" "is the language of a policy choice, not of interpretation." *Id.* at 388 (Larsen, J., concurring in judgment). By declaring that "[e]very video *shall be considered* to contain 75 images," "[t]he Commission has conjured a construction, rather than construed a text." *Id.*

Second, as a matter of ordinary meaning, no reasonable person would say that an "image" is 1/75th of a video. "There can be no thought of deference" when, as here, an agency's interpretation fails to "line[] up with one of" the "reasonable meanings" identified at step one of the *Kisor* analysis. *Kisor*, 588 U.S. at 581; *see also Phillips*, 54 F.4th at 389 (Larsen, J., concurring in judgment) ("A meaning that 'you will not find in any dictionary' is outside the 'zone of ambiguity.'" (quoting *United States v. Riccardi*, 989 F.3d 476, 479, 485 (6th Cir. 2021))).

9

Third and finally, a "specific numeric amount" generally cannot qualify as an "interpretation" of "nonnumeric language." *Phillips*, 54 F.4th at 389 (Larsen, J., concurring in judgment) (internal quotation marks omitted). The Commission's belief that one video should equate to 75 images may be wise as a matter of policy. But because the 75:1 ratio is unmoored from the text of § 2G2.2(b)(7), such a policy choice "belongs in the guidelines, not in the commentary." *Id.* at 388 (Larsen, J., concurring in judgment) (internal quotation marks omitted).

### C.    The rule of lenity applies

Faced with a genuinely ambiguous term in the Guidelines and an unreasonable interpretation by the Commission, the court believes this case calls for application of the rule of lenity. The rule of lenity is a "time-honored interpretive guideline," *Liparota v. United States*, 471 U.S. 419, 429 (1985), "requir[ing] ambiguous criminal laws to be interpreted in favor of the defendants subjected to them," *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion). Importantly, the Fourth Circuit has recognized that "[a]n ambiguous Guideline is also subject to the rule of lenity." *United States v. Mitchell*, 120 F.4th 1233, 1240 (4th Cir. 2024); *see also United States v. Nasir*, 17 F.4th 459, 474 (3d Cir. 2021) (Bibas, J., concurring) (explaining that "[e]ven though the Guidelines are advisory," courts "must still attend to the rule and its animating principles" because the Guidelines "exert a law-like gravitational pull on sentences").

10

As a tool of last resort, the rule of lenity applies only when, after consulting traditional canons of construction, "a reasonable doubt persists about a statute's intended scope." *Moskal v. United States*, 498 U.S. 103, 108 (1990).  Because such doubt remains as to the meaning of "images" in § 2G2.2(b)(7), the court "yield[s] to the rule of lenity" and breaks the interpretive tie in May's favor. *United States v. Hilton*, 701 F.3d 959, 969 (4th Cir. 2012) (internal quotation marks omitted).

## IV.     Conclusion

For these reasons, the court sustained May's objection to the PSR's imposition of the five-level enhancement under § 2G2.2(b)(7) and, instead, imposed the four-level enhancement for his distribution of at least 300 but fewer than 600 images of child pornography.

s/Cameron McGowan Currie<br>
CAMERON MCGOWAN CURRIE<br>
Senior United States District Judge

Columbia, South Carolina
January 15, 2026

11